1  R. Joseph Barton (Cal. Bar No. 212340)          Gregory Y. Porter (to be admitted *pro hac vice*)
   COHEN MILSTEIN SELLERS & TOLL PLLC              Ryan T. Jenny (to be admitted *pro hac vice*)
2  1100 New York Ave., NW                          BAILEY & GLASSER LLP
   Suite 500, East Tower                           1054 31st Street, NW, Suite 230
3  Washington, D.C. 20005                          Washington, D.C. 20007
   Telephone: (202) 408-4600                       Telephone: (202) 463-2101
4  Facsimile:  (202) 408-4699                      Facsimile:  (202) 463-2103

5  Joseph A. Creitz (Cal. Bar No. 169552)          Major Khan
   Lisa S. Serebin (Cal. Bar No. 146312)           MAJOR KHAN LLC
6  CREITZ & SEREBIN LLP                            1120 Avenue of the Americas
   250 Montgomery Street, Suite 1400               Suite 4100
7  San Francisco, CA 94104                         New York, NY 10036
   Telephone: (415) 466-3090                       Telephone: (646) 546-5664
8  Facsimile:  (415) 513-4475                      Facsimile:  (646) 546-5755

9

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12

13  CHRISTOPHER M. SULYMA,                     |  Case No:
    and all others similarly situated,         |
14                                             |  **COMPLAINT**
                Plaintiff,                     |
15                                             |  **CLASS ACTION**
                    v.                         |
16                                             |
17  INTEL CORPORATION INVESTMENT              |
    POLICY COMMITTEE, FINANCE                 |
18  COMMITTEE OF THE INTEL CORPORATION        |
    BOARD OF DIRECTORS, INTEL                 |
19  RETIREMENT PLANS ADMINISTRATIVE           |
    COMMITTEE, CHARLENE BARSHEFSKY,           |
20  FRANK D. YEARY, JAMES D. PLUMMER,         |
    REED E. HUNDT, SUSAN L. DECKER, JOHN      |
21  J. DONAHOE, DAVID S. POTTRUCK, RAVI       |
    JACOB,                                    |
22                                             |
23                Defendants,                  |
                                              |
24   and                                       |
                                              |
25  INTEL 401(K) SAVINGS PLAN and INTEL       |
26  RETIREMENT CONTRIBUTION PLAN,             |
                                              |
27                Nominal Defendants.          |

28

**TABLE OF CONTENTS**

**Page**

I. NATURE OF THE ACTION ........................................................................................... 1

II. JURISDICTION AND VENUE ...................................................................................... 5

III. PARTIES ....................................................................................................................... 6
    A.    Plaintiff ........................................................................................................... 6
    B.    Defendants ....................................................................................................... 6
        1.    Intel Finance Committee Defendants ............................................... 6
        2.    Investment Committee Defendants ................................................... 8
        3.    Administrative Committee Defendants ............................................. 9
        4.    Nominal Defendants ....................................................................... 10
    C.    Relevant Non-Parties .................................................................................... 10

IV. CLASS ALLEGATIONS ............................................................................................ 11
    A.    Numerosity and Impracticability of Joinder ................................................ 11
    B.    Commonality .................................................................................................. 12
    C.    Typicality ...................................................................................................... 14
    D.    Target Date Class .......................................................................................... 14
    E.    Diversified Fund Class .................................................................................. 14
    F.    Adequacy ....................................................................................................... 15
    G.    Rule 23(b)(1) ................................................................................................. 15
    H.    Rule 23(b)(2) ................................................................................................. 15
    I.    Rule 23(b)(3) ................................................................................................. 16

V. FACTUAL ALLEGATIONS ....................................................................................... 17
    A.    The Plans ....................................................................................................... 17
        1.    Intel Retirement Plan ....................................................................... 18
        2.    Intel 401(k) Plan ............................................................................. 19
    B.    Fiduciary Responsibility For Investment Of Assets .................................... 21
    C.    The Plans' Assets .......................................................................................... 23
        1.    Master Trust Investment Funds ...................................................... 23
        2.    The Retirement Plan and the Diversified Fund .............................. 25
        3.    The Intel TDPs ................................................................................ 26
            a.    The Investment Committee Implemented an Imprudent
                Allocation Model. ................................................................ 28
            b.    The Intel TDPs Have Underperformed. .............................. 30
            c.    The Intel TDPs Charge Very High Fees. ............................ 32
        4.    The Intel TDPs Imprudently Invested in Hedge Funds ................. 34
        5.    Hedge Funds and Private Equity Are Generally Not Suitable For
            Balanced Funds ............................................................................... 38
        6.    Risks and Costs of Hedge Funds and Private Equity ..................... 39
            a.    Hedge Funds. ...................................................................... 39
                (1)    Valuation Risk. ........................................................ 39
                (2)    Investment Risk. ...................................................... 40
                (3)    Lack of Liquidity. ................................................... 40
                (4)    High Fees. ................................................................ 40
                (5)    Lack of Transparency. ............................................. 42
                (6)    Operational Risks. ................................................... 42
            b.    Private Equity. ..................................................................... 43
                (1)    High Fees, Hidden Fees, and Inflated Fees ............. 44
                (2)    Valuation and Reporting. ......................................... 46
        7.    The Intel Fiduciaries Failed to Conduct an Appropriate Investigation ......... 47
            a.    The Performance of the Plans' Hedge Funds Portfolio in 2008
                Was Poor. ............................................................................. 47

**TABLE OF CONTENTS**

| | Page |
|---|---|
| b.     Published Reports Questioned the Value of Hedge Funds. | 48 |
| 8.     Intel Hires AllianceBernstein to Manage its TDPs and the Diversified Fund | 56 |
| 9.     Inadequate Disclosure of the Investments Underlying the Intel TDPs and Diversified Fund | 56 |
| VI. CLAIMS FOR RELIEF | 59 |
| COUNT I | 59 |
| COUNT II | 61 |
| COUNT III | 63 |
| COUNT IV | 64 |
| COUNT V | 66 |
| COUNT VI | 68 |
| VII. ENTITLEMENT TO RELIEF | 70 |
| VIII. PRAYER FOR RELIEF | 70 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Complaint

# I.  NATURE OF THE ACTION

1.     This is an action brought under Sections 502(a)(2) and 502(a)(3) of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and

1132(a)(3), by Plaintiff Christopher M. Sulyma on behalf of the Intel 401(k) Savings Plan ("401(k)

Plan") and the Intel Retirement Contribution Plan ("Retirement Plan") (collectively, "the Plans"),

and on behalf of certain participants in the Plans, for breaches of fiduciary duty by the fiduciaries of

those Plans, to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, or other appropriate

equitable relief pursuant to ERISA § 502(a)(3). Plaintiff claims that Defendants breached their

fiduciary duties by (a) investing a significant portion of the Plans' assets in risky and high-cost

hedge fund and private equity investments, and (b) adopting asset allocation models for participant

accounts that departed dramatically from prevailing standards employed by professional investment

managers and plan fiduciaries. As a result of these misguided and imprudent investment decisions,

the fiduciaries of the Plans caused the Plans and many of their respective participants to suffer

massive losses and enormous excess fees.

2.     Plaintiff, a participant in both Plans, seeks to represent two classes: (1) participants in

the 401(k) Plan and Retirement Plan whose accounts were invested in Intel target date portfolios

("Intel TDPs"); and (2) participants in the 401(k) Plan and Retirement Plan whose accounts were

invested in the Intel Global Diversified Fund ("Diversified Fund"). Plaintiff's account in the 401(k)

Plan was invested in the Intel Target Date 2045 "Fund" ("Intel 2045 TDP"). Plaintiff's account in

the Retirement Plan was invested in the Diversified Fund.

3.     The Intel Retirement Plans Investment Policy Committee ("Investment Committee")

was the fiduciary for both Plans responsible for choosing, managing, and monitoring the Plans'

investments. At least until earlier this year when it hired an investment manager, the Investment

Committee was responsible for and did: (1) create the Intel TDPs and Diversified Fund; (2) choose

and manage the asset allocation models for the Intel TDPs and Diversified Fund; and (3) choose and

manage the pooled investment funds (the "Investment Funds")[1] representing various asset classes and investment strategies to which the Intel TDPs and Diversified Fund allocated their respective investments.

4.      The Investment Committee created a suite of custom target date portfolios, the Intel Target Date Portfolios (or TDPs). The Intel TDPs are not actual "funds" as such but a set of allocation strategies directing participant accounts to several underlying funds, namely the Investment Funds, managed by the Investment Committee.

5.      The Investment Committee also created the Diversified Fund, which too is an asset allocation strategy, not an actual fund as such. The Diversified Fund was the sole investment available to the overwhelming majority of participants in the Retirement Plan, including Plaintiff. Like the Intel TDPs, the Diversified Fund allocated participant accounts to the Investment Funds.

6.      The Intel TDPs and the Diversified Fund invested in the same nine Investment Funds, each of which is structured as a so-called master collective trust: the Alternative Investments Fund, which invested largely in private equity investment partnerships ("Private Equity Fund") for most of the relevant period, Commodities Fund, Emerging Markets Fund, Global Bond Fund, Hedge Fund, International Stock Fund, U.S. Small Cap Fund, Stable Value Fund, and U.S. Large Cap Fund.

7.      The Plans and their respective participants invested in the Investment Funds pursuant to the asset allocation models adopted by the Investment Committee for the Intel TDPs and the Diversified Fund. In other words, the Investment Committee, not the Plans and their participants, chose the Investment Funds, managed the Investment Funds, and dictated the amount of the Plans' and participants' assets allocated to each Investment Fund via the Intel TDPs and the Diversified Fund.

8.      Through at least the first quarter of 2015, the Investment Committee was responsible for choosing the asset allocation models and Investment Funds for the Intel TDPs and the Diversified Fund. Beginning in 2011, the Investment Committee dramatically altered the asset

---

[1]The Plans and the Intel Minimum Pension Plan own a percentage of the assets in each Investment Fund.

allocation model for the Intel TDPs by increasing Intel TDP investments in hedge funds from about $50 million to $680 million, an increase of 1,300%.

9.  Similarly, the Investment Committee increased the Diversified Fund's exposure to hedge funds and private equity investments during 2009 through 2014. During this period the Diversified Fund's investment in hedge funds increased from about $582 million to $1.665 billion, an increase of approximately 286%; the fund's investment in private equity increased from about $83 million to $810 million, an increase of 968%.

10.  The Investment Committee's allocation decisions not only deviated greatly from prevailing asset allocation models adopted by investment professionals and plan fiduciaries, but also exposed the Plans and their participants to unreasonably costly and risky investments in hedge and private equity funds.

11.  The Investment Committee's decisions were imprudent because: (1) the allocations and investments of the Intel TDPs and the Diversified Fund were unprecedented departures from prevailing standards for the design and allocation of, respectively, target date funds ("TDFs") and balanced funds; (2) the Investment Committee knew or should have known that the asset allocation models and heavy investments in hedge funds and private equity would expose the Plans to the risk of substantial losses; and (3) the asset allocation models and heavy investments in hedge funds and private equity caused the Plans to incur significant fees and expenses as compared to professionally managed asset allocation funds and exposed the Plans to significant risks without commensurate reward.

12.  As a result of the Investment Committee's decisions, the Plans and their participants suffered hundreds of millions of dollars in losses during the six years preceding the filing of this Complaint as compared to what they would have earned if invested in asset allocation models consistent with prevailing standards for investment experts and prudent fiduciaries.

13.  The Intel TDPs have underperformed peer TDFs by approximately 400 basis points annually. Although Defendants failed to provide documents to Plaintiff disclosing the amount invested by the 401(k) Plan via Intel TDPs, the amount was estimated in June 2015 to be

approximately $3.63 billion.[2] Given the underperformance compared to peer TDFs, and the billions of dollars allocated to Intel TDPs, the Plans have lost hundreds of millions of dollars that they would have otherwise earned had the Intel TDPs been prudently allocated since 2011, when the Investment Committee implemented the current Intel TDP asset allocation model and contemporaneously increased the Intel TDPs' allocations to hedge funds.

14.     Similarly, the Diversified Fund has underperformed peer balanced funds.[3] From May 2007, when the Diversified Fund began investing in hedge funds and private equity, through May 2014, the fund underperformed a Vanguard balanced fund, the LifeStrategy Moderate Growth Fund (Ticker: VSMGX), by approximately 50 basis points (.50%) annually.[4] As of June 2015, the Retirement Plan invested the vast majority of its assets in the Diversified Fund – $5.82 billion out of $6.66 billion.[5] Thus, fifty basis points of underperformance annually between May 2007 and May 2014 translates into a loss of over $100 million. This underperformance is largely due to the massive allocations to hedge funds and private equity, almost $2.5 billion as of the end of 2014.

15.     Additionally, the Administrative Committee, which is responsible for making disclosures to the participants in the Plans, failed to adequately disclose to participants the risks, fees and expenses associated with investment in hedge funds and private equity. In fact, participants were

---

[2]"Intel Corp. moved to external management for two big investment options that house all of the alternative investments in its $14.85 billion defined contribution plans." Robert Steyer, *Intel hires manager for target-date, global funds*, Pensions & Investments (June 15, 2015), http://www.pionline.com/article/20150615/PRINT/306159980/intel-hires-manager-for-target-date-global-funds.

[3]A "balanced fund" is "[a] fund that combines a stock component, a bond component and, sometimes, a money market component, in a single portfolio." *Balanced Fund Definition*, Investopedia, http://www.investopedia.com/terms/b/balancedfund.asp (last visited October 15, 2015).

[4]Hunsberger, Brent, *What's inside Intel's retirement plans. Hedge funds. Lots of 'em.*, The Oregonian (Aug. 30, 2014), http://www.oregonlive.com/finance/index.ssf/2014/08/whats_inside_intels_retirement.html.

[5]"Intel Corp. moved to external management for two big investment options that house all of the alternative investments in its $14.85 billion defined contribution plans." Steyer, *supra* note 2. As of the end of March 31, 2014, the Diversified Fund had approximately 37.59% of its portfolio in commodities, hedge funds, and private equity. Of that, 67.39% was allocated to hedge funds, 17.56% to private equity and venture capital, 11.74% to commodities, and 3.31% to real estate. *401K Global Diversified Fund*, Oregonian Live at 1 (Mar. 31, 2014), http://media.oregonlive.com/finance/other/401K%20Global%20Diversified%20Fund.pdf.

1   given virtually no information about these investments other than that there were some hedge fund

2   and private equity investments. Even the information disclosed in filings with the Department of

3   Labor discloses merely the name of the hedge fund or private equity investment, the costs and last

4   year's value. Virtually nothing about the strategy, the risks, the fees or anything about underlying

5   investments was disclosed in anything that Defendants provided to or made available to participants.

6         16.     Accordingly, Plaintiff alleges claims on behalf of the Classes: (1) for breaches of duty

7   under ERISA § 404(a) by the Investment Committee in managing 401(k) Plan and Retirement Plan

8   assets in connection with the Intel TDPs, and breaches of duty by the Administrative Committee in

9   making inadequate disclosures related to the Plans, on behalf of the Plans and a class of participants

10  in the Plans whose accounts were invested in Intel TDPs from 2011 to the present; and (2) for

11  breaches of duty under ERISA § 404(a) by the Investment Committee in managing the Plans' assets

12  in connection with the Diversified Fund, and breaches of duty by the Administrative Committee in

13  making inadequate disclosures related to the Plans, on behalf of the Plans and a class of participants

14  in the Plans whose accounts were invested in the Diversified Fund from 2009 to the present.

## II.  JURISDICTION AND VENUE

16        17.     This Court has exclusive jurisdiction over the subject matter of this action under 29

17  U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(2) and

18  1132(a)(3).

19        18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

20  § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

21        19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

22  § 1132(e)(2), because, upon information and belief, most, if not all, of the individual defendants can

23  be found in this District.

24        20.     Intradistrict Assignment. Assignment to the San Jose Division is appropriate because

25  Intel is headquartered in Santa Clara County, where much of the complained of conduct occurred.

26

27

28

### III.  PARTIES

**A.**   **Plaintiff**

21.    Plaintiff Christopher M. Sulyma is a former employee of Intel Corporation and is a resident of New Mexico. Sulyma worked for Intel from June 2010 until September 2012. During his employment with Intel Sulyma was a participant, within the meaning of ERISA § 3(7), in the Intel Retirement Plan (n/k/a the Intel Retirement Contribution Plan) and a participant in the Intel 401(k) Savings Plan. As a result of his two years of employment, Sulyma partially vested in his account balance in the Retirement Plan. His account in the Retirement Plan was invested in the Diversified Fund. Sulyma was fully vested in his account in the 401(k) Plan. His account in the 401(k) Plan was invested entirely in the Intel 2045 TDP. As such, Sulyma is and continues to be a participant in the Intel Retirement Plan and the Intel 401(k) Savings Plan.

**B.**   **Defendants**

**1.**      **Intel Finance Committee Defendants**

22.    The Intel Finance Committee is responsible for appointing, monitoring, and removing the members of the Investment Committee and the Administrative Committee pursuant to Section 13(b) of the Plan Document for each of the Plans. Pursuant to Section 13(b), the Finance Committee has the power to remove any member of the Administrative Committee or the Investment Committee at will or "with or without cause" and the power to appoint any successor member. The Intel Finance Committee is comprised of members of the Intel Board of Directors. The Finance Committee is a named fiduciary to the Plans and is responsible for monitoring the Investment Committee and the Administrative Committee. Each member of the Finance Committee is also a fiduciary with respect to the Plans. The members of the Finance Committee during the relevant period are referred to as the "Finance Committee Defendants."

23.    **Charlene Barshefsky** has been a member of Intel's Board of Directors since 2004, has been a member of the Finance Committee continuously since 2007, and has served as the Chair of the Finance Committee since 2009. Ms. Barshefsky is currently a Partner of the law firm Wilmer Hale where she is the Chair of the International Trade, Investment and Market Access Practice

Group. She serves on the Boards of Directors of American Express Company, The Estee Lauder Companies Inc., and Starwood Hotels & Resorts Worldwide, Inc.

24.     **Susan L. Decker** has served on Intel's Board of Directors since 2004, and on the Finance Committee between 2009 and 2011. Ms. Decker was Intel's Chief Financial Officer from 2000 to 2007, and then President of Yahoo! Inc. from June 2007 to April 2009. Susan L. Decker lives in San Francisco, California.

25.     **John J. Donahoe** has served on Intel's Board of Directors since 2009, and on the Finance Committee in 2009. He worked as managing director of Bain & Company since 1982, becoming the firm's president and Chief Executive Officer ("CEO") in 1999. He became the president of eBay in March 2005, and has been CEO of eBay since March 31, 2008. He is a Member of the Advisory Board and Director of eVolution Global Partners, LLC, a global venture capital firm that specializes in early stage investments within the information technology and media sectors. Since 2009, he has been a Director of Skype Global S.a.r.l. and an Independent Director of Nike, Inc. since 2014. John J. Donahoe lives in Portola Valley, California and is the CEO and President of eBay in San Jose, California.

26.     **Reed E. Hundt** has been a member of Intel's Board of Directors since 2001, and a member of the Finance Committee since 2010. Mr. Hundt practiced law at Latham & Watkins from 1975 to 1993. He has been an advisor to the private equity firm Blackstone Group since 2010. He is also a Principal at REH Advisors, a business advisory firm.

27.     **James D. Plummer** has been a member of Intel's Board of Directors since 2005, and a member of the Finance Committee since 2006. James Plummer lives in Portola Valley, California. He is also a professor and the Dean of the School of Engineering at Stanford in Stanford, California.

28.     **Frank D. Yeary** has been a member of Intel's Board of Directors since 2009, and a member of the Finance Committee since 2009. Mr. Yeary is an international investment banker. Prior to 2004, he served as the global head of the Technology, Media and Telecom investment banking practice at Salomon Smith Barney. He served at Citigroup as the Global Head of Mergers and Acquisitions from 2004 to July 2008. Mr. Yeary serves as an Executive Chairman of CamberView Partners which describes itself as a "boutique advisory firm that provides public

companies with the advice and expertise they need to succeed with their institutional investors." He serves as a member of Executive Council at Cohesive Capital Partners, a co-investment firm that makes "direct investments alongside high quality private equity sponsors that are leading the transactions." *Why CamberView*, Camberview Partners, http://www.camberview.com/why-camberview/ (last visited October 15, 2015).  According to his Linked-in Profile, Frank D. Yeary lives in the San Francisco Bay Area and is co-founder and the Executive Chairman of an advisory firm, CamberView Partners, which is located in San Francisco.

   **2.**   **Investment Committee Defendants**

   29.   **Intel Retirement Plans Investment Policy Committee**. The Investment Committee is a named fiduciary for the Plans pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), with respect to the management and control of the Plans' assets, pursuant to Section 13(a) of the Plans. Pursuant to Section 13(a) of the Plans, the Investment Committee and its members have responsibility for asset management; designating and evaluating the designated investment alternatives offered to participants in the Plans; and managing and controlling the Plans' assets. The Investment Committee also has the authority to appoint and remove the Trustees for the Plans, as well as to appoint and remove one or more investment managers for the Plans. Each member of the Investment Committee is also a de facto fiduciary with respect to the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because each exercised discretionary authority or discretionary control with respect to management of the Plans and exercised authority or control with respect to management or disposition of the Plans' assets. The members of the Investment Committee during the relevant period are referred to as the "Investment Committee Defendants."

   30.   **Ravi Jacob** has been a member of the Investment Committee since at least January of 2010. Jacob is also a corporate vice president and the treasurer of Intel Corporation. As treasurer, Mr. Jacob manages Intel's cash and investments, capital markets activity, currency and other financial risks, credit and collections, retirement assets and risk and insurance. Ravi Jacob lives in the San Francisco Bay Area.

   31.   **David S. Pottruck** has been a member of Intel's Board of Directors since 1998. Mr. Pottruck has served as the Chairman of the Investment Committee since at least 2009. Mr. Pottruck

served in various senior executive positions at Charles Schwab Corp. from 1984 to 2004: President (6/1992-7/20/2004), COO (1994-09/1998), Co-CEO (1/1998) and CEO (5/9/2003-7/20/2004). He is the CEO and Chairman of Red Eagle Ventures, a Director of Joyent, Inc., a Director of Serve Virtual Enterprises, Inc., Chairman of the wealth management firm HighTower Advisors, LLC – which Pottruck helped launch in 2008 – and Chairman of CorpU. Pottruck is also a Senior Fellow and adjunct faculty at the Wharton Center for Leadership & Change Management. According to his Linked-In Profile, David S. Pottruck lives in the San Francisco Bay Area and is the Co-Chairman of HighTower Advisors, a wealth management firm and Chairman of Red-Eagle Adventures, both of which are located in San Francisco.

32.     **Does 1-20** are persons serving on the Investment Committee during the relevant period whose identities are unknown to Plaintiff. None of the disclosures provided to Plaintiff name all of the members of the Investment Committee, as such they are named as Does 1-20. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

### 3.     Administrative Committee Defendants

33.     **Administrative Committee**. The Administrative Committee is a named fiduciary with respect to the operation and administration of the Plans (except with respect to management or control of the Plans' assets) pursuant to Section 13(a) of the Plan Document of each of the Plans. The Committee and its individual members (collectively "Administrative Committee") were and are named fiduciaries for the 401(k) Plan and the Retirement Plan with respect to the operation and administration of the Plans. Pursuant to Section 13(e), the Administrative Committee was and is responsible for preparing and furnishing to participants a general explanation of the Plans and all other information required to be furnished to participants under federal law or the Plans, including disclosures regarding designated investment alternatives.

34.     **Does 21-40** are persons serving on the Administrative Committee during the relevant period whose identities are unknown to Plaintiff. None of the disclosures provided to Plaintiff name any of the members of the Administrative Committee, as such they are named as Does 21-40. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

**4.** **Nominal Defendants**

35.     The Intel Corporation 401(k) Savings Plan (the "401(k) Plan") is a defined contribution plan or individual account plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The written instrument of the 401(k) Plan within the meaning of ERISA § 402 was titled Intel 401(k) Savings Plan (As Amended and Restated Effective January 1, 2014). The Plan Sponsor of the 401(k) Plan within the meaning of ERISA § 3(16)(B) is Intel Corporation. The Plan Administrator of the 401(k) Plan within the meaning of ERISA § 3(16)(A) is the Intel Retirement Plans Administrative Committee.

36.     The Intel Retirement Contribution Plan, formerly known as the Intel Corporation Retirement Plan (the "Retirement Plan"), is a defined contribution plan or individual account plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The written instrument of the Retirement Plan within the meaning of ERISA § 402 was titled: The Intel Retirement Contribution Plan (As Amended and Restated Effective January 1, 2014). The Plan Sponsor of the Retirement Plan within the meaning of ERISA § 3(16)(B) is Intel Corporation. The Plan Administrator of the Retirement Plan within the meaning of ERISA § 3(16)(A) is the Intel Retirement Plans Administrative Committee.

37.     The Plans are "employee pension benefit plans" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

**C.** **Relevant Non-Parties**

38.     **Intel Corporation.** Intel Corporation is a multinational technology company headquartered in Santa Clara, California and is one of the world's largest and highest-valued semiconductor chip makers, based on revenue. According to Intel's 2014 Annual Report, Intel had over 106,000 employees worldwide as of December 29, 2014 with approximately 51% of those employees located in the United States. In the United States, Intel employs significant numbers of people in California, Colorado, Massachusetts, Arizona, New Mexico, Oregon, Texas, Washington and Utah.

39.     **The Intel Minimum Pension Plan.** The Intel Minimum Pension Plan, formerly known as the Intel Defined Benefit Pension Plan (the "DB Plan"), is a defined benefit plan or

individual account plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The DB Plan and the Retirement Plan operate as what is known as a "floor offset" arrangement, whereby the DB Plan provides the floor and benefits to be paid are offset to the extent that benefits under the Retirement Plan are greater than those provided by the DB Plan. The Plan Sponsor of the DB Plan within the meaning of ERISA § 3(16)(B) is Intel Corporation.

40.    **State Street Bank and Trust Company, Trustee ("State Street").** State Street is a trust company organized under the laws of the Commonwealth of Massachusetts. Effective January 1, 2010, State Street became the trustee for the Plans and the Master Trust, and thereafter held all of the assets of the Master Trust directly. State Street holds and invests the assets of the Plans, and thus is a fiduciary with respect to the Plans.

## IV.  CLASS ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

- All participants in the Intel Retirement Contribution Plan and the Intel 401(k) Savings Plan whose accounts were invested pursuant to an Intel Target Date Portfolio from 2011 to the present (the "Target Date Class").

- All participants in the Intel Retirement Contribution Plan and the Intel 401(k) Savings Plan whose accounts were invested in, respectively, the Intel Global Diversified Fund and the Intel 401(k) Global Diversified Fund from 2009 to the present (the "Diversified Fund Class").

42.    Excluded from the Classes are the following persons: (a) Defendants, (b) any fiduciaries of the Plans; (c) any officers or directors of Intel; (d) any member of the immediate family of and any heirs, successors or assigns of any such excluded party.

## A.    Numerosity and Impracticability of Joinder

43.    Joinder of all members of the Classes would be impracticable based on the size and geographic diversity of the members of the Classes. Based on the most recent Form 5500 filed with the Department of Labor for 2014, the 401(k) Plan had 63,518 participants and/or beneficiaries. Most of these participants had their Plan investments in or were defaulted to an Intel TDP, which

necessarily included hedge funds and private equity. Based on the most recent Form 5500 filed with the Department of Labor for 2014, the Retirement Plan had 50,718 participants and/or beneficiaries. The Diversified Fund was the only available investment for the vast majority of Retirement Plan participants during the Diversified Fund Period. According to Intel's website, it has locations in at least the following states: Arizona, California, Colorado, the District of Columbia, Idaho, Illinois, Kentucky, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, South Carolina, Texas, Virginia, Washington and Wisconsin. As such, the members of the Class are also geographically dispersed.

44.     The Target Date Class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations. The 401(k) Plan had billions of dollars in participant accounts allocated under the Intel TDPs, meaning that tens of thousands of participants must have had their accounts invested according to an asset allocation strategy set by the Intel TDPs and necessarily held interests in the Hedge and Private Equity Funds. During the Target Date Class Period many participants were defaulted into an Intel TDP. The number of Class members is so large that joinder of all its members is impracticable.

45.     The Diversified Fund Class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations. Participants under the age of 50 had to invest their accounts in the Retirement Plan in the Diversified Fund. During the Diversified Fund Class Period (2009 to present), approximately 99% of Retirement Plan assets were invested in the Diversified Fund. Therefore, virtually all of the Retirement Plan's participants, tens of thousands of persons, invested in the Diversified Fund and necessarily held interests in the Hedge and Private Equity Funds. The number of Class members is so large that joinder of all its members is impracticable.

**B.      Commonality**

46.     Plaintiff's claims raise common questions that will have common answers for each member of the Class with respect to liability and relief. Common questions of law and fact for both Classes include:

A.  Whether the Investment Committee was a named fiduciary for the Plans;

B.  Whether the Investment Committee's fiduciary duties included selecting and managing the Plans' assets;

C.  Whether the Investment Committee selected and managed the underlying funds to which the Intel TDPs and the Diversified Fund allocated the Plans' assets.

47.   Common questions of law and fact with respect to the Target Date Class include:

A.  Whether the Investment Committee breached its fiduciary duties to the Plans and their participants in constructing and managing the Intel TDPs;

B.  Whether the Intel TDP asset allocation models chosen by the Investment Committee for the Plans deviate and deviated from prevailing standards for target date funds;

C.  Whether the Investment Committee prudently selected and managed the underlying funds to which the Intel TDPs allocated the Plans' assets;

D.  Whether the Plans and their participants suffered losses as a result of the Investment Committee's fiduciary breaches; and

E.  Whether the Administrative Committee breached its fiduciary duties to the Plans and their participants by failing to make adequate disclosures about the Intel TDPs and the Investment Funds.

48.   Common questions of law and fact with respect to the Diversified Fund Class include:

A.  Whether the Investment Committee breached its fiduciary duties to the Plans and their participants in constructing and managing the Diversified Fund;

B.  Whether the asset allocation model chosen by the Investment Committee for the Diversified Fund deviates and deviated from prevailing standards for balanced funds;

C.  Whether the Investment Committee Defendants prudently selected and managed the underlying funds to which the Diversified Fund allocated the Plans' assets;

1         D.  Whether the Plans and their participants suffered losses as a result of the

2              Investment Committee Defendants' fiduciary breaches;

3         E.  Whether the Administrative Committee breached its fiduciary duties to the

4              Plans and their participants by failing to make adequate disclosures about the

5              Diversified Fund and the Investment Funds.

**C.**    **Typicality**

49.    Plaintiff's claims are typical of the claims of the Classes because his claims arise from the same event, practice and/or course of conduct as other members of the Classes. Plaintiff's claims challenge whether the fiduciaries of the Intel Plans acted consistently with their fiduciary duties and whether their breaches caused losses or otherwise harmed the Plans and their participants. These are claims common to and typical of other Class members. Moreover, these claims seek recovery on behalf of the Plans.

**1.**    **Target Date Class**

50.    As is the case with all participants in the Plans whose accounts were invested through an Intel TDP, the Investment Committee chose the asset allocation model, the asset Classes, and the funds representing the selected asset Classes for every Intel TDP, including the Intel 2045 TDP in which Sulyma invested in the 401(k) Plan.

51.    Plaintiff's claims are also typical of the claims of the Target Date Class because, like all members of the Class, his claims arise from the Administrative Committee's failure to provide complete and adequate disclosures to him regarding the Intel TDPs.

**2.**    **Diversified Fund Class**

52.    As is the case with all participants in the Plans whose accounts were invested through the Diversified Fund, the Investment Committee chose the asset allocation model, the asset Classes, and the funds representing the selected asset Classes for the Diversified Fund in which Sulyma invested in the Retirement Plan.

53.    Plaintiff's claims are also typical of the claims of the Diversified Fund Class because, like all members of the Class, his claims arise from the Administrative Committee's failure to provide complete and adequate disclosures to him regarding the Diversified Fund.

**D.**     **Adequacy**

54.     Plaintiff will fairly and adequately protect the interests of the Target Date Class. He is committed to the vigorous representation of the Class.

55.     Plaintiff will fairly and adequately protect the interests of the Diversified Fund Class. He is committed to the vigorous representation of the Class.

56.     Defendants do not have any unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Classes.

57.     Plaintiff has engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

**E.**     **Rule 23(b)(1)**

58.     The requirements of Rule 23(b)(1)(A) are satisfied in this case. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to uniformly act in the best interests of the Plans and their participants. As this action challenges whether Defendants acted consistently with their fiduciary duties to the Plans, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the fiduciaries of the Plans.

59.     The requirements of Rule 23(b)(1)(B) are satisfied in this case. Administration of an ERISA plan requires that all similarly situated participants be treated consistently. As such, whether Defendants fulfilled their fiduciary obligations with respect to the Plans and the Plans' participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**F.**     **Rule 23(b)(2)**

60.     The requirements of Rule 23(b)(2) are met in this action. Defendants have applied the same or substantially similar investment policies and investment options in the Plans that cover all members of the Classes. The breaches alleged against Defendants with respect to the Target Date Class and the Diversified Fund Class relate to policies that applied to, respectively, all members of

the Target Date Class and the Diversified Fund Class. As such, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole.

61.     The primary relief sought on behalf of the Classes is a determination that Defendants breached their fiduciary duties, a determination of the amount by which those breaches adversely affected the Plans rather than individual members of the Classes, and a consequent order requiring Defendants to make good those losses to the Plans. Such relief is accomplished by issuance of a declaration or an injunction and therefore the primary requested relief constitutes final injunctive or declaratory on behalf the Classes with respect to the Plans.

**G.   <u>Rule 23(b)(3)</u>**

62.     The requirements of Rule 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plans. Because Class members are those participants whose accounts were invested in the affected investments, common questions related to liability will necessarily predominate over individual questions. Similarly, as relief will be on behalf of and will flow to the Plans, common questions related to remedies and relief will likewise predominate over individual issues.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by many of the individual members of the Classes are likely small, particularly in relation to the cost to bring this litigation and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. The fiduciaries of the Plans have an obligation to treat all similarly situated participants similarly and are subject to uniform standards of conduct under ERISA; thus the members of the Classes have an interest in having this action proceed in a single action. As such, no Class member has an interest in individually controlling the prosecution of this matter.

64.     Plaintiff and his counsel are not aware of any other lawsuit filed by any member of the Classes concerning this controversy pending in any other court.

65.     This District is the most desirable forum for concentration of this litigation because of the following: (1) Intel is headquartered in this District; (2) a number of the actions challenged by this Complaint took place in this District, chiefly, on information and belief, Investment Committee

and Administrative Committee meetings; (3) the Plans are administered in or near this District;

(4) many of the employees of the company are located in or near this District; and (5) many of the

employees of Intel named as Defendants can be found in this District.

66.     Given the nature of the allegations, there are no difficulties likely to be encountered

in the management of this matter as a class action.

## V.  FACTUAL ALLEGATIONS

**A.      The Plans**

67.     According to Section 1 of both the Plan Document of the Intel Retirement Plan and

the Plan Document of the Intel 401(k) Plan, the Intel Corporation Profit-Sharing Retirement Plan

("the Profit Sharing Plan") was established in 1979 and is the predecessor plan of both the Intel

Retirement Plan and the Intel 401(k) Plan. The Profit Sharing Plan was amended and restated

effective on January 1, 1984 to permit Eligible Employees to contribute to the Plan through salary

deferrals. Effective January 1, 1996, the Profit Sharing Plan was bifurcated into two separate plans,

the Intel 401(k) Plan and the Intel Retirement Plan.

68.     The Retirement Plan was amended and restated effective January 1, 2011. Among

other changes, the 2011 amendments precluded employees who started employment on or after

January 1, 2011 from participating in the Plan and eliminated the provisions requiring that company

contributions be made from profits. The Retirement Plan was restated effective January 1, 2014.

During the Diversified Fund Class Period, the Intel Retirement Plan was maintained pursuant to the

Intel Retirement Contribution Plan Effective January 1, 2011. The Retirement Plan was again

amended and restated effective January 1, 2014 ("Retirement Plan Document").

69.     The Intel 401(k) Plan was amended and restated effective January 1, 2011. Among

other changes, the 2011 amendments added Employer Contribution Accounts generally for

employees who commenced employment on or after January 1, 2011. The 401(k) Plan was restated

effective January 1, 2014. During the relevant period the 401(k) Plan was maintained pursuant to the

Intel 401(k) Savings Plan Effective January 1, 2006, and subsequently, pursuant to the Intel 401(k)

Savings Plan Effective January 1, 2011. The 401(k) Plan was again amended and restated effective

January 1, 2014 ("401(k) Plan Document").

### 1.   Intel Retirement Plan

*Participation*

70.   Section 3(a) of the Retirement Plan provides that Eligible Employees are automatically enrolled in the Plan as soon as they become eligible to participate (as defined under the Plan). Effective January 1, 2011, the Retirement Plan was closed to new participants. Even though closed to new participants, the Retirement Plan continues to cover eligible employees. According to the 2014 Form 5500 filed August 16, 2015, the Retirement Plan had 48,272 participants with account balances and $6,722,726,892 in total assets as of December 31, 2014.

*Contributions*

71.   Section 4(a) of the Retirement Plan Document provides that Intel (and its affiliates that are Participating Companies) makes discretionary contributions to the Plan in such amounts as the Intel Board of Directors determines in its sole and absolute discretion. Eligible Employees do not and did not make contributions into the Intel Retirement Plan.

*Vesting*

72.   Section 8 of the Retirement Plan Document sets forth the Vesting and Forfeiture under the terms of the Plan. Pursuant to Section 8(a) and (b), Participants' interests become 100% vested and nonforfeitable upon the occurrence of any of the following: (a) attainment of age 60 (if they became participants after January 1, 1987) or age 55 (if they became Participants on or before January 1, 1987); (b) death; (c) total and permanent disability; (d) job elimination; (e) termination of employment as a result of a divestiture or formation of the Care Innovations Joint Venture. Section 8(c) of the Retirement Plan Document provide the following vesting schedule for a Participant who was an Employee on or after December 31, 2007:

| Completed Years of Service | Nonforfeitable Percentage |
| --- | --- |
| Less than 2 | 0 (Percent) |
| 2 but less than 3 | 20 (Percent) |
| 3 but less than 4 | 40 (Percent) |
| 4 but less than 5 | 60 (Percent) |
| 5 but less than 6 | 80 (Percent) |

6 or more                              100 (Percent)

73.     Section 8(c) of the Retirement Plan Document provides the following vesting

schedule for a Participant who was an Employee on or after December 31, 2007:

| Completed Years of Service | Nonforfeitable Percentage |
| --- | --- |
| Less than 3 | 0 (Percent) |
| 3 but less than 4 | 20 (Percent) |
| 4 but less than 5 | 40 (Percent) |
| 5 but less than 6 | 60 (Percent) |
| 6 but less than 7 | 80 (Percent) |
| 7 or more | 100 (Percent) |

74.     Throughout the Diversified Fund Class Period until January 1, 2015, the participants

in the Retirement Plan under the age of 50 were required to invest their accounts in the Diversified

Fund. According to Section 12(a) of the Plan Document, between January 1, 2007 and March 31,

2009, participants over the age of 50 could elect to invest their Plan accounts in an Intel TDP. As of

April 1, 2009, the Plan Document permitted participants over the age of 50 to elect to invest their

Plan accounts in an Intel TDP or in the Intel Stable Value Fund.

75.     Pursuant to the Second Amendment to Intel Retirement Contribution Plan, effective

January 1, 2015, participants in the Retirement Plan were allowed to elect to have their accounts in

the Plan invested in whatever funds or portfolios that the Investment Committee determined to make

available as an option.

**2.     Intel 401(k) Plan**

*Participation*

76.     Section 3(a) of the 401(k) Plan Document provides that Eligible Employees are

automatically enrolled in the Plan as soon as administratively practicable following 45 days after

becoming an Eligible Employee unless he or she affirmatively elects otherwise. According to the

2014 Form 5500 filed August 16, 2015, the 401(k) Plan had 62,838 participants with account

balances and $7,895,030,553 in total assets as of December 31, 2014.

*Contributions*

77. Section 4(a) of the 401(k) Plan Document provides that an Eligible Employee (i) may elect to have his or her taxable compensation reduced and corresponding Pre-Tax Deferrals contributed to the Plan up to the maximum percentage established by the Company; (ii) who is automatically enrolled in the Plan shall be deemed to have elected to make Pre-Tax Deferrals in an amount equal to 3% to 6% of the regular pay portion of his or her earnings absent an affirmative election otherwise and/or (iii) may elect to have Roth Deferrals contributed to Plan.

78. Starting in 2007, Intel began to automatically enroll employees who were eligible to participate in the 401(k) Plan but who had not yet enrolled, unless they opted out by affirmatively electing otherwise during a forty-five day opt-out period. According to Section 3 of the 401(k) Plan Document, such participants were deemed to have elected to contribute 3% of their regular earnings to their 401(k) Plan account, absent an affirmative election otherwise. This contribution then automatically increased by one percentage point each successive year, up to a maximum deferral of 10% of the participant's pre-tax earnings.

79. Pursuant to Section 3(a)(i) of the 401(k) Plan document, employees who became eligible to participate in the 401(k) Plan on or after January 1, 2013 were also automatically enrolled in the Plan. If such participants did not opt-out within a forty-five day opt-out period, they were deemed to have elected to contribute 6% of their regular earnings to their 401(k) Plan account, absent an affirmative election otherwise. This contribution then automatically increased by two percentage points each successive year, up to a maximum deferral of 16% of the participant's pre-tax earnings.

*Vesting*

80. Section 8 of the 401(k) Plan Document sets forth the Vesting and Forfeiture under the terms of the Plan. Pursuant to Section 8(a), Participants are 100% vested and nonforfeitable in their accounts in the Plan (other than their Retirement Contribution Accounts as explained below).

81. Pursuant to Section 8(a), Participants are 100% vested and nonforfeitable in their Retirement Contribution Account, representing the employer's contribution, in the Plan upon the occurrence of any of the following: (a) attainment of age 60; (b) death; (c) total and permanent

disability; (d) job elimination; (e) termination of employment as a result of a divestiture. Section 8(c) of the 401(k) Plan Document provides the following vesting schedule for a Participant:

| Completed Years of Service | Nonforfeitable Percentage |
| --- | --- |
| Less than 2 | 0 (Percent) |
| 2 but less than 3 | 20 (Percent) |
| 3 but less than 4 | 40 (Percent) |
| 4 but less than 5 | 60 (Percent) |
| 5 but less than 6 | 80 (Percent) |
| 6 or more | 100 (Percent) |

*Investment of Plan Assets*

82.     Pursuant to Section 12(a) of the 401(k) Plan document, participants in the 401(k) Plan may invest in the Funds established by the Investment Committee in such amounts as elected by the Participant.

83.     Pursuant to Section 12(a) of the 401(k) Plan document, participants in the 401(k) Plan who are automatically enrolled in the Plan pursuant to Section 3(a) and fail to make an affirmative investment election for their accounts are defaulted into the Intel TDP that corresponds with the Participant's age (i.e. that matches his or her anticipated retirement date) as determined by the Investment Committee.

84.     In 2011, Intel also mapped existing participant accounts in the 401(k) Plan into the customized Intel TDPs unless they opted out. According to a PIMCO DC Dialogue interview with Stuart Odell, in March/April 2014, as a result of this reallocation policy approximately two-thirds of existing participants were mapped into the TDPs.

**B.     Fiduciary Responsibility For Investment Of Assets**

85.     Pursuant to Section 13(f) of both Plan Documents, the Investment Committee, in accordance with the terms of the Plan and Trust Agreement, was responsible for designating and evaluating the Funds offered to Participants (including Funds designated at the default investment pursuant to Section 12(a)) and had all the powers necessary or appropriate to accomplish those purposes, including the following:

(i)      To appoint and remove, as it deems advisable, the Trustee;

(ii)      To appoint and remove, as it deems advisable, one or more investment managers pursuant to the provisions of the Trust Agreement, each of which (A) shall be (1) an investment adviser registered under the Investment Advisers Act of 1940; (2) a bank, as defined in the Investment Advisers Act of 1940; or (3) an insurance company qualified to manage, acquire, or dispose of qualified plan assets under the laws of more than one state; and (B) shall acknowledge in writing to the Investment Committee that such investment manager is a fiduciary with respect to the Plan;

(iii)      To conduct periodic reviews of the performance, costs, and expenses of the Funds, the Trustee, investment managers, and outside service providers;

(iv)      To establish and communicate to the Trustee and the investment managers from time to time its determination of the Plan's short- and long-term financial needs, so that the Trustee's and investment managers' investment decisions with regard to Trust Fund assets can be coordinated therewith; provided that such determination of the Plan's financial needs shall be consistent with the funding policies and methods adopted by the Company and in effect at the time of such determination;

(vii)      To directly enter into and confirm any investment transaction or to direct the Trustee pursuant to the Trust to enter into or confirm any investment transaction, in each case the term "investment transaction" shall include any investment permitted under the Trust, including, but not limited to, any investment in a partnership, limited liability company, unit investment trust, business development company, private equity fund, investment company (registered or otherwise) or other similar arrangement (whether publicly traded or otherwise) and, for all purposes under this Section 13, to exercise all other fiduciary powers relating to the management of Plan assets.

86.      Pursuant to Section 13(m) of both Plan Documents, the Administrative Committee and the Investment Committee were required to report to the Finance Committee at least annually and provide information necessary or appropriate to permit the Finance Committee to review the continued prudence of its appointments of the members of both Committees.

**C.    The Plans' Assets**

    **1.    Master Trust Investment Funds**

87.    The Plans' assets are invested in relevant part in nine master trust investment funds ("Investment Funds"). The financial statements attached to the 2014 Forms 5500 for the Investment Funds report the following holdings:

    (1)    Alternative Investments (aka Private Equity Fund): invests in over fifty private equity investment partnerships.[6]

    (2)    Commodities Fund: invests in two commodities funds and a commodities hedge fund.[7]

    (3)    Emerging Markets Fund: invests in two emerging market funds and two emerging market private equity funds.

    (4)    Global Bond Fund: invests largely in debt securities.

    (5)    Hedge Fund: invests in over twenty hedge fund investment partnerships.

    (6)    International Stock Fund: invests in two international stock funds and equity securities.

    (7)    Small Cap Fund: invests in three small cap funds and small cap equity securities.

    (8)    Stable Value Fund: invests in several guaranteed investment contracts and pooled separate accounts.

    (9)    U.S. Large Cap Fund: invests in four large cap equity funds.

88.    The Investment Funds are structured as Master Trusts. Some Investment Funds are structured as a fund-of-funds. Others invest in securities directly as well as in funds.

89.    Each fund within an Investment Fund buys, holds, and sells securities (or other assets) under the direction of an investment manager or investment advisor. At least until Alliance

---

[6]Early in the relevant period, the Alternative Investments Fund included hedge funds and commodities in addition to private equity. The hedge funds were subsequently broken out into two hedge funds of funds, an Absolute Return Fund and a Long Short Fund in 2010. Then, in 2011, the Investment Committee merged these two funds of funds into the Hedge Fund while at the same time increasing the number of hedge fund managers and increasing the Plans' investments in hedge funds from approximately $750 million to approximately $1.86 billion.

[7]The Commodities Fund was added in 2010.

1  Bernstein was hired as Investment Manager in 2015, the Investment Committee selected the funds,

2  investment managers, advisors, and securities for the Investment Funds.

3  90.  The Investment Funds represent the various asset Classes to which the asset

4  allocation portfolios in the Plans, namely the Intel TDPs and the Diversified Fund, allocated the

5  Plans' and participants' assets.

6  91.  An asset allocation fund is a portfolio consisting of a diverse set of asset classes such

7  as equities, bonds, and international securities. Asset allocation funds are generally structured as

8  "funds-of-funds," meaning that the portfolio invests in underlying funds representing various asset

9  classes rather than investing directly in securities representative of the asset classes.

10  92.  Table 1 below lists, on December 31, 2011, respectively, the name of each

11  Investment Fund, the total assets in the given Investment Fund, the 401(k) Plan's percentage

12  ownership of the given Investment Fund, the dollar value of the 401(k) Plan's ownership of the

13  given Investment Fund, the Retirement Plan's percentage ownership of the given Investment Fund,

14  and the dollar value of the Retirement Plan's ownership of the given Investment Account.[8]

15  **TABLE 1**

16

17

| Investment Fund | Assets in Fund | 401(k) Plan % | 401(k) Plan $ | Ret. Plan % | Retirement Plan $ |
|---|---|---|---|---|---|
| **US Large Cap** | $1,411,807,722 | 45.10% | $636,725,283 | 54.90% | $775,082,439 |
| **Int'l Stock** | $1,216,444,003 | 48.10% | $585,109,565 | 51.90% | $631,334,438 |
| **Global Bond** | $2,200,337,976 | 17.30% | $380,658,470 | 54.00% | $1,188,182,507 |
| **US Small Cap** | $368,890,696 | 54.20% | $199,938,757 | 45.80% | $168,951,939 |
| **Em Mkts** | $963,325,120 | 43.20% | $416,156,452 | 56.80% | $547,168,668 |
| **Stable Value** | $596,326,952 | 79.70% | $475,272,581 | 20.30% | $121,054,371 |
| **Pvt Equity** | $348,400,370 | 0.40% | $1,393,601 | 99.60% | $347,006,769 |
| **Commodities** | $385,501,100 | 36.90% | $142,249,906 | 63.10% | $243,251,194 |
| **Hedge Fund** | $1,860,015,367 | 36.60% | $680,765,624 | 58.20% | $1,082,528,944 |

[8]Table 1 represents the Plans' holdings in the Investment Funds, not the Diversified Fund's and Intel TDPs' dollar and percentage allocations to the Investment Funds, except as to the Private Equity, Commodities, and Hedge Funds, because the specific dollar and percentage allocations of the Diversified Fund and Intel TDPs are not available to participants. In other words, Table 1 does not represent the asset allocations of the Diversified Fund and Intel TDPs as such. Using Table 1 for that purpose would understate the percentage allocations to Private Equity, Commodities, and Hedge Funds because the remaining funds were held in part in participant accounts outside of the Diversified Fund and Intel TDP portfolios.

93.     The Plans' financial statements filed with the Forms 5500 with the Department of Labor reflect similar allocations in 2012-2014.

**2.     The Retirement Plan and the Diversified Fund**

94.     Until January 1, 2015, participants in the Retirement Plan under the age of 50 did not have any ability to direct the investment of their individual accounts. Rather, until approximately January 1, 2015, the Investment Committee directed that the Retirement Plan allocate substantially all of its assets to the Diversified Fund. The Diversified Fund, in turn, invested in a mix of Investment Funds, as explained above.

95.     The Intel Diversified "Fund" is a portfolio invested in the Investment Funds, representing various asset classes. It is not a fund as such, but rather an asset allocation model that directs the assets of the Retirement Plan and the 401(k) Plan into the various Investment Funds. The Retirement Plan and 401(k) Plan own a percentage of each Investment Fund, as shown in Table 1, above.

96.     The Intel Diversified "Fund" is managed by the Investment Committee, and it dictates the asset allocation model, chooses and manages the Investment Funds representing the various asset classes, and chooses the investments and investment managers in the Investment Funds, e.g., the various limited partnerships that make up the Private Equity and Hedge Funds.

97.     The Diversified Fund's substantial allocation to private equity, commodities, and hedge fund investments differs markedly from the typical allocation of peer balanced funds, which was the primary cause of the Fund's underperformance in recent years.

98.     Beginning in 2009, the Investment Committee began dramatically increasing the Retirement Plan's investment in private equity, hedge funds, and commodities via the Diversified Fund.

99.     At the end of 2008, the Diversified Fund held approximately 6.17% of its assets, or $214 million, in private equity, hedge funds, and commodities. By the end of 2009, the Diversified Fund held approximately 15.33%, or $667 million, of its assets in such investments.

100.     In 2010, the Diversified Fund's investment in private equity tripled, from about $83 million to $245 million. In 2010, the Diversified Fund added an investment in commodities, about

$245 million, and its investment in hedge funds increased from approximately $583 million in 2009 to approximately $697 million in 2010. By the end of the year, the Diversified Fund held about 22.23% of its assets in commodities, private equity, and hedge funds, or about $1.2 billion.

101.    In 2011, the Investment Committee invested even more Diversified Fund money into private equity, hedge funds, and commodities, increasing such investments to almost 33% of the fund's portfolio, or approximately $1.67 billion.

102.    By the end of 2013, the Diversified Fund held approximately 36.71% of its assets in private equity, hedge funds, and commodities, or approximately $2.4 billion.

103.    Between 2009 and 2013, the Investment Committee caused the Diversified Fund to increase its allocation to private equity, hedge funds, and commodities by 595% and increase the dollar value of the Fund's investment in such investments from an estimated $214 million to almost $2.33 billion, an increase of 1,088%. These changes in investment allocations in the Diversified Fund are detailed in Figure 1 below.

**FIGURE 1**



### 3.    The Intel TDPs

104.    The Investment Committee has included Intel's custom TDPs in the Plans throughout the Target Date Class Period.

105.    A target date fund is a one-stop fund which holds a mix of asset classes and follows what is known as a "glide path." A glide path describes a fund's asset reallocation strategy, which (generally) becomes more conservative as the fund approaches its target date, that is, the retirement date of the plan participant. A target date fund's number represents the approximate year when a participant expects to withdraw benefits. The target date generally is a projected retirement date at age 65. Thus, a participant who anticipates retiring at 65 in or near 2045 would generally select a 2045 fund.

106.    The Intel TDPs offered in the Plans are not actual funds as such in the sense that the Plans' participants hold units or shares of the fund.

107.    Instead, the Intel TDPs are an asset allocation service. The Investment Committee determined the allocations and selected the underlying Investment Funds to which the Intel TDPs allocate the Plans' and participants' assets, but there is no actual target date fund as a distinct entity. Rather, each participant is placed in an asset allocation model chosen and managed by the Investment Committee, which provides each such participant with a proportionate interest in the underlying Investment Funds, based on the allocation dictates of the Intel TDP set by the Investment Committee. Thus, Intel TDPs are effectively an investment management service.

108.    The Intel TDPs, in other words, are not mutual funds or collective investment vehicles that issue shares or units. Rather, by investing in an Intel TDP a plan participant invests in a specifically weighted selection of investments, which weighting changes over time, designed by the Investment Committee. And the selected investments, *i.e.*, the Investment Funds, also are chosen and managed by the Investment Committee.

109.    All the Intel TDPs offered in the Plans are invested in the same nine Investment Funds, and share the same glide path. A "glide path" is the formula by which monies in the target date fund are reallocated across asset classes as the fund "glides" toward the target date. The amount allocated to the Investment Funds vary however. As the target date approaches, the particular Intel TDP generally adopts a purportedly more conservative allocation. Stated differently, each Intel TDP has adopted the same allocation and reallocation model (i.e., glide path) and invests in the same underlying Investment Funds, but the TDPs are simply on staggered start dates and end dates such

that each TDP is five years ahead of the TDP behind it, and five years behind the TDP ahead of it on the glide path.

110.   Prior to 2011, Defendants called the customized target date portfolios LifeStage Funds. In or around 2011, the Investment Committee created a new suite of customized target date portfolios and called them Target Date Funds.

111.   The Investment Committee also created additional Intel TDPs representing additional target dates.

112.   As part of this new model, beginning in 2011, the Intel TDPs invested a very large percentage of 401(k) Plan TDP assets in hedge funds and commodities, approximately 23% in 2011. The Intel TDPs also adopted a heavy weighting in international equities in comparison to peer TDFs.

113.   As Bill Parish, an independent registered investment advisor, observed in Intel Q4 2013 Earnings – Time to Fix Pension Plan (January 16, 2014), Intel's 401(k) and Retirement Plans "have been infiltrated by hedge funds," commenting that Intel's decision to invest heavily in hedge funds amounted to "institutional gambling with employees['] assets." Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish- Parish & Company Registered Investment Advisor Blog (January 16, 2014), http://blog.billparish.com/2014/01/16/intel-q4-2013-earnings-time-to-fix-pension-plan/.

114.   As The Oregonian newspaper reported on August 30, 2014 in *What's Inside Intel's retirement plans? Hedge funds. Lots of 'em*:  "Intel's 401k-type plans are unusual in a couple of ways that aren't comforting to some investors and financial advisers. It's embarked, essentially, on an experiment with nearly $14 billion in worker retirement money for more than 63,000 participants." As this article observed, Intel decided to use "expensive, opaque and potentially risky hedge funds in its main 401k investment options[]" and to "forc[e] company contributions into [hedge funds]." Hunsberger, *supra* note 4.

a.   *The Investment Committee Implemented an Imprudent Allocation Model.*

115.   Instead of implementing an asset allocation model consistent with prevailing standards adopted by investment professionals, the Investment Committee implemented an asset allocation strategy for the Intel TDPs that grossly over-weighted allocations to hedge funds,

commodities, and international equities as compared to target date funds available in the marketplace.

116.    The average asset allocations for 2030 target date funds offered by major fund companies in 2009 are reflected in Table 2:

**TABLE 2**

| Firm/Product | US Equity | Non-US Equity | Bond | Cash | Other |
|---|---|---|---|---|---|
| Fidelity | 48.57% | 18.29% | 14.28% | 4.26% | 14.60% |
| American Century | 60.48% | 21.52% | 6.74% | 11.19% | 0.07% |
| American Funds | 50.13% | 28.59% | 11.09% | 9.08% | 1.10% |
| John Hancock | 60.63% | 27.70% | 5.49% | 5.10% | 1.08% |
| Principal | 53.46% | 19.63% | 23.58% | -0.43% | 3.76% |
| Russell | 58.55% | 27.60% | 7.01% | 5.35% | 1.48% |
| T Rowe Price | 64.01% | 19.96% | 10.73% | 4.29% | 1.01% |
| Vanguard | 68.09% | 16.65% | 14.28% | 0.54% | 0.43% |
| **Average** | **58.0%** | **22.5%** | **11.7%** | **4.9%** | **2.9%** |

117.    By comparison, the Intel 2030 TDP had approximately 21% of assets allocated to hedge funds and 5% to commodities by 2014.[9] Peer group TDFs – or funds with a "target date" of 2030 – do not allocate any assets to hedge funds and very few peer TDFs have even small commodity stakes. Further, peer TDFs allocate 70% of equity assets to U.S. stocks and 30% to foreign, whereas the Intel 2030 TDP allocates over 50% of equity investments to foreign stocks.

118.    Figure 2 below compares the asset allocation of the 2030 Intel TDP to the average asset allocations of the eight professional investment management firms represented in Table 2.[10]

---

[9] *Target Date 2030 Fund*, Oregonian Live at 2 (March 31, 2014), http://media.oregonlive.com/finance/other/Target%20Date%202030%20Fund-1.pdf.
[10] The categories represented in the pie chart for the 2030 Intel TDP correlate to the Investment Funds as follows: the Hedge Funds category represents the Hedge Fund; the Other category represents the Stable Value Fund, the Private Equity Fund, and the Commodities Fund; the US Equity category represents the U.S. Large Cap Fund and U.S. Small Cap Fund; the Non U.S. Equity category represents the International Stock Fund and the Emerging Markets Fund; the Bonds category represents the Global Bond Fund. The allocations to these respective categories are based on the allocations represented in a Target Date Funds fact sheet published by Intel effective April 30, 2015.

1

**FIGURE 2**

2




8    119.    Exhibit 1 to the Complaint provides comparisons between several Intel TDPs and the

9  average allocations of the eight professional investment management firms represented in Table 2

10  for the TDF of the same year.

11    120.    As of 2015, approximately $3.63 billion of the 401(k) Plan's assets are in the Intel

12  TDPs.[11]

13        b.    *The Intel TDPs Have Underperformed.*

14    121.    As a result of the asset allocation and investment decisions, the Intel 2030 TDP

15  underperformed peers by approximately 400 basis points (4%) in 2013.[12]

16    122.    Because all twelve of the Intel TDPs share the same underlying investments and asset

17  allocation model,[13] the Investment Committee's asset allocation and investment decisions have

18  impacted the entire family of Intel TDPs in more or less the same fashion. Morningstar commented

19  that the entire family of Intel TDPs has underperformed peers because of these allocation and

20  investment decisions.[14]

21    123.    Table 3[15] below shows how an index-based (the underlying funds are index funds)

22  suite of target date funds offered by Fidelity Investments yielded, on average, over 4.5 times the

23  returns of the suite of Intel TDPs.[16]

24  _____

25  [11]Robert Steyer, *supra* note 2.
    [12]*Target Date 2030 Fund*, *supra* note 9.

26  [13]Intel Target Date Funds (Apr. 30, 2015).
    [14]*Target Date 2030 Fund*, *supra* note 9.

27  [15]Incomplete data prevented comparison of all Intel TDPs to corresponding Fidelity TDFs.
    Nevertheless, the results are sufficiently uniform to conclude that similar excess fees and

28  underperformance would have been found for the Intel Income, 2030, 2040, 2050 and 2055 TDPs.

**TABLE 3**

| TD Year | Tckr | 3 Yr Perform as of 6/30/2014 | | Fidelity Out Performance |
|---|---|---|---|---|
| | | Fidelity | Intel | |
| 2005 | FJIFX | 16.17% | 6.02% | 269% |
| 2010 | FKIFX | 20.63% | 6.48% | 318% |
| 2015 | FLIFX | 22.06% | 7.00% | 315% |
| 2020 | FPIFX | 23.45% | 7.36% | 319% |
| 2025 | FQIFX | 27.41% | 7.18% | 382% |
| 2035 | FIHFX | 31.52% | 7.30% | 432% |
| 2045 | FIOFX | 32.17% | 7.22% | 446% |
| | | | Avg: | 354% |

124.     Figure 3 below represents the data in Table 3 in a chart format.

**FIGURE 3**



125.     If the Investment Committee had simply selected index funds for the Intel TDPs, the 401(k) Plan and its participants would be far better off today. Consider Figure 3 which represents the growth of a hypothetical $500,000,000[17] investment in each Intel TDP as compared to the same

---

[16]The sources for Table 4 are, respectively: an Intel 401(k) Plan Investment Options Performance Update as of June 30, 2014 for the investment performance of the Intel TDPs; and Yahoo Finance for the Fidelity funds (comparing the adjusted closing share price on the first and last day of the three-year period ending June 30, 2014).

[17]A $500,000,000 hypothetical investment is consistent with the 401(k) Plan's actual investments

investment in the corresponding Fidelity TDF from Table 4 during the three-year period ending June 30, 2014.

**FIGURE 4**



126.     Assuming the $500 million hypothetical investments described above, the 401(k) Plan and its participants whose accounts were invested through the Intel TDPs would have more than $600 million in additional retirement savings as of June 2014.

        c.     *The Intel TDPs Charge Very High Fees.*

127.     Before the Investment Committee changed the Intel TDP allocations in approximately 2011, the fees for the Intel TDPs ranged from 65 basis points to 71 basis points.[18]

128.     Although the fees for the Intel TDPs were already substantially higher than index-based TDFs such as those offered by Fidelity, the increased allocation to hedge funds beginning in 2011 significantly increased the expenses of the Intel TDPs, almost doubling the range of fees to between 130 to 136 basis points. This significant investment and allocation to high-fee hedge funds

---

given the estimated $3.5 billion managed through the Intel TDPs and the seven Intel TDPs represented here.
[18]Intel 401(k) Savings Plan: Important Plan and Investment-Related Information, Including the Plan's Investment Options, Performance History, Fees and Expenses, at 6-8.

Complaint

and private equity added no value. To the contrary, investing in high-fee hedge funds and private equity caused the Intel TDPs to consistently and substantially underperform index-based TDFs since 2011 as shown in Figures 3 and 4 above.

129.    Table 4 compares the fees and expenses of the Intel TDPs to Fidelity's index-based TDF offerings.[19]

**TABLE 4**

| TD Year | | Fees | | Intel Excess Fees |
|---|---|---|---|---|
| | Tckr | Fidelity | Intel | |
| 2005 | FJIFX | 0.0016 | 0.0136 | 850% |
| 2010 | FKIFX | 0.0016 | 0.0137 | 856% |
| 2015 | FLIFX | 0.0016 | 0.0136 | 850% |
| 2020 | FPIFX | 0.0016 | 0.0135 | 844% |
| 2025 | FQIFX | 0.0016 | 0.0134 | 838% |
| 2035 | FIHFX | 0.0016 | 0.0131 | 819% |
| 2045 | FIOFX | 0.0016 | 0.0130 | 813% |
| | | | Avg | 838% |

130.    The fee differences are staggering, as Figure 5 illustrates.

**FIGURE 5**



---

[19]The sources for Table 5 are an Intel Target Date Funds fact sheet dated April 15, 2015 and fact sheets for the Fidelity funds.

Complaint

131.    As *What's behind the changes to Intel's worker retirement plans,* commented, the Intel TDPs are rising in expenses in contrast to the general trend in the industry, which is lowering expenses. Brent Hunsberger, *What's behind the changes to Intel's worker retirement plans*, The Oregonian (May 2, 2015),

http://www.oregonlive.com/finance/index.ssf/2015/05/whats_behind_the_changes_to_in.html.

132.    In other words, the 401(k) Plan and its participants paid huge fees for inferior performance, as reflected in Figure 6.

**FIGURE 6**



### 4.    The Intel TDPs Imprudently Invested in Hedge Funds

133.    Target date funds are based on two important investment theories: Modern Portfolio Theory ("MPT") and the importance of asset allocation to generating retirement savings.

134.    MPT posits that the power of combining securities and asset classes that have low correlations to each other can bring immensely positive benefits to mitigating the impacts of market volatility to a portfolio. Behavioral theory shows that investors tend to act emotionally and irrationally to such volatility and often make knee-jerk decisions in the wake of market swings. In fact, a study circa 2008 showed that average retirement plan participants had achieved an approximate annual return of just 4% over the preceding 20 years due to such reactive impulses while the overall market (as gauged by the S&P 500) had averaged approximately 12%. Investors'

emotional decision making – due primarily to poorly diversified portfolios that showed pronounced swings with the markets – led them to achieve barely a third of the market returns they could have made had they simply stayed invested. A more diversified asset allocation tends to avert these investor behavioral reactions.

135.    Brinson, Beebower and Hood studied the impacts of asset allocation on 91 pension funds over a 10 year period and found that 94% of performance can be explained purely by the asset allocation and only 6% is explained by market timing and security selection. Gary P. Brinson et al., *Determinants of Portfolio Performance*, 42 Financial Analysts Journal 133, 133-138 (1995). This utterly refutes the alpha delivery of active securities selection, as with hedge funds, and underscores that trying to achieve excess returns by either timing the markets or actively managing funds via security selection is a generally superfluous strategy when considering a large pool of assets over a long investment horizon covering many market cycles. Market timing and security selection are typically tied to near-term cycles that tend to wash out over time. But TDFs are designed to be held for a long period of time—to retirement age.

136.    These two theories, in combination, argue for low-cost, passive fund management with strictly disciplined asset allocation methodologies at the core of the investment process as being the most effective and prudent approach to managing long-term, retirement-oriented assets such as TDFs. This is what target date funds should seek to achieve as a one-stop fund for individual retirement investors.

137.    Hedge funds contradict these investment theories. Hedge funds are vehicles designed to enable the manager to invest in near-term opportunities without adhering to a stated fund objective. Most off-the-shelf TDFs go to great lengths to select underlying funds with clear objectives in order to ensure that the benefits of MPT and asset allocation are properly captured. 1940 Act registered funds (i.e., mutual funds) in particular are obligated to state and adhere to their investment objectives – therefore a fund that intends to invest in large cap value stocks will generally stay in that space. In doing so, it will achieve the diversification benefits that the fund hopes to gain from also having equity allocations in mid or small cap stocks and other different disciplines such as growth stocks. Mutual funds also have stringent fee disclosure requirements. Even within an asset

class, such as equities, there are definite cyclical differences that can provide meaningful correlation

benefits. These benefits are even more pronounced at the asset class level.

138.    In this regard, most TDFs employ a sliding scale of equity, fixed income and cash

allocations to provide substantial correlation benefits to market swings. Most off-the-shelf TDFs

avoid any meaningful use of leverage (as leverage is strictly constrained in 1940 Act funds) and

generally only minor use of derivatives usually for proxy or liquidity needs (and typically in the

fixed income allocation where bond liquidity is increasingly challenged). Thus the portfolio manager

of a standard target date fund has strong guidance as to the exposures he/she will get when

incorporating standard, prospectus-driven mutual funds into their fund-of-fund lineup. There is very

little concern that the value equity managers will flock into growth stocks and therefore create an

overconcentration of risk. There is even less concern that equity managers might invest heavily in

fixed income securities. There is essentially a mandated assurance of diversification that is lost

entirely when incorporating hedge funds. This is even truer of index-based TDFs where computer

programs dictate strict adherence to the given index and afford no manager discretion to deviate

from guidelines and strategies.

139.    Hedge funds involved in event driven and directional bets are generally using either

focused security selection or market timing strategies, while distressed (and/or stressed) and value

driven are generally security selection funds. As per Brinson, Beebower & Hood, none of these

strategies make sense for a retirement investment. Hedge funds have been traditionally limited to

"accredited investors" who have over $200,000 in annual income and/or over $1,000,000 in net

worth. *Id.* The reason for limiting investment to those accredited investors is to restrict these

investments to those who can afford to lose their invested principal. Retirement accounts encompass

all levels from the c-suite to those working in the shipping department. Managing a retirement plan

therefore must focus always on the most vulnerable participant. Higher earning participants can

choose to take more risk, but TDFs are designed for everyone and need to be constructed to protect

the average employee.

140.    The Intel Hedge Fund contained in the Intel TDPs purports to include 21 different

hedge funds. Of those funds at least 6 are primarily deemed Multi-Strategy, 5 are deemed

Directional, 5 involved Distressed (or Stressed) and 8 are Event Driven (several list many strategies). All of these represent amongst the most potentially volatile of hedge fund strategies – with Multi-Strategy in particular being the most ambiguous as the name itself indicates that the managers can pretty much do whatever they want. Directional and Event driven strategies generally place bets on the chance that a particular market event – such as a merger or a key interest rate change – takes place. If the event does not occur, or if the ramifications are not as impactful, then the leveraging and risk concentration employed will be for naught and potentially large losses can take place as a result. Distressed strategies tend to seek opportunities with either equity or debt in companies or other entities that are on the verge of a potentially calamitous event – such as a bankruptcy – thus driving the price of their securities down. The hedge fund managers bet the event will not happen and buy in. If the event does happen, the losses are usually deep and permanent. Conversely, if they are "short" the event (i.e. a bet on the price of the securities going down) and it does not happen, losses can exceed even the invested principal.

141.   A key common bond across all of these strategies is that the managers often employ copious amounts of leverage through various means such as borrowing, shorting or the use of derivatives. They tie themselves into these positions and commit all their capital to sustain the collateral requirement to maintain the trade through the cycle of the anticipated event. During this build up, the funds are extremely illiquid. It is not surprising then that most hedge funds employ very strict constraints around access to invested capital by their investors – often requiring months' of notice and reserving the right to deny such requests for redemptions at their discretion. During a downturn event in the markets it is already well established that plan participants will tend to redeem in a knee-jerk fashion. If these funds are unable to meet those redemption requests, the Investment Committee will be forced to sell off other, more marketable investments – likely from the more common public markets that are also likely to be experiencing the headline volatility driving these investor reactions in the first place. The lock-up of hedge fund investments will cause selling in traditional securities and further harm the invested principal of the plan participants.

142.   Compounding the liquidity constraints of hedge funds are the common use of "side pockets," a practice whereby hedge fund managers move illiquid or impaired assets out of the main

fund into a separate holding vehicle. Creating a side pocket is solely within the discretion of the hedge fund manager. As the Wall Street Journal reported, as early as 2006, regulators and investors were become concerned about the abusive use of side pockets to mask underperformance and inflate manager performance fees.[20] Further, because side pockets are often used for illiquid investments, hedge fund managers impose onerous withdrawal constraints. In the wake of the 2008 financial crisis, the SEC instituted several enforcement proceedings against hedge fund managers for improper use of side pockets.[21]

143.    Further, the vast majority of plan participants will roll their 401(k) investments into an IRA (upon retirement or changing employers) or into a new employer's plan. Thus portability and liquidity are important considerations in constructing and selecting a TDF. But hedge funds are not liquid and not portable. During a volatile or down market, participants attempting to liquidate Intel TDP holdings could find themselves constrained or forced to lock-in substantial realized losses. Thus, the optimal TDF emphasizes liquidity at all points in the glide-path.

**5.     Hedge Funds and Private Equity Are Generally Not Suitable For Balanced Funds**

144.    Like TDFs, balanced funds are designed as a one-stop fund for retirement plan investors. A typical 60/40 equity/bond balanced fund is intended to reflect the broad performance of the key securities markets in a ratio that balances risk and return suitable for the average investor.

145.    Like TDFs, balanced funds in retirement plans need minimum levels of liquidity, and volatility. And, given the two key investment theories discussed above, the surest way to consistent and meaningful performance is low-cost index funds.

146.    For these reasons, hedge funds and private equity are generally not suitable for balanced funds and few, if any, balanced fund portfolio managers invest in hedge funds and private equity. As the detailed analyses of hedge funds and private equity that follow reflect, hedge funds

---

[20]Gregory Zuckerman & Scott Patterson, *'Side Pocket' Accounts of Hedge Funds Studied*, The Wall Street Journal (Aug. 4, 2006) http://www.wsj.com/articles/SB115465505123626547.

[21]*SEC Charges Hedge Fund Managers With Fraudulently Overvaluing Side-Pocketed Assets, Defalcation, and Material Misrepresentation,* U.S. Securities and Exchange Commission (October 19, 2010), http://www.sec.gov/litigation/litreleases/2010/lr21699.htm.

and private equity have high and hidden fees, uncompensated risk, higher than expected volatility, correlation to other asset classes, lack of transparency, and virtually no constraints on investment decisions (unlike mutual funds), notwithstanding the nominal strategy or asset class described in the offering and partnership documents.

### 6.   Risks and Costs of Hedge Funds and Private Equity

147.   Hedge funds and private equity funds are generally structured as investment partnerships. The investors are limited partners and the managers are general partners. Managers are typically paid under a "2 and 20" formula, meaning that the manager gets 2% of the assets under management and 20% of the profits generated by the fund's investments.

a.   *Hedge Funds.*

148.   A "hedge fund" pools investor assets to pursue a variety of active management strategies.

149.   Hedge funds invest in many different types of assets. They "do not constitute an asset class but rather provide access to particular trading strategies that may be employed by specific fund managers."[22] Hedge funds usually are classified according to their investment strategy.

(1)   Valuation Risk.

150.   Because the investment holdings and investment strategies of many hedge funds are often not well known, even to institutional investors like the Plans,[23] it is difficult for the fund assets to be marked to market. The Government Accountability Office noted in 2011 that "[b]ecause many hedge funds may own [securities traded infrequently or in low volume] and derivatives whose valuation can be complex and subjective, a retirement plan official may not be able to obtain timely information on the value of assets owned by a hedge fund. Further, hedge fund managers may

---

[22]Theda R. Haber et al., Report to the Secretary of Labor: *Hedge Funds and Private Equity Investments*, at 6 (November 2011), http://www.dol.gov/ebsa/pdf/2011ACReport3.pdf.
[23]To think of the Plans as institutional investors is misleading. To be sure, the large amount of assets in the Plans affords them pricing opportunities such as selecting institutional product structures, e.g., institutional share class mutual funds versus retail funds, but the vast majority of ultimate investors are rank and file employees, not sophisticated investors with millions of dollars in assets and the risk appetite to take a flyer on hedge funds and private equity.

1   decline to disclose information on asset holdings and the net value of individual assets largely

2   because the release of such information could compromise their trading strategy."[24]

3                  (2)     Investment Risk.

4          151.    Hedge funds pose risks not found with traditional investments managed by registered

5   investment companies. For example, registered investment companies are subject to strict leverage

6   limits, whereas hedge funds "can make relatively unrestricted use of leverage." *Id.* at 7. Leverage –

7   essentially borrowed money – "can magnify profits, but can also magnify losses to the fund if the

8   market goes against the fund's expectations." *Id.*

9                  (3)     Lack of Liquidity.

10         152.    Hedge funds tend to be illiquid investments, where investor redemptions are severely

11  limited by the hedge fund manager. For example, hedge funds often require an initial "lock-up"

12  period where investors must commit their money for one or two years, or more.

13         153.    Alternately, hedge fund managers may only allow one capital redemption per quarter.

14  Once invested in a hedge fund, it is difficult for an investor to sell its interest in the fund and move to

15  another option. Unlike investments in other vehicles like mutual funds, a hedge fund investment

16  cannot simply be bought or sold any day of the week.

17         154.    The hedge funds in Intel's Hedge Fund typically require at least thirty days' notice to

18  receive or redeem capital.[25]

19                 (4)     High Fees.

20         155.    The hedge funds in Intel's Hedge Fund (the Hedge Fund managed by Intel is a fund-

21  of-hedge funds) charge incentive fees, and inclusion of hedge fund investments in the Plans'

22  portfolios has driven fees up.[26]

23

24

25  [24]Barbara Borbjerg, *Plans Face Challenges When Investing in Hedge Funds and Private Equity*, at 6
    (August 31, 2011), http://www.gao.gov/assets/90/82457.pdf.

26  [25]Interview Moderated by Stacy L. Schaus, PIMCO Executive Vice President and Defined
    Contribution Practice Leader with Stuart Odell, Assistant Treasurer of Retirement Investments, Intel

27  Corp., (March/April 2014)
    ,http://media.pimco.com/Documents/PIMCO_DC_Dialogue_Odell_Schaus_Mar_Apr_2014.pdf.

28  [26]*Id.*

156.    Even without an incentive fee, a two percent annual flat fee on assets under management is high and not justified in the defined contribution plan context. Such a fee is up to ten times higher than the average standard wholesale level fees for pension plan investments – for example, 2% versus 0.20%.[27] Indeed, one hedge fund industry expert has calculated that hedge fund managers collected 98% of the profits generated by hedge funds during the years 1998-2010.[28]

157.    The high fees of hedge funds can have a significant negative impact on net investment returns. For example, under the typical two and twenty fee structure, a 12% return would be reduced to only 8% after deduction of fees.[29]

158.    The Investment Committee purportedly chose to invest in hedge funds in an attempt to achieve at least three goals: to increase diversification of plan assets; to decrease the volatility of the plan's investment performance; and to enhance the plan's performance overall.[30] However, such investments do not provide adequate value in these areas to justify their high fees.

159.    For example, hedge fund investments do not provide substantial risk reduction or risk diversification for pension plan assets because they are correlated to the equity market. Correlation means the extent to which different asset classes will simultaneously rise or fall, in lock step. Specifically, according to data compiled by the hedge fund house AQR, the HFRI Fund Weighted Composite Index – a leading hedge fund industry index – was 0.93 correlated with equity markets, or nearly 100% correlated. Moreover, plan fiduciaries do not have sufficient visibility into the strategies of their hedge fund investments to be able to properly understand the risk profile of the investment; thus, hedge fund investment is not an effective diversification tool.

---

[27]Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish- Parish & Company Registered Investment Advisor Blog (January 16, 2014) ,http://blog.billparish.com/2014/01/16/intel-q4-2013-earnings-time-to-fix-pension-plan/.

[28]Simon Lack, *How The Hedge Fund Industry Has Kept 98% of The Profits In Fees*, SL Advisors: The Hedge Fund Mirage Blog (January 23, 2012), http://www.sl-advisors.com/how-the-hedge-fund-industry-has-kept-98-of-the-profits-in-fees/.

[29]Borbjerg, *supra* note 24, at 8, n. 11.

[30]*401K Global Diversified Fund, supra* note 5, at 3.

(5)     Lack of Transparency.

160.    Hedge funds lack the transparency of publicly traded funds such as mutual funds. In particular, hedge funds lack transparency by design, because individual hedge fund managers claim a proprietary interest in their investment strategies.

161.    The desire of the hedge fund manager to keep an investment methodology private is in direct conflict with a plan fiduciary's duty to monitor such a methodology. As Randall Dodd, Director of the Financial Policy Forum testified before the U.S. Department of Labor, Employee Benefits Security Administration: Advisory Council on Employee Welfare and Pension Benefit Plans, September 20, 2006, about hedge funds: "[t]he investment strategies of hedge funds are often not well known, or are so lacking in transparency – even to their own investors […]– that the investors cannot adequately assess the hedge fund investment's contribution to their overall portfolio risk."

162.    It is very difficult for retirement plan fiduciaries to evaluate the performance of hedge funds, because of the variety of hedge fund strategies; the substantial rate of turnover of funds opening and closing; the selection bias created when new funds choose not to report returns until after they have a run of good years; and the survivorship bias created when closed funds simply disappear from hedge fund indices.[31]

(6)     Operational Risks.

163.    Retirement plans investing in hedge funds are also exposed to greater operational risks than presented by traditional investments. As the GAO Report explained, operational risk is the "risk of investment loss because of inadequate or failed internal processes, people, and systems, or problems with external service providers." "Operational problems can arise from a number of sources, including inexperienced operations personnel; inadequate internal controls; lack of compliance standards and enforcement; errors in analyzing, trading or recording positions; or outright fraud."[32]

---

[31]Haber, *supra* note 22, at 13.
[32]Borbjerg, *supra* note 24, at 8.

164.   Hedge funds are not registered with the SEC, and are subject to few regulatory controls. Unlike mutual funds and other registered investment companies in the United States, hedge funds may avoid the registration requirement imposed by the Investment Company Act.[33] As Mr. Dodd explained, the absence of such regulatory controls, coupled with the fact that many hedge funds make it difficult for their assets to be marked to market, make hedge fund investments "especially prone to financial fraud."

165.   Further, hedge fund strategies can be exceedingly complex. A prudent fiduciary must be capable of understanding the strategy in order to evaluate whether it is appropriate for investment of retirement plan assets. "[P]articular care should be exercised in due diligence of hedge funds, because of the complex investment strategies they employ; the fact that hedge fund organizations are frequently young and small; their use of leverage and the associated risks; the possibilities of concentrated exposure to market and counterparty risks, and the generally more lightly regulated nature of these organizations."[34] "The process of selecting and monitoring hedge fund investments requires additional resources and continuous support from experienced professionals, which may be substantially more expensive than those required to select and monitor traditional investments. Fiduciaries should understand the effort and costs that will be required, and should commit these resources prior to investing in hedge funds."[35]

166.   Even if the plan fiduciary is able to gain visibility of a hedge fund's investment strategy, the detailed holdings of a hedge fund portfolio are not disclosed to individual investors like Plaintiff and the participants invested in the Intel TDPs and the Diversified Fund.

   b.   *Private Equity.*

167.   The term "private equity" refers to a form of alternative investment which uses pooled funds to invest in privately held companies. Investors are generally described as "limited partners."

---

[33]Haber, *supra* note 22.
[34]Gary Bruebaker et al., *Principles and Best Practice for Hedge Fund Investors*, U.S. Commodity Futures Trading Commission at 14 (January 15, 2009,),
http://www.cftc.gov/idc/groups/public/@swaps/documents/file/principlespractices.pdf.
[35]*Id.* at 7.

168.     Private equity advisors have been criticized for their valuation practices, such as using a valuation methodology that is different from the one that has been disclosed to investors or changing the valuation methodology from period to period without additional disclosure. Such valuation practices make it exceedingly difficult, if not impossible, to monitor manager performance and evaluate fees accurately where fees are tied to assets under management and therefore increase as valuations increase.

169.     Private equity investments pose several challenges for retirement plans like the Intel Plans at issue. These challenges generally make private equity investments imprudent for the Intel Plans. In fact, the four largest TDF providers in the market, BlackRock, Fidelity, T. Rowe Price, and Vanguard, do not include private equity in their TDF funds.[36]

(1)     High Fees, Hidden Fees, and Inflated Fees.

170.     Contracts with private equity managers generally address two forms of manager compensation: a flat fee for all assets under management (generally about 2%), and a "carried interest" fee, which is a percentage of any profits after a "hurdle" has been met. A typical fee structure in the private equity industry is "two and twenty," where the fee for assets under management is 2% and the incentive fee is 20% of profits above the hurdle.

171.     The private equity funds in Intel's Private Equity Fund charge incentive fees.

172.     An examination of private equity firms by the SEC has found that many private equity managers charge hidden and inflated fees to investors in their funds. According to Andrew Bowden, director of the SEC's Office of Compliance Inspections and Examinations (OCIE), the SEC identified "violations of law or material weaknesses in controls over 50% of the time." This, according to Mr. Bowden, is "a remarkable statistic."[37] The SEC's examination found that the most

---

[36]Margaret Collins& Devin Banerjee, *Would You Like Some Private Equity in Your 401(k)?,* Bloomberg Businessweek, (Apr. 4, 2013). http://www.bloomberg.com/bw/articles/2013-04-04/would-you-like-some-private-equity-in-your-401-k.

[37]Andrew J. Bowden,, Director of the Office of Compliance Inspections and Examinations, Spreading Sunshine in Private Equity, Address Before Private Fund Compliance Forum (May 16, 2014). http://www.sec.gov/news/speech/2014--spch05062014ab.html.

1    egregious violations were in the areas of fees, where the SEC found inadequate disclosures to

2    investors. Examples of hidden or undisclosed fees include:

3            (a)    Accelerated Monitoring Fees. Many private equity managers charge monitoring fees
                    to the portfolio companies in the fund. These fees are charged at the portfolio
4                   company level, not the fund level, and, thus, are generally invisible to investors.
                    Moreover, private equity managers often force monitoring agreements of ten years or
5                   more on the portfolio companies they control. When the portfolio company is sold
                    before the monitoring agreement expires, the private equity manager accelerates the
6                   fees for the remaining years of the contract even though the manager is no longer
                    monitoring the portfolio company. Disclosure of this practice is virtually nonexistent.
7

8            (b)    Operating Partners. Private equity managers often foist "operating partners" or
                    consultants in which they have an interest or affiliation on portfolio companies
9                   without the knowledge of investors. The fees collected by the private equity managers
                    via these arrangements are not disclosed to investors. As Mr. Bowden commented:
10                  "Many of these Operating Partners, however, are paid directly by portfolio companies
                    or the funds without sufficient disclosure to investors. This effectively creates an
11                  additional "back door" fee that many investors do not expect, especially since
                    Operating Partners often look and act just like other adviser employees. They usually
12                  work exclusively for the manager; they have offices at the manager's offices; they
                    invest in the manager's funds on the same terms as other employees; they have the
13                  title "partner"; and they appear both on the manager's website and marketing
                    materials as full members of the team. Unlike the other employees of the adviser,
14                  however, often they are not paid by the adviser but instead are expensed to either the
                    fund or to the portfolio companies that they advise." *Id.* Mr. Bowden continues: There
15                  are at least two problems with this. First, since these professionals are presented as
                    full members of the adviser's team, investors often do not realize that they are paying
16                  for them a la carte, in addition to the management fee and carried interest. The
                    adviser is able to generate a significant marketing benefit by presenting high-profile
17                  and capable operators as part of its team, but it is the investors who are unknowingly
                    footing the bill for these resources. Second, most limited partnership agreements
18                  require that a fee generated by employees or affiliates of the adviser offset the
                    management fee, in whole or in part. Operating Partners, however, are not usually
19                  treated as employees or affiliates of the manager, and the fees they receive therefore
                    rarely offset management fees, even though in many cases the Operating Partners
20                  walk, talk, act, and look just like employees or affiliates." *Id.*

21           (c)    Usurping Fee Discounts. Private equity firms leverage investor capital to obtain
                    discounts on professional and vendor services for themselves, but cause their funds
22                  and portfolio companies to use the same professionals and vendors without any
                    discounts.

23           (d)    Charging undisclosed "administrative" or other fees not contemplated by the limited
24                  partnership agreement.

25           (e)    Exceeding the limits set in the limited partnership agreement around transaction fees
                    or charging transaction fees in cases not contemplated by the limited partnership
26                  agreement, such as recapitalizations.

27           (f)    Hiring related-party service providers, who deliver services of questionable value.[38]

28   _____
     [38]*Id.*

173.     The SEC has also found problems in how private equity managers report investment returns. Private equity managers generally report investment performance in the form of "net internal rate of return" (IRR), which is supposed to reflect actual investor profits (or losses). But many managers invest their own money in their funds and that money does not pay fees at the fund level, i.e., the 2% asset fee and the 20% carried interest. Given that fees are a significant factor in net performance, including the manager's fee-free assets in the computation of IRR distorts investor experience because investors actually receive a lower return. Among the private equity firms that include manager assets in calculating IRR is Apollo Global Management LLC.

174.     The high fees of private equity funds can have a significant negative impact on net investment returns. For example, under the typical two and twenty fee structure, a 12% return would be reduced to only 8% after deduction of fees. GAO 11-901SP at 8, n.11.

(2)     Valuation and Reporting.

175.     The SEC has found deep problems in the way private equity conducts valuations of Portfolio Companies. Common valuation problems identified by the SEC include: [39]

(a)     Advisers using a valuation methodology that is different from the one that has been disclosed to investors.

(b)     Cherry-picking comparables or adding back inappropriate items to EBITDA — especially costs that are recurring and persist even after a strategic sale — if there are not rational reasons for the changes, and/or if there are not sufficient disclosures to alert investors.

(c)     Changing the valuation methodology from period to period without additional disclosure — even if such actions fit into a broadly defined valuation policy — unless there's a logical purpose for the change. For instance, the SEC has observed advisers changing from using trailing comparables to using forward comparables, which resulted in higher interim values for certain struggling investments. While making such changes is not wrong in and of itself, the change in valuation methodology should be consistent with the adviser's valuation policy and should be sufficiently disclosed to investors.

176.     These valuation practices make it exceedingly difficult, if not impossible, to monitor manager performance and evaluate fees accurately where fees are tied to assets under management and therefore increase as valuations increase.

---

[39] *Id.*

7.    **The Intel Fiduciaries Failed to Conduct an Appropriate Investigation**

177.    Despite the gravity and variety of the risks inherent in investing defined contribution plan assets in hedge funds, fiduciaries of the Plans allocated substantial Plan assets to hedge fund investments—eventually almost $2.5 billion as of the end of 2014. The Intel fiduciaries did not properly conduct a prudent investigation.

a.    *The Performance of the Plans' Hedge Funds Portfolio in 2008 Was Poor.*

178.    According to Brent Hunsberger, *What's inside Intel's retirement plans? Hedge funds. Lots of 'em.* (Aug. 30. 2014), Steven Odell, Intel's assistant treasurer for retirement plan investments, and the Investment Committee members strongly believe that hedge funds can reduce the ups and downs of traditional stock and bond markets. Hunsberger, *supra* note 4. The Investment Committee supposedly included hedge funds in the Plans' asset allocation portfolios to increase diversification and reduce risk.

179.    But hedge funds should not be considered an independent asset class for purposes of diversification. Rather, hedge funds generally invest in other widely held asset classes such as bonds and equities but implement investment strategies that supposedly reduce volatility and risk. Thus it is a mistake to think of hedge funds as asset diversification. Rather, hedge funds are simply a form of active management. In other words, hedge funds are strategy diversification.

180.    Odell adds that he believes hedge funds have good risk-adjusted returns.[40]

181.    Odell conceded that the Plans' hedge fund portfolio did not meet expectations during the 2008 financial crisis—it lost 17% in 2008 as compared to a 5.2 percent gain in the Barclay's U.S. Aggregate Bond Index. This should have caused the Investment Committee to reconsider its investments in hedge funds.

182.    But based on the Forms 5500 filed with the Department of Labor, the Investment Committee added hedge funds after 2008, raising the number of managers in the hedge fund portfolio from about 10 or 12 to 21 by 2011. Indeed, in 2009 the 401(k) Plan had less than one

---

[40]Robert Steyer, *Intel's 401(k) reboot aims for better outcomes,* Pensions & Investments (March 5, 2012), http://www.pionline.com/article/20120305/PRINT/303059972/intels-401k-reboot-aims-for-better-outcomes/M.

million dollars in hedge fund investments and the Retirement Plan had approximately $550 million. By the end of 2011, the 401(k) Plan held $680 million in hedge fund assets and the Retirement Plan held approximately $1 billion. Rather than learn from the failures of hedge funds in 2008, the Investment Committee doubled down with the Retirement Plan and increased the 401(k) Plan's investment from under a million to over $680 million.

183.    As of December 31, 2014, the Plans have almost $2.5 billion invested in hedge funds. All of that money was invested via the Intel TDPs and the Diversified Fund.

### b.    *Published Reports Questioned the Value of Hedge Funds.*

184.    In addition to the Investment Committee's personal experience with hedge fund underperformance in 2008, numerous studies and reports published in the years before and after the 2008 financial crisis questioned the value of hedge funds. In light of its own experience and the wealth of data available to it, the Investment Committee knew or should have known during the Target Date and Diversified Fund Class Periods that hedge funds were an imprudent investment for target date funds and balanced funds.

185.    Unlike more traditional investment products, hedge funds typically charge both a management fee (typically 1-2% and sometimes more) based upon the amount of assets under management (the "Management Fee") and an annual performance fee (typically 20%) based on the success of the fund (the "Performance Fee"). *The New Money Men*, The Economist (Feb. 17, 2005), http://www.economist.com/node/3666459. Performance-based compensation arrangements with managers may create an incentive to make investments that are riskier or more speculative than would be the case if such arrangements were not in effect. In addition, because performance-based compensation is calculated on a basis that may include unrealized appreciation of client account assets, this compensation may be greater than if such compensation were based solely on realized gains.

186.    By at least 2006, studies of the performance of alternative investments began to reveal that the returns produced by hedge funds – at least after 2000 – did not exceed the investment performance of index-tracking mutual funds (at least once fees were subtracted from performance). Reports of such studies were not buried in some obscure investment newsletter but were widely

published in articles such as *Rolling in It: Why Investors should kick up a fuss about hedge-fund fees*, The Economist (Nov. 16, 2006), http://www.economist.com/node8173853;  *The New Money Men*, The Economist, Feb. 17, 2005 (citing studies). As a result, investors in hedge funds were taking greater risks and paying much higher fees for performance that could have been obtained for lower risk and lower fees.

187.   As the Economist succinctly explained in *Rolling in It*, by November 2006, hedge fund managers were receiving "Alpha pay for beta performance." As Narayan Naikof the London Business School noted in that Economist article, "pension funds ha[d] been advised to move into hedge funds by consultants," but those consultants had relied on outdated data from the 1990s and biased data regarding performance and returns.  *Rolling in It: Why Investors should kick up a fuss about hedge-fund fees*, The Economist (Nov. 16, 2006), http://www.economist.com/node8173853.

188.   As reported in a New York Times article, *How to Pay Millions and Lag Behind the Market* on October 19, 2013, many overseers of public pension funds, desperate to bolster returns and meet ballooning retiree obligations, have turned from traditional investments like stocks and bonds to hedge funds and private equity. Gretchen Morgenson, *How to Pay Millions and Lag Behind the Market,* The New York Times (October 19, 2013), http://www.nytimes.com/2013/10/20/business/how-to-pay-millions-and-lag-behind-the-market.html?_r=0.

189.   In 2013, Benchmark Financial Services, a forensic firm hired by a Rhode Island council of the American Federation of State, County and Municipal Employees, issued a report, http://www.ricouncil94.org/Portals/0/Uploads/Documents/Rhode%20Island%20X.pdf, that concluded that the Rhode Island Pension system's $2 billion investment in high-cost and opaque alternative investments in hedge funds, private equity and venture capital had failed to outperform the pension plan's peer plans. Benchmark Financial Services, *Rhode Island Public Pension Reform: Wall Street's License to Steal,* Rhode Island Council 94 (October 17, 2013), http://ricouncil94.org/portals/0/uploads/documents/rhode%20island%20x.pdf.

190.   As reported by *Reuters* on January 7, 2011, in *Hedge Funds Rise in 2010 but lag broader market*, both the Hennessee Group and Hedge Fund Research, groups that track

performance and asset flows, reported hedge funds gained approximately 10 percent in 2010, but lagged behind the average stock market indexes and fell short of the average stock mutual fund's returns. Svea Herbst-Bayliss, *Hedge funds rise in 2010 but lag broader market,* Reuters (January 7, 2011), http://www.reuters.com/article/2011/01/07/us-hedgefunds-performance-idUSTRE7063QR20110107. As reported by Reuters, the S&P 500 index gained 12.8 percent and the average stock mutual fund rose 17.48 percent, according to data from Lipper Inc.

191.    As reported in a 2012 Economist article, *Rich Managers, Poor Clients: A Devastating Analysis of Hedge Fund Returns* (citing Simon Lack, *The Hedge Fund Mirage: The Illusion of Big Money and Why It's Too Good to Be True*, (2012)) "since 1998, the effective return to hedge-fund clients has only been 2.1% a year, half the return they could have achieved by investing in boring old Treasury bills." *Rich Managers, poor clients: A devastating analysis of hedge-fund returns,* The Economist: Buttonwood's notebook blog (January 7, 2012), http://www.economist.com/node/21542452.

192.    Surveys conducted of pension funds (both public and private) showed that fewer than half the pension funds surveyed have investments in private equity and about one quarter have investments in hedge funds. Borbjerg, *supra* note 24, at 13-19. Among those pension plans that do invest in hedge funds and/or private equity, the investments generally represent a small share of the total plan assets. According to the GAO Report one survey showed that "the average allocation to hedge funds among plans with such investments was about 4 percent in 2007" and "among plans with investments in private equity, the average was about 5 percent." *Id.* at 13.

193.    The GAO Report summarized the level of pension plan investments in alternative investments as follows:

> Although the majority of plans with investments in hedge funds or private equity have small allocations to these assets, a few plans have relatively large allocations. . . . . Of the 62 plans that reported investments in hedge funds in 2007, 12 plans had allocations of 10 percent or more and, of those, 3 plans had allocations of 20 percent or more. The highest reported hedge fund allocation was 30 percent of total assets. Large allocations to private equity were even less common. A total of 106 surveyed plans reported investments in private equity in 2007, of which 11 plans had allocations of 10 percent or more and, of those, 1 plan had an allocation of about 20 percent.

*Id.* at 13-14. The data on hedge fund and private equity allocations set forth in the GAO Report was based on a survey conducted by Pension and Investments in 2007 of the largest 200 plans, ranked by combined defined benefit and defined contribution plan assets. Of the 200 plans surveyed, only 133 completed the survey and provided asset allocation information.

194.    Although there are a handful of very successful hedge funds and hedge fund managers who have delivered good returns for their investors, the performance of hedge funds as a group has not been good, the hedge fund indices suffer from several deficiencies, of which the Investment Committee should have been aware in 2008-2011, and the overwhelming percentage of hedge fund profits flow to managers, not investors.

195.    Hedge fund indices suffer from survivor bias. Hedge funds commonly shut down and experience relatively high attrition rates—about 8.5% fail each year. But these funds are routinely excluded from the indices. Thus the indices primarily represent the returns of successful hedge funds, not those that fail, which biases returns upwards and lowers apparent downside volatility. Smoothed volatility also lowers correlations to other asset classes, thus falsely supporting the claim that hedge fund performance does not correlate to bonds and equities.

196.    Hedge fund returns are self-reported. Many of the worst performing hedge funds do not report returns for obvious reasons. And even successful hedge fund managers may choose only to report the returns of their most successful funds, but not the returns of poor-performers. This problem is described as membership bias.

197.    Even those funds and managers who do report returns may not do so on a regular basis. Infrequent fund valuations mask volatility—and reduced volatility is a primary selling point of hedge funds. For example, a hedge fund that reports performance quarterly can mask extreme swings in valuations over short periods of time.

198.    Hedge funds also may hold illiquid investments that are valued at the discretion of the manager. Given that fees are based on assets under management, hedge fund managers have an incentive to inflate valuations to increase fees as well as to boost performance.

199.    The various hedge fund indices do not have common standards. Indices differ on the number of funds covered, inclusion criteria, strategy definitions, etc. They even account for

membership and survivorship bias differently. For instance, while Tremont Capital Management segments funds into 9 strategies, Hedge Fund Research uses 20 strategies, and the Hennessee Group uses 23 strategies. Inclusion criteria range from minimum assets to proof of an audited statement, for example. Such differences can result in significant variation in performance statistics. As such, even simple comparisons among hedge funds can be misleading.

200.    The concerns about hedge fund investments, fees, reporting, and performance are not new, but were widely reported before 2011.

201.    In 2006, Vanguard published "Understanding Alternative Investments: A Primer on Hedge Fund Evaluation." Among other things, the author concluded: "Reported hedge fund returns contain significant biases that skew conventional mean-variance and regression analysis." The Vanguard Report observed that generally hedge funds do not mitigate market risk to the extent expected by investors. Christopher B. Phillips, *Understanding Alternative Investments: A Primer on Hedge Fund Evaluation,* Vanguard Investment Counseling and Research (2006), https://personal.vanguard.com/pdf/s554.pdf.

202.    Hedge funds can be classified into two basic categories: non-directional and opportunistic. Opportunistic strategies generally seek to overweight or underweight exposure to systematic risk factors to exploit general market trends. Thus, opportunistic strategies generally are exposed to the same market risk as the broader markets. Non-directional strategies are closest to the original intent of hedge funds, whereby long and short positions are established in securities that bear similar risk factor exposures. Consequently, security selection is critical.

203.    Opportunistic strategies reveal similar mean returns, suggesting investors are exposed to greater than expected risk. *Id.* at 10.

204.    Certain non-directional strategies, including convertible arbitrage and fixed income arbitrage, have recorded steeper losses than gains, suggesting that the significant relative downside risk of volatility is asymmetric, which disproportionately costs investors in down markets.

205.    Further, hedge fund use of leverage and derivatives can cause disproportionate movements in hedge funds returns as compared to underlying asset class returns. These non-linear movements can distort interpretation of mean and variance.

206.    And event-driven, convertible arbitrage and fixed income arbitrage strategies have highly negatively skewed returns. *Id.* at 11.

207.    Thus, the author concluded (in 2006): "The implications of this are important, because even with [hedge fund] index returns largely self-reported and concentrated on those funds that do not fail, investors remain exposed to significant levels of extreme returns, particularly to the downside. Accounting for survivorship bias and self-reporting would likely increase the non-normality represented in hedge fund indexes. In sum, the experiences of individual and institutional investors probably differ greatly from what might be expected from index-level analysis, with investors exposed to greater probabilities of extreme returns." *Id.* at 11.

208.    With respect to operational risk, financial experts were reporting as early as 2008 that operational risk associated with conflicts of interest within the fund and external to the fund can lead to reduced average annualized returns by 1.68%.[41]

209.    With respect to actual investor experience, the authors of a study first presented in 2009 and published in 2011 concluded that "the real alpha of hedge fund investors is close to zero."[42] In other words, for all the active management and esoteric strategies employed by hedge fund managers, the hedge fund managers add little or no value. The authors go on to conclude that "[i]n absolute terms, the dollar-weighted returns [of hedge funds] are reliably lower than the return of the S&P 500 index, and are only marginally higher than the risk-free rate as of the end of 2008." *Id.* These authors in turn cite to other studies finding small and sporadic alpha in hedge funds. The main finding of the authors was that actual investor returns are 3 to 7 percent lower than reported hedge fund returns. They conclude in 2009 that the actual risk-return profile of hedge fund investors is much worse than investors would expect from observing hedge fund indices.

---

[41]Stephen Brown et al., *Mandatory Disclosure and Operational Risk: Evidence from Hedge Fund Registration,* Journal of Finance (2008),
http://depot.som.yale.edu/icf/papers/fileuploads/2472/original/06-15.pdf.
[42]Ilia D. Dichev & Gewn Yu, *Higher risk, lower returns: What hedge fund investors really earn*, 100 Journal of Financial Economics 248 (July 20,
2009), http://www.people.hbs.edu/gyu/higherrisklowerreturns.pdf.

210.    In 2010, Vanguard published a report titled "Do hedge funds hedge? The experience of the Great Recession."[43] The authors compared the performance of hedge funds to broad market indices and a 60/40 portfolio of equities and bonds from October 2007 through February 2010. During the first part of this period, October 2007 to February 2009, hedge fund strategies declined at about -2% to -1.3%, substantially better than the broader equity indices, but not much better than a 60/40 portfolio, which had monthly returns of -2.3% during the same period. *Id.* at 3. From March 2009 to February 2010, however, the 60/40 portfolio outperformed all hedge fund categories except one. And equity indices outperformed all hedge fund strategies substantially. *Id.* Moreover, the authors reported a high performance correlation between all hedge fund categories, except one, and a 60/40 portfolio. The monthly correlation of the fund-of-hedge-funds index (the Intel Hedge Fund is a fund-of-hedge funds) to a 60/40 portfolio was 0.67 during the period, raising serious questions about whether there was any hedging at all. *Id.* at 3.

211.    Indeed, just as the Investment Committee was making huge bets on hedge funds with retirement savings, the Economist was reporting on the pitfalls of hedge funds.[44] Among other things, the Economist noted that hedge funds were performing poorly in volatile markets, "the very conditions in which hedge funds are meant to prosper." The Economist presented a line chart comparing hedge fund index returns with the S&P 500, which showed extremely high correlation in volatility and performance, thus prompting the caption "Unhedged?"

212.    In sum, the downside performance of hedge funds in 2008, although superior to equity markets, nevertheless disappointed investors and did not provide the hedge that investors expected. Hedge funds failed to do much better than a 60/40 portfolio in 2008, and have done a lot worse since, including in the period March 2009 to 2011, when the Investment Committee loaded up on hedge funds.

---

[43]Geetesh Bhardwaj, Ph.D., *Do hedge funds hedge? The experience of the Great Recession,* Vanguard Research (2010), https://pressroom.vanguard.com/content/nonindexed/Do_hedge_funds_hedge_the_experience_of_the_great_recession.pdf.

[44]*Many unhappy returns*, The Economist (Aug. 20, 2011), http://www.economist.com/node/21526326.

213.     Indeed, institutional investors were questioning the virtues of hedge fund investments just as the Investment Committee was loading up on them. A survey of such investors revealed the following[45]:

- 70% of institutional investors were demanding more transparency
- 80% of respondents reported a desire for better transparency into valuation methodologies
- Whereas the 2008 respondents ranked poor performance as their #1 concern, by Q1 2010 they ranked "lack of transparency" and "liquidity risk" as their top concerns
- 72% of investors in hedge funds in 2010 were institutions, not individuals such as retirement plan participants, and the vast majority did so for short time horizons: 94% for 3 years; 52% for 6 years; and only 31% for 10 years or more
- Only 8% of hedge fund investors sought decreased volatility by investing in hedge funds, suggesting that 92% of investors were well aware that hedge funds would likely introduce more volatility
- Even amongst this institutional respondent base, nearly 50% allocated less than 10% to hedge funds

214.     More recently, hedge funds have continued to badly underperform and fail to provide downside market protections. As recently reported in the New York Times,[46] hedge fund investors have suffered deep losses in 2015. Investors in prominent and lesser known hedge funds have seen all of 2015's gains wiped out, and are now in the red. Pershing Square Capitol Management has lost 9.4%; Marcato International has lost 11.6%; Glenview Capital Management is down 13.5%. Because of continued poor performance, investors are withdrawing from hedge funds and causing many hedge funds to close. Preqin, which publishes quarterly reports on hedge fund performance, recently reported that the third quarter of 2015 was the worst quarter for hedge funds since the third quarter of 2015, posting average losses in its benchmark of 4.08%.[47] Thus the Plans and their respective participants whose accounts were invested in Intel TDPs and the Diversified Fund continue to suffer substantial losses due to Defendants' breaches of fiduciary duty.

---

[45]*Institutional Hedge Fund Investing Comes of Age,* SEI (2010), https://www.seic.com/IMS/SEI_2011HedgeFundWhitePaper_US.pdf.
[46]Alexandra Stevenson, *Hedge Fund Assets Decline by Biggest Amount Since Financial Crisis*, New York Times (Oct. 20, 2015), http://www.nytimes.com/2015/10/21/business/dealbook/hedge-fund-assets-decline-by-biggest-amount-since-financial-crisis.html?_r=0.
[47]*The Preqin Quarterly Update*: *Hedge Funds, Q3 2015,* Preqin (2015), https://www.preqin.com/docs/quarterly/hf/Preqin-Quarterly-Hedge-Fund-Update-Q3-2015.pdf.

**8.** **Intel Hires AllianceBernstein to Manage its TDPs and the Diversified Fund**

215.     As of April 30, 2015, Intel hired AllianceBernstein to manage its two alternative investment portfolios, namely the Intel TDPs and the Diversified Fund, which had previously been managed by the Investment Committee. As observed by Cordant Wealth, in Intel's Target Date Funds: Do They Hit the Mark?, according to Morningstar's target date fund research, AllianceBernstein target date funds "have some of the highest fees in the industry and poor past performance."[48] As reported by the Wall Street Journal in *Target Date 401(k)s Get a Taste of Hedge Funds*, on September 11, 2015, AllianceBernstein is one of the few mutual fund providers that actually include hedge funds in their target date funds. But, as the Wall Street Journal article observed, only the "smaller players" like AllianceBernstein who "are seeking to 'differentiate themselves and find a place in the market" have added "hedge-fund-like 'alternative' mutual funds."[49] By contrast, "Fidelity Investments, Vanguard Group and T. Rowe Price Group, Inc., which manage more than 70% of the assets in target-date mutual funds, haven't embraced hedge-fund-like investments." *Id.*  According to the Wall Street Journal article, even those smaller players who invest some target date fund money in hedge funds invest 3% or less of their funds' assets in these alternative investments.

216.     As a result of this underperformance, a prudent fiduciary would have re-evaluated the selection of these, or all of, the Hedge Funds and Private Equity, and began divesting.

**9.** **Inadequate Disclosure of the Investments Underlying the Intel TDPs and Diversified Fund**

217.     According to applicable regulations, 29 C.F.R. § 2550-404a-5(a), entitled "Fiduciary requirements for disclosure in participant-directed individual account plans" (the "Disclosure Regulation"), the administrator of a participant-directed retirement plan must disclose several types

---

[48]Isaac Presley, *Intel's Target Date Funds: Do They Hit the Mark*, Cordant Wealth Partners: The Cordant Blog (May 18, 2015), https://cordantwealth.com/intels-target-date-funds-do-they-hit-the-target/.
[49]Anne Tergesen, *Target Date 401(k)s Get a Taste of Hedge Funds,* The Wall Street Journal (September 11, 2015), http://www.wsj.com/articles/target-date-401-k-s-get-a-taste-of-hedge-funds-1442001842.

1   of information to participants in such a plan, both prior to the initial investment and also on an

2   ongoing basis, if there are material changes to the plan's investment options.

3       218.    Under the Disclosure Regulation, the plan administrator – here, the Administrative

4   Committee – must ensure that participants "are made aware of their rights and responsibilities with

5   respect to the investment of assets held in, or contributed to, their accounts and are provided

6   sufficient information regarding the plan, including fees and expenses, and regarding designated

7   investment alternatives, including fees and expenses thereto, to make informed decisions with regard

8   to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

9       219.    In order to comply with the Disclosure Regulation, the Administrative Committee

10   Defendants had to make the following complete and accurate disclosures, among other things:

> a) An explanation of any specified limitations on investment instructions under the terms of the plan, including any restrictions on transfer to or from a designated investment alternative;
>
> b) An identification of any designated investment alternatives offered under the plan;
>
> c) An identification of any designated investment managers;
>
> d) An explanation of any fees and expenses for general plan administrative services which may be charged against individual accounts of participants and which are not reflected in the total annual operating expenses of any designated investment alternative and the dollar amount of such fees and expenses that are actually charged to an individual account, on a quarterly basis;
>
> e) The name of each designated investment alternative and the type or category of investment; performance and benchmark data for such investment; detailed fee and expense information such as expense ratios; the internet web site address containing information about the designated investment alternative.

22   29 C.F.R. § 2550-404a-5(c)-(d).

23       220.    Based on the documents provided to Plaintiff, the Administrative Committee

24   Defendants failed to make any of the required disclosures listed above, and failed to comply with

25   their duties pursuant to the Disclosure Regulation as a whole, with respect to disclosure of the

26   designated investment alternatives like the Investment Funds underlying the Intel TDPs and

27   Diversified Fund.

28

                Complaint

221.    Based on the documents provided to Plaintiff, the Administrative Committee Defendants failed to disclose any of the required information regarding the Hedge Fund, the Commodities Fund, or the Private Equity Fund.

222.    These failures to disclose left the majority of participants in the Plans unaware regarding the true content and character of their retirement savings, because investment in Intel TDPs was the primary investment options for Intel's 401(k) Plan participants and the Diversified Fund was the primary investment option for Retirement Plan participants. Even if participants were provided some information that the TDPs and Diversified Fund included investments in hedge funds and private equity, the plan fiduciaries failed to provide participants with adequate sufficient information so that they could make any informed intelligent decision about whether investing in these particular hedge funds and private equity funds was prudent.

223.    The Investment Committee designed the 401(k) Plan to make Intel TDPs the main investment option; since 2011, eligible employees who are auto-enrolled in the 401(k) Plan are automatically invested in the appropriate vintage Intel TDP as the default investment option. Participants who are auto-enrolled in the 401(k) Plan, and thus also the Intel TDP investment, must affirmatively opt-out of the investment option.

224.    In 2014, Intel reported that 40% of the 401(k) Plan participants invested 100% of their account balance in a single Intel TDP.

225.    But the account statements received by Plaintiff from the 401(k) Plan (for which the contents the Administrative Committee was responsible) described the asset allocation of his 401(k) account as invested approximately 63% in stocks, 16% in bonds, and 21% in "short-term/other" investments, as of December 2011 and again as of December 2012. The term "short-term/other" was not defined on the face of the statements Plaintiff received. Thus, Plaintiff's account statements did not reveal any investment or allocation to hedge funds, private equity, or commodities.

226.    Similarly, the Investment Committee designed the Retirement Plan to make the Diversified Fund the main investment option for participants in the Plan. Until recently, the Diversified Fund was the only fund available to participants under the age of 50. As a result, over 90% of the Plan's and participants' assets were invested via the Diversified Fund.

# VI.  CLAIMS FOR RELIEF
## Count I
### (Violations of ERISA § 404(a) by the Investment Committee Defendants in Managing The Plans' Assets on Behalf of the Target Date Class)

227.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

228.    As fiduciaries of the Plans, the Investment Committee Defendants were required pursuant to ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

229.    The Investment Committee Defendants breached those duties by adopting an asset allocation model such that the Intel TDPs were and are comprised of approximately 20-25% Hedge Funds, 4-5% commodities, and where international equities account for over 50% of equity holdings.

230.    The investment allocation of the Intel TDPs represents a significant departure from the target date funds offered by professional managers, even the ones offered by Intel's new Investment Manager, AllianceBernstein.

231.    Based on this excessive allocation to alternative investments, the Intel TDPs have all underperformed their peer funds during the Target Date Class Period. For example, as Morningstar observed with respect to the 2030 Intel TDP: "the fund has some vital differences from its Morningstar Target Date 2026-2030 category peers. For one the fund invests 21% of its assets in a wide mix of hedge fund strategies and has a 5% allocation to commodities, whereas none of its peers own hedge funds and only a few have small commodity stakes. Moreover, the fund's equity allocation favors foreign stocks over U.S. stocks, whereas its typical competitor invests 70% in domestic stocks and 30% overseas."[50] The substantial divergence from peer group allocations means that the Intel 2035 TDP underperformed the peer group by 400 basis points in 2013 alone.

---

[50]Morningstar Report on *Target Date 2030 Fund*, Oregonian Live at 2 (March 31,

232.     According to Morningstar, the entire suite of Intel TDPs "have lagged their respective peers amid other market rallies, such as in 2012 and 2009." Morningstar predicts that because of the investments and allocations made by the Investment Committee, the Intel 2030 TDP is "less likely to keep pace with competitors amid stock market booms." *Id.* As the Intel TDPs all share the same asset allocation model and the same underlying Investment Accounts, all of the Intel TDPs over-allocate the accounts of participants in the 401(k) Plan and the Retirement Plan to alternative investments and similarly underperformed.

233.     In light of the well-known risks associated with investment in alternative investments like hedge funds, private equity, and commodities alleged above, the Investment Committee Defendants knew or should have known that such heavy allocation to these types of investments was imprudent and inappropriate for a defined contribution plan particularly in light of the risks, lack of transparency, and lack of liquidity of hedge fund investments.

234.     On information and belief, including based on the statements of Stuart Odell, the Investment Committee Defendants did not understand and failed to give appropriate consideration to these risks, or disregarded such risks, when they selected and maintained the asset allocation for the Intel TDPs.

235.     Through the foregoing conduct, the Investment Committee Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Thus the Investment Committee Defendants breached their fiduciary duties to the Plans and their participants and beneficiaries and are liable to restore all losses to the Plans resulting from their investment decisions with respect to the Intel TDPs.

2014), http://media.oregonlive.com/finance/other/Target%20Date%202030%20Fund-1.pdf.

236.    As a result of the Investment Committee Defendants' breaches, the Plans, Plaintiff, and the Plans' participants and beneficiaries have suffered financial losses through the loss of return that would have been earned on prudent investment of the Plans' assets.

**Count II**

**(Violations of ERISA § 404(a)(1)(B) by the Administrative Committee in Failing to Provide Disclosures to Participants Regarding Designated Investment Alternatives on Behalf of the Target Date Class)**

237.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

238.    As fiduciaries of the Plans with respect to the administration of the Plans, the Administrative Committee Defendants were required pursuant to ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

239.    Consistent with their obligations under ERISA § 404(a)(1)(A) and (B), the Administrative Committee Defendants were required to ensure that participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

240.    The Administrative Committee Defendants failed to comply with the requirements of the Disclosure Regulation, because they failed to, among other things:

    a)    Provide an explanation of any specified limitations on investment instructions under the terms of the plan, including any restrictions on transfer to or from designated investment alternatives like the Hedge Fund and the Private Equity Fund;

b) Identify the Hedge Fund and the Private Equity Fund as designated investment alternatives offered under the plan;

c) Identify designated investment managers for the Hedge Fund and the Private Equity Fund;

d) Provide an explanation of any fees and expenses for general plan administrative services which may be charged against individual accounts of participants and which are not reflected in the total annual operating expenses of designated investment alternatives like the Hedge Fund and the Private Equity Fund and the dollar amount of such fees and expenses that are actually charged to an individual account, on a quarterly basis, for investment in such funds;

e) Provide the name of designated investment alternatives like the Hedge Fund and the Private Equity Fund and the type or category of investment; performance and benchmark data for each such investment; detailed fee and expense information such as expense ratios; the internet web site address containing information about such designated investment alternative.

*See* 29 C.F.R. § 2550-404a-5(c)-(d).

241.    The Administrative Committee failed to adequately disclose to participants and beneficiaries in the Plans information regarding risks, fees and expenses associated with such hedge funds and private equity funds. Although the Administrative Committee disclosed information regarding the allocation strategy of the Intel TDPs as designated investment alternatives of the Plans, it failed to provide the required disclosure for the Hedge Fund and Private Equity Fund in which the Plans invested pursuant to the allocation models for the Intel TDPs. Among other things, the Administrative Committee failed to provide adequate disclosures about: (1) the arrangements between the Plans and the hedge fund and private equity funds, including the fees and expenses and the investment strategies and holdings for each fund; and the identity of the private equity and hedge fund firms and individual managers.

242.    As a result of these failures, Plaintiff and participants in the Plans were not able to make informed decisions with regard to the management of their individual accounts.

243.    As a result of the Administrative Committee Defendants' breaches of their fiduciary duty, Plaintiff and participants in the Plans have suffered financial losses through the loss of return that would have been earned on prudent investment of the Plans' assets.

**Count III**
**(Violations of ERISA § 404(a)(1)(A) & (B) by the Investment Committee in Managing Global Diversified Fund on Behalf of Diversified Fund Class)**

244.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

245.     As fiduciaries of the Plans, the Investment Committee Defendants were required pursuant to ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

246.     The Investment Committee breached those duties to both the Retirement Plan and the 401(k) Plan and their participants by making asset allocation and investment decisions for the Diversified Fund.

247.     At the end of 2008, the Diversified Fund held approximately 5.28% of its assets, about $243 million, in hedge fund and private equity investments. A year later, the fund allocated 16.52% of its assets to hedge funds and private equity. In the following year, the Investment Committee increased the Diversified Fund's allocations to hedge funds and private equity and added allocations to commodities, resulting in 22.23% of fund assets, approximately $1.2 billion, allocated to these alternative investments. By the end of 2013, the Investment Committee had caused the Diversified Fund to allocate 36.71%, $2.33 billion, to such alternative investments.

248.     In light of the well-known risks associated with investments such as hedge funds and private equity, alleged above, the Investment Committee Defendants knew or should have known that such heavy allocation to these types of investments was imprudent and inappropriate for a defined contribution plan particularly in light of the risks, lack of transparency, and lack of liquidity of hedge fund investments. Nothing in the prior performance indicated that the portfolio that the Investment Committee had assembled would be different.

249.     Based on the statements of Stuart Odell, the Investment Committee Defendants did not understand and failed to give appropriate consideration to these risks, or disregarded such risks, when they selected and maintained the asset allocation for the Diversified Fund.

250.     Through the foregoing conduct, the Investment Committee Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Thus the Investment Committee Defendants breached their fiduciary duties to the Plans and their participants and beneficiaries and are liable to restore all losses to the Plans resulting from their investment decisions with respect to the Diversified Fund.

251.     As a result of the Investment Committee Defendants' breaches, the Plans, Plaintiff, and the other participants and beneficiaries have suffered financial losses through the loss of return that would have been earned on prudent investment of the Plans' assets.

**Count IV**
**(Violations of ERISA § 404(a)(1)(B) by the Administrative Committee in Failing to Provide Disclosures to Participants Regarding Designated Investment Alternatives on Behalf of the Diversified Fund Class)**

252.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

253.     As fiduciaries of the Plans with respect to the administration of the Plans, the Administrative Committee Defendants were required pursuant to ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

254.    Consistent with their obligations under ERISA § 404(a)(1)(A) and (B), the Administrative Committee Defendants were required to ensure that participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a).

255.    The Administrative Committee Defendants failed to comply with the requirements of the Disclosure Regulation, because they failed to, among other things:

a)  Provide an explanation of any specified limitations on investment instructions under the terms of the plan, including any restrictions on transfer to or from designated investment alternatives like the Hedge Fund and the Private Equity Fund;

b)  Identify the Hedge Fund and the Private Equity Fund as designated investment alternatives offered under the plan;

c)  Identify designated investment managers for the Hedge Fund and the Private Equity Fund;

d)  Provide an explanation of any fees and expenses for general plan administrative services which may be charged against individual accounts of participants and which are not reflected in the total annual operating expenses of designated investment alternatives like the Hedge Fund and the Private Equity Fund and the dollar amount of such fees and expenses that are actually charged to an individual account, on a quarterly basis, for investment in such funds;

e)  Provide the name of designated investment alternatives like the Hedge Fund and the Private Equity Fund and the type or category of investment; performance and benchmark data for each such investment; detailed fee and expense information such as expense ratios; the internet web site address containing information about such designated investment alternative.

*See* 29 C.F.R. § 2550-404a-5(c)-(d).

256.    The Administrative Committee failed to adequately disclose to participants and beneficiaries in the Plans information regarding risks, fees and expenses associated with such hedge

funds and private equity funds. Although the Administrative Committee disclosed information regarding the allocation strategy of the Diversified Fund as designated investment alternatives of the Plans, it failed to provide the required disclosure for the Hedge Fund and Private Equity Fund in which the Plans invested pursuant to the allocation models for the Diversified Fund. Among other things, the Administrative Committee failed to provide adequate disclosures about: (1) the arrangements between the Plans and the hedge and private equity fund managers in the Hedge Fund and Private Equity Fund, respectively, including the fees and expenses and the investment strategies and holdings for each fund; and the identity of the private equity and hedge fund firms and individual managers.

257.    As a result of the Administrative Committee Defendants' breaches of their fiduciary duty, Plaintiff and participants in the Plans have suffered financial losses through the loss of return that would have been earned on prudent investment of the Plans' assets.

### Count V
**(Breach of Fiduciary Duty Under ERISA § 404 for Failure to Monitor Other Fiduciaries of the Plans, Against the Finance Committee Defendants)**

258.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

259.    As fiduciaries of the Plans, the Finance Committee Defendants were required pursuant to ERISA § 404(a)(1) to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

260.    Under ERISA, a fiduciary charged with the authority to select and remove other fiduciaries or who, as a practical matter, in fact appoints other fiduciaries, has an ongoing duty to monitor the performance of those persons whom the fiduciary is empowered to remove. An appointing fiduciary therefore must, at reasonable intervals, ensure that the fiduciary it has appointed

is acting in compliance with the terms of the applicable plan, acting in accordance with ERISA and applicable law, and satisfying the needs of the plan.

261.    Pursuant to Section 13 of the Plans, the Finance Committee Defendants were responsible for the appointment and removal, and for periodically monitoring the performance, of the Investment Committee Defendants and the Administrative Committee Defendants.

262.  Each of the Finance Committee Defendants is/was individually and collectively responsible for periodically, or at least on a quarterly basis, monitoring the performance of each of the other named fiduciaries and for the removal of any breaching fiduciary. The Finance Defendants breached that duty to monitor by, inter alia:

a.    Failing to properly monitor the performance of the Investment Committee Defendants to determine whether the Committee was prudently selecting an appropriate allocation for the assets of the Plans, including via the Intel TDPs and the Diversified Fund;

b.    Failing to properly monitor the Investment Committee Defendants to ensure that the Committee was not pursuing an excessively expensive and complicated investment strategy, when other strategies that performed better with lower fees and expenses were available for investment of the assets of the Plans; and

c.    Failing to properly monitor the performance of the Administrative Committee Defendants to determine whether the Committee was complying with its duties to disclose information regarding designated investment alternatives in the Plans;

263.    By failing to properly monitor the performance of the Finance Committee Defendants the Board of Directors (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

264.    As a result of their breaches, the Finance Committee Defendants caused the Plans to suffer losses, through the payment of excessive fees for active investment in alternatives like hedge

funds and private equity, and through loss of investment return that would have been gained through prudent investment of the Plans' assets.

**Count VI**
**(Co-fiduciary Liability Under ERISA § 405 Against All Defendants)**

265.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

266.    ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if

(1)    he participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2)    by his failure to comply with ERISA § 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    he knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

267.    Defendants were fiduciaries within the meaning of ERISA, by the nature of their fiduciary duties with respect to the Plans, and they knew of each breach of fiduciary duty alleged herein arising out of the excessive and imprudent investment of the assets of the Plans in alternative investments. Yet they knowingly participated in, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

268.    The Finance Committee Defendants knew that the Plans were invested heavily in alternative investments such as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because the Investment Committee created this asset allocation strategy, and pursuant to Section 13(m) of the Plan Documents, the Investment Committee was responsible for reporting not less than annually to the Finance Committee about its actions.

269.    Each member of the Investment Committee knew that the Plans were invested heavily in alternative investments such as the Hedge Fund Portfolio, the Commodities Fund, and the

Alternative Investments Fund in the Intel Master Trust, because the Investment Committee created this asset allocation strategy.

270.    The Finance Committee Defendants also knew that the Administrative Committee did not disclose to participants the information required in the Disclosure Regulations, particularly regarding such designated investment alternatives as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because pursuant to Section 13(m) of the Plan Documents, the Administrative Committee was responsible for reporting not less than annually to the Finance Committee about its actions.

271.    The Investment Committee Defendants also knew or should have known that the Administrative Committee did not disclose to participants the information required in the Disclosure Regulations, particularly regarding such designated investment alternatives as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because they must have been aware of what information was being disclosed.

272.    Each member of the Administrative Committee also knew that the Administrative Committee did not disclose to participants the information required in the Disclosure Regulations, particularly regarding such designated investment alternatives as the Hedge Fund Portfolio, the Commodities Fund, and the Alternative Investments Fund in the Intel Master Trust, because they were each responsible for making sure proper information was being disclosed.

273.    Despite this knowledge, the Finance Committee Defendants, the Investment Committee Defendants and the Administrative Committee Defendants failed to act to remedy the several violations of ERISA alleged in Counts I-V.

274.    As such, each member of the Investment Committee is liable for the breaches by the other Investment Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

275.    As such, each member of the Administrative Committee is liable for the breaches by the other Administrative Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

276.    As such, each member of the Finance Committee is liable for the breaches by the other Finance Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

277.    As such, each of the Defendants is liable for breaches by the Investment Committee Defendants and the Administrative Committee Defendants pursuant to Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3).

## VII.  ENTITLEMENT TO RELIEF

278.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled to sue each of the fiduciary Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plans as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plans, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

279.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A declaration that the Defendants breached their fiduciary duties under ERISA;

B.    An order compelling each fiduciary found to have breached his/her/its fiduciary duties to the Plans to jointly and severally restore all losses to the Plans which resulted from the breaches of fiduciary duty or by virtue of liability pursuant to ERISA § 405;

C.    An order requiring (a) the disgorgement of profit made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with their breach of fiduciary duties or violations of ERISA, (c) an order requiring the Plans to divest themselves of investments in hedge funds and commodity funds or (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plans;

D.    Ordering, pursuant to ERISA § 206(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plans;

E.       Removing any breaching fiduciaries as fiduciaries of the Plans and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiff or any member of the Class is a participant or beneficiary;

F.       Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plans and the management of the Plans' investments and/or selection of investment options and/or to oversee the divestment of the Plans' investments in hedge funds and commodity funds;

G.       Ordering the Plans' fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plans;

H.       Awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), the common benefit doctrine and/or the common fund doctrine;

I.       Awarding pre-judgment and post-judgment interest; and

J.       Awarding such other remedial or equitable as the Court deems appropriate.

Dated:  October 29, 2015          Respectfully submitted,

/s/ R. Joseph Barton
R. Joseph Barton (Cal. Bar No. 212340)
jbarton@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., NW
Suite 500, East Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699

Joseph A. Creitz (Cal. Bar No. 169552)
joe@creitzserebin.com
Lisa S. Serebin (Cal. Bar No. 146312)
lisa@creitzserebin.com
CREITZ & SEREBIN LLP
250 Montgomery Street
Suite 1400
San Francisco, CA 94104
Telephone: (415) 466-3090
Facsimile:  (415) 513-4475

Gregory Y. Porter (to be admitted *pro hac vice*)
gporter@baileyglasser.com
Ryan T. Jenny (to be admitted *pro hac vice*)
rjenny@baileyglasser.com
BAILEY & GLASSER LLP
1054 31st Street, NW
Suite 230
Washington, D.C. 20007
Telephone: (202) 463-2101
Facsimile:  (202) 463-2103

Major Khan
mk@mk-llc.com
MAJOR KHAN LLC
1120 Avenue of the Americas
Suite 4100
New York, NY 10036
Telephone: (646) 546-5664
Facsimile:  (646) 546-5755

*Attorneys for Plaintiff*

# EXHIBIT 1

**Income Fund:**





**Target Date Fund - 2005**





**Target Date Fund - 2015**





**Target Date Fund – 2020**





**Target Date Fund - 2030**





**Target Date Fund – 2040**





**Target Date Fund – 2050**


