1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3          Before The Honorable Nathanael M. Cousins, Judge

4

5   SULYMA,                        )
                                   )
6            Plaintiff,            )
                                   )
7   vs.                            )   No. C 15-04977-NMC
                                   )
8   INTEL CORPORATION INVESTMENT   )
    POLICY COMMITTEE, et al.,      )
9                                  )
             Defendants.           )
10  _____)

11                                 San Jose, California
                                   Wednesday, August 10, 2016
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 2:19 - 3:44 = 85 MINUTES
14
    APPEARANCES:
15
    For Plaintiff:
16                                 Cohen, Milstein, Sellers
                                     & Toll, PLLC
17                                 1100 New York Avenue, N.W.
                                   Suite 500
18                                 Washington, D.C. 20005
                             BY:   R. JOSEPH BARTON, ESQ.
19
    For Defendants:
20                                 Williams and Connolly
                                   725 12th Street Northwest
21                                 Washington, D.C. 20005
                             BY:   JOHN J. BUCKLEY, JR., ESQ.
22
    Transcribed by:                Echo Reporting, Inc.
23                                 Contracted Court Reporter/
                                   Transcriber
24                                 echoreporting@yahoo.com

25

2

1 <u>Wednesday, August 10, 2016</u>                         <u>2:19 p.m.</u>

2                          P-R-O-C-E-E-D-I-N-G-S

3                               --oOo--

4           THE CLERK:  Calling civil 15-4977, Christopher

5 Sulyma versus Intel Corporation Investment Policy Committee,

6 et al.

7           MR. BARTON:  Good afternoon, your Honor.  Joseph

8 Barton for the Plaintiff.

9           THE COURT:  Good afternoon.

10           MR. BUCKLEY:  Good afternoon, your Honor.  I'm

11 John Buckley, Williams and Connolly for the Intel

12 Defendants.

13           THE COURT:  Good afternoon.  Thanks all for being

14 here.

15           MR. BUCKLEY:  Thank you.

16           THE COURT:  All right.  We are making a recording

17 of the argument.  So if you'll continue to speak clearly in

18 the microphone, that will aid in the creation of a good

19 transcript if one is desired.

20     Many issues presented in the motion and opposition.

21 Give me a scope, Mr. Barton, of what's going on in this

22 case.  How many other cases might be implicated?  How many

23 other ERISA cases might there be if I were to deny the

24 motion and allow this case to go forward?

25           MR. BARTON:  I'm not sure what you're -- exactly

3

1 what you mean.

2          THE COURT:  This -- if this theory -- it looks to

3 be a bit of a novel theory to me as far as liability for

4 what's gone on here, but maybe I'm off on that and lack the

5 -- the context that you have in your experience.  Are there

6 going to be thousands, hundreds, tens, or is this kind of a

7 one off situation with what is alleged in the case?

8          MR. BARTON:  Well, I think the actual practice

9 that the Defendants have engaged in here is an unusual

10 practice.  I don't think the theory is particularly unusual.

11 You see many of the cases that we cite.  There's been many

12 allegations that Defendants have not put proper -- have not

13 engaged in proper strategies, not put proper investments

14 into various defined contribution plans.  That's not a novel

15 theory, nor is the theory -- and I think what Defendants

16 mis-portray the case, this case is not about did they -- of

17 a theory that you can never invest in an alternative

18 investment.  It's not a theory that a particular investment

19 that they are invested in was imprudent.  And, primarily, we

20 don't know much about the actual investments that they were

21 invested in because they have failed to disclose it both to

22 us upon request and even its participants.

23      So what the case is about is the improper construction

24 of a strategy, an allocation of portfolio models -- or

25 portfolios.  It's not really models.  It's portfolios that

4

1 they created to invest the assets, and they invested the
2 assets between 25 and 40 percent in these alternatives.
3 This is the asset class, if you even want to call it that,
4 of hedge funds or private equity.  That's what they put them
5 in, and the result of that is that these plans have under-
6 performed.  They have put them in -- and what we lay out in
7 the complaint is that investing in hedge funds, they -- and
8 they have certain risks.  They have significant costs.  They
9 have liquidity problems.  There are a whole host of problems
10 with investing in these things.  And it doesn't mean that
11 everything you do or every time you invest in it there's
12 something wrong with it, but what we do learn is that they
13 -- this -- these plans have under-performed.  They have very
14 high fees.  They had high fees even before they engaged in
15 the strategy.  And once they really ramped it up, they had
16 excessively high fees.  And if you compare these to other
17 things that they could have done to have changed what they
18 claim to be the same objectives, which is to minimize
19 volatility, to minimize risk, and they seem to have -- they
20 seem to say they want to do two things, which don't make
21 sense to me.  They want to minimize volatility and risk but
22 at the same time achieve -- you know, out-market
23 performance.  Those two things don't seem to be sensible to
24 me, to do the same thing.  They seem to be doing two
25 opposite things, but that's what they seem to say, you know,

5

1  in both -- sort of talking out of both sides of their mouths

2  in terms of what they're doing.

3      And they have under-performed and had high fees, and

4  that's -- and through -- as a result of this over-

5  allocation, through this strategy.  And that's the core of

6  the complaint.

7              THE COURT:  All right.  So if I were to define the

8  case narrowly to over-allocation and not just the investment

9  in alternate assets, it would be a smaller world of -- of

10 funds that might be prone to this type of liability?

11             MR. BARTON:  Probably so, your Honor.

12             THE COURT:  All right.  And that's, of course, not

13 the determining question here, but I just wanted to get a

14 sense for the context of how this case fits in with others

15 cross the country.

16     All right.  The Defendants, it's, of course their

17 motion, and they had the last word of the reply.  So, given

18 that we've got a number of different issues presented, I

19 want to give you a chance first to respond to any arguments

20 you -- you wish to in their reply that you think you haven't

21 had a chance to talk back at yet.

22             MR. BARTON:  Your Honor, I can -- I can start

23 wherever you'd like.

24             THE COURT:  You start where you'd like.

25             MR. BARTON:  I can run through them if you would

6

1 like, your Honor.

2          THE COURT:  Yes.

3          MR. BARTON:  We can start with -- they started

4 with statute of limitations.  I'm happy to start there.

5          THE COURT:  Yes.

6          MR. BARTON:  I think the fundamental problem with

7 their argument is they confuse actual knowledge versus

8 constructive knowledge.  Now, in their reply the complain

9 that we cite cases from outside the Ninth Circuit and that

10 conflict with Ninth Circuit standards.  The reason is

11 because they cited cases from the Second Circuit and the

12 Sixth Circuit which they now contend conflict with the Ninth

13 Circuit.  So we responded to those cases.  We explained

14 those cases.  We actually cited Ninth Circuit cases.  They

15 cited one Ninth Circuit case in their opening, Blanton

16 (phonetic), and what we said in response was Blanton is an

17 -- it has a particular narrow focus, and the reason it has a

18 narrow focus is because of the facts in Blanton, and the

19 facts of Blanton are that the Defendants asserted a

20 counterclaim.  So the Defendants are in the role of the

21 Plaintiff in that case, and one of the things to remember in

22 that case is that the Defendants -- the Defendants/Counter-

23 Plaintiffs, they had actual knowledge of the transaction at

24 the time it took place because as trustees they were parties

25 to the transaction, and they actually made the decision to

7

1  undertake the transaction.

2      Now, the other thing is, the other distinguishing

3  factor in <u>Blanton</u> is it was a per se or obvious violation of

4  the statute, and that's what's going on there.  And they

5  then -- and we say, "Look, that's limited to those

6  situations where the transaction itself can have actual

7  knowledge."  And you also have to focus on what the Ninth

8  Circuit's deciding, parties that actually were parties to

9  the transaction.  That's not this Plaintiff.  He has nothing

10 to do with these transactions.  He's not making the

11 allocation decisions or how to set up the fund.  And I think

12 the -- the Defendants appear to concede that the Seventh

13 Circuit standard is in line with the Ninth Circuit standard,

14 at least in the cases that they cite.  They say the Seventh

15 Circuit and the Ninth Circuit align together.

16     So an important thing to remember there is in the

17 Seventh Circuit case, <u>Dish v. Great Bank</u>, what they said is

18 to distinguish actual knowledge from constructive knowledge

19 is what actual knowledge means is knowledge of all material

20 facts necessary to understand that some claim exists, which

21 facts could include necessary opinions of experts, knowledge

22 of the transaction's harmful consequences, or even actual

23 harm, and that's important.  These kind of -- this kind of

24 transaction, this kind of investments requires an ordinary

25 plaintiff to consult with an expert.  This kind of plaintiff

8

1  is not -- an ordinary participant is going to need the

2  education and help of experts, and that's why we don't have

3  actual knowledge here.

4        THE COURT:  Just to put it into kind of plain

5  facts, what does the Plaintiff claim that he needed to know

6  that he didn't know in 2013?  And this is not a statute of

7  limitations issue, of course.

8        MR. BARTON:  Sure.  What ne needed to know is to

9  understand the implications of the decisions that the

10 Defendants had -- had made with respect to the decisions to

11 allocate.  And he also had to understand --

12       THE COURT:  And what does that look like in real

13 life?  Like what does that disclosure fund sheet or

14 information sheet look like?  If you were designing -- if

15 you were in their defense shoes designing the disclosure,

16 what does it look like to actually provide sufficient

17 notice?

18       MR. BARTON:  Are you asking in terms of the

19 prudence?

20       THE COURT:  As far as the inadequate -- Counts 2

21 and 4, the inadequate disclosure.

22       MR. BARTON:  Sure.  So as to the inadequate

23 disclosure, I mean, their -- I mean, you can look at -- I

24 think they may have handed you up a little booklet, and you

25 can look at -- but also in the attachments of what they

9

1  claimed was disclosed, there is -- so far as I can tell,

2  there is very little disclosed about these things.  They

3  tell them they're in hedge funds.  That's the equivalent of

4  telling somebody "You're in equities" or "You're in domestic

5  stocks," not -- it makes a big difference.  Are you in AT&T,

6  in IBM, in Google or are you in penny stocks?  Both are

7  stocks.  Telling somebody you're in hedge funds is virtually

8  worthless disclosures.  Telling somebody you're in private

9  equity, which I don't actually see in any of the fact

10 sheets, is not very much -- it wouldn't even also be

11 helpful.  What kind of private equity are you in?  What

12 types of these investments?  What are the nature of these

13 things?  There's virtually no disclosures, as compared to

14 the type of disclosures that you would get if they had put

15 you in a mutual fund.  You get a prospectus every year.  You

16 get a quarterly statement that lays out what is the

17 strategy, and they're required to adhere to the strategy.

18 What are the actual investments that you're in?  What is the

19 performance of these funds?  This is not laid out in

20 anything that they would disclose.

21     And we have a -- we have difference of opinion legally

22 of what was required, but those certainly things, there is

23 very little in the way of disclosure that was actually made

24 here in terms of what people were in, and people were not in

25 -- there was no fund here.  You're not in a mutual fund.

10

1  There's no mutual fund, and so you can see just the -- this

2  is what you have an interest in and seeing the actual assets

3  or the actual performance of the mutual fund.  This is a

4  portfolio allocation.

5      What I mean by that is instead of -- if I were your

6  investment advisor and you said to me "Help me invest," and

7  I said "Why don't you invest in the Vanguard 500 index

8  fund," and then you would get a bunch of disclosures from

9  Vanguard.  Instead, what I have done is said let me just

10 allocate the way -- any way I want.  Maybe I'll do something

11 like Vanguard, but I act as Vanguard, but I don't give you

12 any disclosures.  I don't give you any disclosures about the

13 actual investments that you're in.  I don't give you any

14 disclosures in terms of what I'm doing.  That's what's going

15 on.

16         THE COURT:  Mr. Buckley, I'll give you a chance to

17 respond to that.  Why were the 2013 notices -- I'm focusing

18 right now on Counts 2 and 4.  Why did that put Plaintiff on

19 notice?

20         MR. BUCKLEY:  Well, your Honor, if you would, I'd

21 like to take you through all the disclosures in a more

22 methodical manner rather than --

23         THE COURT:  Go for it.

24         MR. BUCKLEY:  -- to kind of jump in in the middle

25 of Mr. Barton's argument and respond in a piecemeal manner.

1    So I'll do it whenever the Court pleases.  If you'd
2  like to let him finish presentation in and then --

3         THE COURT:  No.  Jump in.  Let's have a little
4  back and forth.

5         MR. BUCKLEY:  Okay.  Let me go back then to
6  respond to one thing he said at the outset, is this a novel
7  theory.  You may recall in the briefing over who was the
8  lead counsel, they were touting this as a novel theory, as a
9  first of its kind, and what they were saying is this is the
10  first case in which there's been a claim that it was
11  imprudent to over-allocate to alternative investments in a
12  retirement plan.

13    The fact that retirement plans contain alternative
14  investments, hedge funds and private equity, that's not
15  novel.  You may have noticed that in one of the footnotes in
16  our -- our brief we cited one of the publications that was
17  referenced in the complaint, and that publication, which was
18  the Department of Labor report and the JO report, indicated
19  that public pension plans contain hedge funds and private
20  equity, that endowments contain those types of investments,
21  and that as to large corporations such as Intel, that it's
22  also common for large corporations in their retirement plans
23  to have alternative investments, including hedge funds,
24  other types of alternative investments such as private
25  equities.

1      So it's not novel to have alternative investments in

2  hedge fund plans.  What's novel is in this case the

3  contention that a certain level of such alternative

4  investments.  Here they have arbitrarily chosen 30 percent

5  approximately to coincide with the level that was contained

6  in the Intel plans.  They've just arbitrarily declared that

7  to be excessive, without giving any facts to distinguish.

8  So it is a novel claim.  It's like in ERISA fields,

9  plaintiffs are always looking to -- it's like the Star Ship

10 Enterprise, to go where man has never gone before.  Well,

11 this is one of those cases where they're trying to expand,

12 get into a new cottage industry of suing pension plans if

13 they succeed here in that theory.

14     So let me then go to -- to the disclosure.  So I think

15 it would be helpful if I -- if I take them -- take you

16 through them, and I do have a booklet that contains the ones

17 we're relying on for purposes of the statute of limitations.

18          THE COURT:  These are excerpts of materials filed

19 with the motion, correct?

20          MR. BUCKLEY:  Yes, that's correct.

21          THE COURT:  Thank you.  The Plaintiff, if I may,

22 tried to create some confusion as to what documents we're

23 relying on and the basis for our reliance, and in this

24 booklet I've limited myself to the documents that pertain to

25 the statute of limitations complaint.

13

1    So, if I can, let me start -- and I had intended to

2 show you why it's appropriate for you to reference each of

3 these.  I was interested in the argument in the earlier case

4 about --

5         THE COURT:  It overlaps.  Let's talk about that

6 now.

7         MR. BUCKLEY:  It overlaps.  So I -- let me go

8 through these documents, and then I can --

9         THE COURT:  Well, I'm actually going to jump off

10 there for a moment --

11        MR. BUCKLEY:  Okay.

12        THE COURT:  -- to see if we have a contested issue

13 and, if so, if we can flush it out a little more.

14    Does Plaintiff contest the authenticity of these

15 documents, and, if so, as I asked in my previous question,

16 what's the basis for the authenticity objection?

17        MR. BARTON:  Sure.  So, first of all, we asserted

18 an objection in our response, and the reason that we

19 asserted objection is the only declaration that was put in

20 about these documents is from Mr. Buckley.  Mr. Buckley does

21 not appear from his declaration to have any firsthand

22 knowledge about these documents, whether they were authentic

23 or when -- and the critical question from their point of

24 view is when did they get posted on a website.  That's the

25 question, and Mr. Buckley had no knowledge or information

14

1  about that, and he didn't say who he was in his declaration.

2      They then -- and I think it's their burden on the

3  opening motion to show that, and they did not show that.

4  They then submitted in -- with the reply declarations from

5  two gentlemen who attest that these are documents that are

6  held by Intel and one of whom says these are documents that

7  Intel would have published about the same time of the -- I

8  don't have any information or knowledge about who these

9  people are.  They were never disclosed to us before.  I

10 don't even know whether they were working there at the time.

11 They don't say that in their declaration.  So this continues

12 to be a problem.

13     The other thing that I think is problematic about the

14 documents is their use of the documents.  They use the

15 documents to --

16         MR. BUCKLEY:  Can I explain how I'm going to use

17 the documents?

18         THE COURT:  I'll come --

19         MR. BARTON:  Your Honor --

20         THE COURT:  I'll come back to that.  Mr. --

21         MR. BUCKLEY:  My suggest --

22         THE COURT:  I'll come back to that, Mr. Buckley.

23         MR. BUCKLEY:  I would really like the chance to

24 present the Defendants' case in terms of how we're using the

25 documents.  I seem to be in the position where I always have

1 to rebut mischaracterizations of what we're relying on.  I

2 think just for clarity, I would certainly like to present

3 what we're relying on and then --

4          THE COURT:  Well, you're the moving party.  So you

5 did have a chance in your briefs.  So that's why I'm giving

6 Mr. Barton a chance.

7          MR. BARTON:  So one of the things that they say

8 repeatedly in the briefs is why they did what they did,

9 which they point to these documents.  That's not proper use

10 of these documents.  That's why they did -- the fact that

11 they said something, that can be used in the document, the

12 fact that they said it, but for the truth of the matter,

13 these documents cannot be used for the truth of the matter

14 that's in these documents.  They can use it for the purpose

15 of showing something was disclosed, something was said, if

16 they establish the relevant and requisite basis for when

17 these statements were made and how they were made, but I

18 don't think they've done that.

19          THE COURT:  All right.  Mr. Buckley, back to you.

20 What is the --

21          MR. BUCKLEY:  I appreciate it.  So --

22          THE COURT:  -- the authenticity and the hook to

23 get these documents before me?

24          MR. BUCKLEY:  So we presented these documents as

25 part of my declaration initially, and all that the Plaintiff

16

1  said in response was that we had the burden of establishing

2  authenticity.  They didn't deny the authenticity.  They just

3  said the burden's on us.  So we responded with two

4  declarations.

5          THE COURT:  Uh-huh.

6          MR. BUCKLEY:  One from Mr. Knudsen, who is the

7  benefits coordinator at Intel, authenticating the documents

8  and then another one from Mr. Vogel from Fidelity.  Fidelity

9  is the service provider for the plans and maintains the Net

10 Benefits website.  So between the two of them they have

11 confirmed that the documents are authentic and that they

12 were available on the Net Benefits website and the time when

13 they would have been posted on the Net Benefits website.

14     All this goes to the question of knowledge on the part

15 of the Plaintiff.  Again, Mr. Barton today has tried to sort

16 of orally amend his complaint on the fly, but the complaint

17 alleges there was an over-allocation to hedge funds and to

18 private equity and that it was in the range of 30 percent,

19 and that's in their view too much.  So the question is for

20 purposes of the statute of limitations, was the Plaintiff

21 aware more than three years before he filed his lawsuit in

22 October 2015 of the fact that the two funds in which he

23 invested, the Target Date Fund of 2045 and the Global

24 Diversified Fund, contained such investments.  Just for

25 clarity, the Target Date Fund just had -- the only

17

1 alternative it had was hedge funds, whereas the Global

2 Diversified Plan -- or Fund, rather, had both hedge funds

3 and private equity.

4     So let's then turn to among the documents that were

5 available to the Plaintiff on the Net Benefits website, and

6 the first of these is the -- the fund fact sheet and Exhibit

7 8 in the booklet I've given you is the one for the Target

8 Date Fund of 2045.  I'd like to stop and pause and note that

9 in the complaint the Plaintiff makes repeated references to

10 these fund fact sheets, and in paragraphs that we -- we've

11 cited, he also makes allegations as to the nature of the

12 disclosures made by Intel.  So he is describing the contents

13 of the disclosures, and under the -- the Purino (phonetic)

14 and the Blanch (phonetic) case, once you've been into the

15 field of describing the contents of disclosures, you open

16 the door to the Court considering the nature of those

17 disclosures in the context of a 12(b)(6) motion  And also

18 under the Purino case, if a document, even though not

19 referenced in the complaint, is essential to the claims --

20 and here there's a disclosure claim -- then that document

21 can appropriately be considered by the Court.  So on

22 multiple grounds it's appropriate to consider that.

23     So let's look at this --

24          THE COURT:  A question for you.

25          MR. BUCKLEY:  Yes.

1           THE COURT:  This document appears to have yellow

2  highlighting.  I just wanted to --

3           MR. BUCKLEY:  Yes, I added that.

4           THE COURT:  That's added highlight.  Thank you.

5           MR. BUCKLEY:  Yeah.  So if you -- if you go to the

6  -- work backwards in the document, it's a little bit easier.

7  If you go to page three of five in the document -- and this

8  is the portion of the document that was prepared by Morning

9  Star, which is an independent analyst, you'll see on page

10 three Global Equity, the -- there the percentage of hedge

11 fund investment in that, and then the lower right-hand

12 column there is a -- the text about the hedge funds and the

13 nature of the hedge funds and, for example, mentioning that

14 these hedge funds include the directional hedge funds, the

15 strategy of the fund.

16      If we then turn to page two, the prior page, this is,

17 again, part of the Morning Star presentation.  If you look

18 in the upper right-hand part of the document, there's a

19 graph.  You'll notice that the yellow portion of that is the

20 hedge fund allocation.  You can see it's in the range that

21 they complain was excessive.  You'll be below that a

22 portfolio analysis which I may not have highlighted, but

23 underlying funds you'll see alternative investments which

24 also is defined as including hedge funds.  You'll see the

25 percentage included there.

19

1       And then here's the independent Morning Star analyst

2   report, and you'll see on the middle paragraph -- I haven't

3   highlighted this, but toward the end of the middle paragraph

4   of the analyst report, it says:

5               "At the same time the fund has a

6          sleeve of alternative strategies which

7          have the ability to go both long and

8          short stocks, thereby mitigating

9          sensitivity to market fluctuations.

10         These components helped cushion losses

11         during a tumultuous third quarter when

12         the markets were rocked by a narrowly

13         avoided government shutdown, weaker than

14         expected economic turns, and a deepening

15         crisis in Europe," and so forth.

16      Then what I have highlighted, just turning quickly to

17  the last full sentence about six lines up from that, it says

18  -- I'm sorry.  Let me start at the top because that's all

19  important.  It says:

20              "The fund's steadier performance

21         does come with a price, however.  For

22         starters, the fund's reduced market

23         exposure is bound to serve as a drag

24         where markets are experiencing rapid

25         run-ups."

1    So disclosure of the effect of the strategy, including

2  the hedge fund, there's going to be a drag when you have a

3  bull market.  You're going to lag behind.

4    Additionally, the fund's cost is higher than it used to

5  be due to the fact that it invests in less -- in passively

6  run invest funds, and now devotes more through higher cost

7  active run investments.  So disclosing is going to lag

8  equities, and it's going to cost more because it's an

9  equitably managed strategy.  That's on balance, however, the

10  improved diversification opportunity set that these

11  strategies offer are apt to outweigh the potential cost

12  drag, awarding investors a more efficiently designed

13  portfolio and help them to experience the smoother ride

14  toward their targeted return and date.

15    And as you know form our papers, this all grew out of

16  the 2008 financial crisis when the -- for example, the

17  target date fund offered by Fidelity, the one that Plaintiff

18  says that the Intel employees should have been invested in,

19  that, you know, the sort of -- the target date mutual fund,

20  that -- that fell by 34 percent in -- in 2008.

21    The hedge funds that were held in the target date funds

22  fell by only 17 percent.  There were some retail target date

23  funds whose target date -- and that's the retirement date

24  you're aiming for -- was 2010 that in 2008 fell 40 percent

25  because they were so heavily invested in equities.  So

21

1  imagine you're counting two years to your retirement, you

2  lose 40 percent of the value of your retirement assets.

3  It's because all of those retail market funds were heavily

4  tilted toward equities, and, in fact, the ones they're

5  saying here we should have been invested in, you can look

6  between the balance of domestic and foreign equities.  It's

7  80 percent.  Fifty-eight percent Fidelity has in domestic,

8  22 percent in international, 80 percent in equities.  So you

9  have this full on unhedged exposure to the equity market.

10  So in the aftermath of that, the investment policy committee

11  at Intel, advised by outside consultants, wanted to hedge

12  against the volatility of equity in markets, aiming over the

13  long time horizon of these funds.  Mr. Sulyma was in the

14  Target Date Fund for 2045, meaning he has, you know, three

15  decades to go before he tires.  Given that long time

16  horizon, investment horizon, to provide sort of a smoother

17  ride and to guard against rapid losses of the value of the

18  portfolio because in 2008 there's some untold event, and

19  that's why they went to alternatives, hedge funds and then

20  the TDF as well adding private equity, to smooth out the

21  return.  And this was the independent analyst saying if it

22  comes to the price, you're going to lag the bull market.

23  You're going to have higher costs because it's actively

24  managed, but we think it's going to be overall a better

25  outcome for you in the long term.

22

1    So what we're saying here is that in this fact sheet
2  which was made available to Mr. Sulyma, he would have known
3  the hedge fund investments, the percentage.  He would have
4  known the strategy.  He would have known that the fees were
5  going to increase, and he would have known it's going to lag
6  a bull market.  So in the last six years we've had an
7  unprecedented bull market.  The fact that these hedge funds
8  could lag, that was of no surprise.  It was disclosed to Mr.
9  Sulyma and everyone else who invested in it.  And if you go
10 to the -- to the page one of the fund fact sheet, again,
11 this is the -- this is the -- the portion that Intel
12 prepared.  You see again the allocation, the hedge fund
13 point six percent, disclosed in the table, then graphically
14 disclosed by the yellow sort of sleeve across and then in
15 the -- the commentary, the company -- I won't take time to
16 read the entire thing, but it says:
17             "In addition to hedge funds and
18             commodities, provide diversification
19             benefits and reduce investment risk by
20             investing in assets whose returns are
21             less correlated to equity market."
22    So that's the key phrase, "less correlated to equity
23 market."  So it was disclosed we're not going to try to
24 match the S and P 500.  We're going to be less correlated.
25 That's the strategy that goes on to -- to explain some of

1   the permutations of that.

2       If you go back now, since there's two funds involved

3   here, to what's Exhibit 4, this is the fund fact sheet for

4   the Global Diversified Fund.  And remember that's part of

5   the -- the retirement contribution plan.  All the

6   contributions are made by Intel in its discretion.  Intel

7   directs the investments.

8       So if you go back here to page three, this is the

9   disclosure from Intel about Global Diversified Fund.  The

10  middle column, what we've highlighted, you can see it

11  discloses 25 percent hedge funds and so forth and then

12  there's 10 percent real assets that include private equity

13  and then five percent pure private equity, and then the

14  objective, the last four or five lines, of these

15  alternatives is to provide exposure to investments that have

16  a low or negative correlation to the broad equity and fixed-

17  income markets, providing further diversification to the

18  fund.

19      So the idea was to diversify, not to have all your eggs

20  in the sort of equity basket.  And then on the right-hand

21  side, again, we've highlighted the -- that this aim is to

22  get lower volatility for participants as well as higher

23  relative performance in certain economic scenarios.  In

24  other words, we're not just planning for the sunny day.

25  We're planning -- we're looking for the inflationary period.

1 We're looking for another recession.  We're looking at the

2 full market cycle, not just the sun shines, then the market

3 goes up, through storm and sun and all types of weather

4 conditions, the full gamut of normal market cycle.

5      Finally, the portfolio is designed to mitigate the risk

6 of drastic declines resulting from U.S. equity market

7 volatility, thus providing better protection.  So that's --

8 that goes back to the 2008 experience as to what happened

9 then when people in some cases two years from retirement

10 lost 40 percent of their portfolio.

11      Page -- I should just note on the -- the Target Date

12 Fund, you know, that's a fund, the Target Date Fund now, on

13 the 401K savings plan where it's just been a directed plan.

14 So, although Mr. Sulyma chose the target date of 2045, he

15 could have chosen any target date.  He could have chosen

16 core funds, or there's a brokerage account that gives him

17 access to thousands of mutual funds and ETS, so he has the

18 full gamut of -- if he doesn't like the strategy, he can

19 choose a different strategy.  He can choose bonds.  He can

20 choose equity.  He can go, and he can buy the Fidelities and

21 the Vanguard target date retail funds if he wants.  It's

22 full freedom.

23          Global Diversity -- Global Diversified Fund, Intel

24 puts the money and Intel makes the decisions.  On page two,

25 just to show you the scope of disclosure, this is Morning

1  Star now talking, and you'll notice there's the middle

2  column "Alternatives."  Again, it talks in that first

3  paragraph about investing in assets with low correlation to

4  traditional assets such as stocks and bonds, and then it

5  talks about hedge funds, in the next paragraph, are broadly

6  characterized in two major creating synergies, absolute

7  return and directional hedge.  It goes on to explain

8  something about them.

9       Then it says -- it goes on to explain another hedge

10  fund strategy at the bottom of the page, the debt strategies

11  target instruments and companies experiencing financial

12  difficulty.  So there's explanation on what the strategies

13  are that are being pursued, and then in the lower right-hand

14  column, private equity.  Okay.  Here we go.  Private equity

15  provide a working capital to target companies to nurture

16  expansion of new product development, restructuring of the

17  company's operations, management, and ownership.  Among the

18  most common investment strategy in private equity are growth

19  capital, venture capital, and (indiscernible).  So that's

20  what these entities are doing.

21       And then, finally, on page one, the Morning Star

22  analyst report, and notice here the same types of disclosure

23  as before with the TDF 2045, that the fund's steady

24  performance does come at a price, and it mentions again the

25  lagging behind of the stock market in a run-up, higher cost

26

because these are actively managed strategies that on
balance -- this is -- their independent assessment was this
provides improved diversification opportunity set that these
strategies offer outweigh potential cost drag, awarding
investors a more efficiently designed portfolio and help
them experience a smoother ride.

And then the middle column, portfolio analysis, you
have again the alternative investments and the percentage,
beneath that alternative fund composition.  It tells you of
the alternatives what percentage of those are hedge funds
and what percentage are private equity.  So it provides a
lot of information.

Now, these were on the Net Benefits website, which
every employee was made aware of, and I just want to go to
Exhibit 16, which are the quarterly account statements.  I
should note the quarterly account statements the Plaintiff
admits in his complaint that he received the quarterly
account statements which are available through Net Benefits.
So I've just taken one.  Exhibit 5 has them all.  He was an
employee for nine quarters.  So he would have gotten nine of
these.  He was employed from June 2010 until September 2012.
So nine quarters he would have gotten these account
statements.

And you'll notice on page one of the statement it says
in the highlighted portion it directs him to go to Net

27

Benefits for more information about your account.  Page
three of six, market value of your account, "Please refer to
Net Benefits for that information versus your SPD."  The SPD
is -- that's a summary plan description that's given out
annual.  So he's being notified and directed to go on Net
Benefits here to read the SPD.  On page four of six, again,
he's being directed if you have changes to your account or
questions about the statement, go to the website, www.401k,
which is the Net Benefits website.  And then, finally, on
the last page, to access performance information on the
investment options in your plan, again, referring to Net
Benefits.

So he got it again.  It was like nine times or four
notices.  So he got 36 sentences saying -- and documents he
admitted receiving saying "Please go to Net Benefits."  Now,
notice one of those things you got this document said go see
the SPD.  So the SPD is Exhibit 2 to the booklet.  What does
the SPD say?  Well, we go through the SPD and the numeration
is -- it starts with 18.1 and so it's a bit odd, but if you
go to what's 1810, 18.10, investment options, and at the
bottom of the page we've highlighted, it says "You should
review the fund prospectus and/or fund fact sheets," which
we have done, "available for each of the funds."  And these
-- these documents provide information about the investment
strategy, expenses and operation, including trade

28

1 limitations.

2      The next page, 18.11, investment categories, again

3 asking them to look at the fund fact sheets that provide

4 updated information on recent fund performance.  The middle

5 of the page they specifically discuss Target Date Income

6 Fund and the 401K Global Diversified Fund.  You'll notice

7 that the Target Date Income Fund, the last line it says it

8 includes hedge funds.  So, again, he's being told about the

9 hedge funds.

10      And I've got to go back.  Every -- each of the nine

11 account statements he got said go read the SPD.  Next line,

12 Global Diversified Fund, it says it includes hedge funds and

13 private equity.  So he's told again.  The bottom of the page

14 "For additional information about the performance of Target

15 Date Funds, refer to Morning Star Fund fact sheets on the

16 Fidelity website."

17      And if you go over to page 18-20, you'll see there

18 again with respect to the Global Diversified Fund, it again

19 directs them for performance information and other

20 information on your Global Diversified Fund Investment,

21 please visit Fidelity's Net Benefit's website, and look at

22 the Morning Star fact sheet.

23      And then, with that not enough, on page 18-47, it talks

24 about the online Fidelity Net Benefits always available 24

25 hours a day, seven days a week, and it says what it

1  provides, and among other things it says you'll see -- it

2  says a few investment fund fact sheets and fund

3  prospectuses.

4      On top of that, in 2012 in July and August we've got

5  two annual disclosures which are presented here as Exhibits

6  6 and 7, two because one was for the 401K savings plan, and

7  one was for the retirement benefits plan.  If you go to

8  Exhibit 6, which is the one for the 410K savings plan, which

9  means the TDF 2045, you'll notice in that document there are

10 two references to please visit the net -- the Net Benefits

11 site for performance information or if you have any

12 questions.  One is on page six in the lower right-hand

13 corner.  That's where the pagination is, and asking, you

14 know, please look at that.  And then there's a second

15 reference on page 16, for more information and so forth,

16 please go online to Net Benefits Fidelity and so forth, read

17 all the information.

18     So there was a -- a plethora of information available

19 to him in documents that he admitted he received, including

20 the quarterly statements and documents that you can consider

21 because there -- there's no dispute that he got the

22 quarterly statements, and you have four references in each

23 of those nine quarterly statements through the Net Benefits

24 website, and it references, well, to please read the SPD,

25 which discloses hedge funds and refers them to the Morning

30

1  Star Fund fact sheets.

2      You know, the fact that the complaint references the

3  fund fact sheets, the complaint has general allegations

4  about the nature of the contents of the disclosures that

5  were made by the Defendants in this case.  To just give you

6  an example, the -- the company --

7          MR. BARTON:  Your Honor, if I can short-circuit

8  this, we don't dispute --

9          MR. BUCKLEY:  The company --

10          THE COURT:  Just -- I'm going to give you --

11          MR. BARTON:  Sure.

12          THE COURT:  -- a minute to wrap up, and then we'll

13  go back to Mr. Barton.

14          MR. BUCKLEY:  So, just to give you an example,

15  paragraph 252, page 65 of the complaint says:

16              "The administrative committee

17          disclosed information regarding the

18          allocation strategy of the Intel TDP's

19          as designating an investment alternative

20          for the plans."

21      So that's an admission, but what's he referring to?

22  He's referring to the fund fact sheets because that's where

23  the investment -- or that's where the allocation strategy is

24  explained.

25          Paragraph 267 reads:

31

1              "The administrative committee

2          disclosed information regarding the

3          allocation strategy of the diversified

4          fund as the designated investment

5          alternative of the plan."

6       So, there again, that's a reference.  Where does that

7  come -- we've seen where that comes from.  That's a

8  reference to fund fact sheets that disclose the allocation

9  strategy, the percentages, why it was done and what to

10 expect.  It will lag bull markets, lag markets.  It will

11 cost more, but we're doing it for good and proper reason.

12 So full notice.

13      Under the case law, the important thing is when -- is

14 the date when the documents containing the information or

15 the facts or transactions that supposedly constitutes the

16 violations were made available to the Plaintiff.  It doesn't

17 matter whether he read them or not.  And in the Brown v.

18 Owens Corning case, the Court said there all the company did

19 was to say to the Plaintiff participant in the plan is you

20 can get the summary plan description on the website.

21      That was enough for the Court to conclude, therefore,

22 the Plaintiff participant had actual knowledge of the SPF,

23 that one statement notifying him of how he could access the

24 document, and Brown case, we've backed it up with other

25 cases that follow the same rule.  It's not an unusual rule.

32

1  It is the rule in terms of actual notice for purposes of the
2  statute of limitations in all of these cases.
3      So it doesn't matter whether you actually read it or
4  not.  It doesn't matter how you got it, including Internet
5  is fine, and he got it physically as well through the
6  account statements.  So he got multiple notifications.
7      What was the critical fact of which he had to be
8  notified.  The critical fact was that hedge funds and
9  private equity were among the investments in one or another
10 or both of the plans, and the level of allocation.  If you
11 read the complaint, it's the level of allocation that
12 they're complaining about.  They're not saying there's no
13 per se -- no per se -- no, no, you had too much.  Well, if
14 30 percent, whatever it is, was too much, that was disclosed
15 in multiple manners.  That's all they had to disclose.  He
16 got the information.
17     Let's go to the colloquy you had with Mr. Blanton over
18 -- Mr. -- over the Blanton case, okay.  I commend to you a
19 decision by Judge Morrow in the Northrop Grumman case.  It's
20 a 2015 decision.  So there's a Circuit split on what
21 constitutes actual knowledge for limitations purposes, and
22 in one camp is the Ninth Circuit under Blanton, and the
23 judge in that case analyzes the Blanton decision.  It is
24 understood not only by courts in the Ninth Circuit but by
25 courts around the country who have discussed the Circuit

1 split as representing the principle that actual knowledge of

2 the transaction suffices, and courts have not limited it to

3 say, well, <u>Blanton</u> involved a per se or a prohibited

4 transaction.

5     We've also cited the <u>Meger</u> (phonetic) case that applied

6 <u>Blanton</u> in the Ninth Circuit.  That was not a prohibited

7 transaction.  It was a breach of fiduciary duty case that

8 applied the same rule.  So you can't confine <u>Blanton</u> to

9 saying it's a prohibited transaction.  You -- it is the law

10 of the Ninth Circuit.  The only -- the judge in the -- the

11 <u>Northrop Grumman</u> case discussed it, but the <u>Heyne</u>, H-E-Y-N-

12 E, <u>v. Wright</u> decision of the Sixth Circuit also took the

13 lineup of where the circuits stand on actual knowledge and

14 said, well, <u>Blanton</u> represents one school of thought, the

15 Ninth Circuit's rule, and that the <u>Gluck</u> (phonetic) case,

16 which they cite in their brief, which is a Third Circuit

17 decision, is saying, well, you might need more -- you might

18 need -- it's sort of a fuzzy rule -- you might need expert

19 opinions.  You might need to know the harm.  That's the

20 other school of thought.  So that's not the Ninth Circuit

21 law, and if you read those two cases, I think there's a good

22 example of how courts have analyzed the jurisprudence and

23 how they've understood <u>Glen</u>.

24     So here we say if he knew, which he did know, had

25 available to him the fact that there were alternative

1  investments that were hedge funds and private equity, the

2  level of the allocation which is the nub of what they're

3  complaining about, that's enough.  But, in fact, it

4  discloses a lot more because they've predicted the two

5  things that they say are -- make the strategy inadvisable.

6  They predicted it's going to lag equity markets, and they

7  predicted it's going to cost more.  So that was not

8  necessary, in our view, to start the limitations clock, but

9  he was told that in the fact sheets.  And, by the way, fact

10  sheets came out every quarter, and they were one for the GF

11  and one for the TDF.  So he was there for nine quarters.  So

12  you can do the math.  You can see how many fund fact sheets

13  were available to him over that period of time explaining

14  what the strategy was.

15          THE COURT:  All right.  I'm going to give Mr.

16  Barton a chance to respond.

17          MR. BUCKLEY:  Okay.  Thank you.

18          THE COURT:  And, of course, you -- you've objected

19  to the authenticity of these documents and the -- and the

20  hook for them, but assuming without deciding that I can look

21  at these and consider them in connection with this motion,

22  why wasn't there actual knowledge created by these

23  documents.

24          MR. BARTON:  Sure.  So if this was an argument on

25  summary judgment, if this was an argument at trial, if this

1  -- the standard were constructive knowledge, he'd have the

2  better argument, but it's not.  And if you look at a lot of

3  his cases that he cites, they're on summary judgment,

4  including <u>Northrop Grumman</u>.

5       He does not dispute my statement that the Seventh

6  Circuit and the Ninth Circuit employ a similar standard and

7  that the use of experts is -- again, that is a standard used

8  in the Seventh Circuit.  It's used in the Ninth Circuit.

9       He is referring to a lot -- let me clarify one thing

10  factually.  With respect to the fund fact sheets, those are

11  things that Mr. Sulyma got when he made a document request

12  of the Defendants in January of 2015.  They finally produced

13  then in April of 2013 -- 2015, three months later than they

14  were obligated to do so under the law, but that's when they

15  finally provided them to him, pursuant to a document

16  request.

17       So factually that's why we have them.  That's why

18  various things are referenced in the complaint.  I don't

19  have an objection to them using them on the prudence claim,

20  but to establish certain facts about when Mr. Sulyma had

21  knowledge of certain things, that's the -- that is the

22  objection or when they made certain disclosures.

23       There's a lot of statements that defense counsel made

24  that is not based in anything in the record, that is not

25  based in anything in the complaint or that is based on the

36

1  documents and is inadmissible and that can't be considered

2  here because they're not -- they're statements that they

3  made, and they're trying to prove them for the truth.

4      The reasons why they did this is -- that cannot be used

5  on a motion to dismiss.  If they want to make the arguments

6  of why they did what they did and whether those were

7  truthful reasons, they can make that on summary judgment or

8  reply.

9      The fact that -- he has asserted that these fund fact

10 sheets came out every quarter.  There's no evidence in the

11 record, not in anything they even put in that they came out

12 every quarter.  That's simply beyond the record in this

13 case.  It's not in the complaint.  It's not in anything that

14 -- even if you were to consider everything, it's certainly

15 not in there.

16     The statement that he made, he's referring to a case

17 called Brown.  That is a case from the Sixth Circuit.  The

18 fact that something was in an SPD, I urge your Honor look at

19 the Tibble (phonetic) case, which is out of the Ninth

20 Circuit.  They rejected that.

21         THE COURT:  So you think Tibble's the best Ninth

22 Circuit case on that -- on that score?

23         MR. BARTON:  Yes.  The other case I think is very

24 important to understand the difference between constructive

25 knowledge and actual knowledge, and he made the statement

1  that there is no distinction between whether something's an

2  inherent statutory breach of duty.  Look at the Waller

3  (phonetic) case, again, from the Ninth Circuit.  The

4  question in that case, the argument made by the Defendant,

5  Blue Cross, is whether or not the annuities that they had

6  purchased more than four years before the complaint was

7  filed predated the actual knowledge.  They made an argument

8  under an actual knowledge.  They -- the Defendant -- the

9  Ninth Circuit said "We reject Blue Cross' argument that the

10 statute of limitations necessarily began to run at the point

11 Plaintiffs learned that Blue Cross purchased the annuities.

12 We decline to equate now that the purchase of the annuities

13 in this case was actual knowledge of the breach of fiduciary

14 duty."  The important thing, they then quote the Think

15 (phonetic) case, which was the same case that we quoted from

16 the Sixth Circuit.  I'm sorry.  It's a D.C. Circuit case, b

17 ut the Sixth Circuit adopted this as well.  I think the

18 Third Circuit has, and what the Think case says is -- and

19 quoted by the Ninth Circuit:

20              "The disclosure of a transaction

21         that is not inherently a statutory

22         breach of fiduciary duty cannot

23         communicate the existence of an

24         underlying breach."

25      That's the standard in the Ninth Circuit.  That's the

1  distinction from <u>Branton</u>.  If <u>Northrop Grumman</u> says

2  something different, which is a District Court case from the

3  Central District of California, then Central District is

4  simply wrong.

5              MR. BUCKLEY:  Well --

6              MR. BARTON:  Your Honor, I'm not finished.

7              MR. BUCKLEY:  I was going to say something

8  different.

9              THE COURT:  Well, I'll give you a chance when he's

10  done.

11              MR. BARTON:  It is on summary judgment, and it --

12  you know, the Ninth Circuit, of course, as we all know,

13  rules.  What the Defendant said is what's the critical

14  information?  The critical information, we have to go back.

15  This is -- I'm, first of all, underwhelmed by the

16  disclosures that they gave, even if they were there, even if

17  they existed, a bunch of fund fact sheets.  You see

18  references to prospectus?  Where's the prospectus?  Where is

19  the detailed information?  They're saying all that's there

20  is these fund fact sheets that give a little bit of

21  information we're in hedge funds and private equity.  What

22  does that communicate to an ordinary participant?  Is an

23  ordinary participant able to make the determination?  And

24  they give rosy statements, "Well, we expect this to do not

25  so well sometimes.  It will cost a little bit more, but it's

1  going to perform other times, and we think this is going to

2  do well."  But the critical information that the Plaintiff

3  needs to know, which he's entitled to do and this under

4  actual knowledge is to rely on an expert, and when he has

5  the expert and the critical opinion is this is not an

6  appropriate allocation for these -- for this strategy in

7  defining contribution plans.

8       Let me now go back to where defense counsel started,

9  and he said it's common for pension plans to invest in

10  private hedge funds -- I'm sorry -- hedge funds and private

11  equity.  What he is not -- did not tell you is what he's

12  talking about is defined benefit plans.  What's the

13  difference?  The difference is in a defined benefit plan,

14  you get a promised benefit.  It's backed up by what the

15  Defendants put in and the investments that they make, but

16  your amount that you eventually receive is not determined on

17  how the Defendants decide to invest the money.  They still

18  have an obligation to invest prudently, but at the end of

19  the day, they're on the hook to put enough money into that

20  plan so long as the plan sponsor is solvent to pay you the

21  benefit that you're entitled to get.

22       The difference in a defined contribution plan like this

23  is that your benefit is solely determined on the amount

24  that's in your account.  That has -- and there are huge --

25  numerous studies about the impact of fees, the impact of

performance, and how those affect, because at the end of the day, if your -- your balance does well or your account does well, that's your benefit, and you've done really well. But at the end of the day, if performance drags, fees drag you down, you've lost, and under ERISA, the way the law looks at that, that is a loss to you as if somebody took money out of your pocket. It's no difference. A substandard performance is no different than somebody taking money out of your pocket.

So the other thing that he did not mention is just yesterday another article about how public pension plans are divesting themselves, most famously California, having started the trend of vesting themselves of hedge funds and private equity. New York followed, and Massachusetts said yesterday that they were going to get out. You know why? Because they have substandard performance, and they have very high cost, and they're not -- they don't -- it's not generating what they promise to generate.

The allegations in this complaint, he's tried to portray the allegations as something unique or something we create. If you look at the Lumis (phonetic), cited by the Ninth Circuit in 2001 which Defendants try to distinguish but they can't distinguish because here's the facts of Lumis. They invested 30 percent of the trust assets, the welfare trust assets, in mortgage securities, a particular

41

1  type of class of mortgage securities, inverse floaters.  And
2  what the -- and it was not a particular investment.  It was
3  not one investment.  It was a class of investments that they
4  had.
5      The sole claim was a prudence claim.  The Defendants
6  tried to say "Oh, no, it violated the investment
7  guidelines."  The District Court at trial -- this is post-
8  trial -- rejected that.  They said it did not invest --
9  violate the investment guidelines, and it did not violate
10 the spirit of the investment guidelines, but they still
11 determined -- the trial judge determined and the Ninth
12 Circuit affirmed that the fiduciary had -- even though he
13 had adequately investigated the investment, that he had
14 breached his fiduciary duties of prudence.  That was all
15 there was.  There was no loyalty claim or, you know, claim
16 that he was disloyal.  He had failed to adequately -- he had
17 violated his prudence obligation because floaters -- these
18 are the words of the Ninth Circuit -- could be highly risky.
19 He had one-third of the assets in various different floater
20 investments, and there was no need that any particular one
21 was inappropriate.  The breach was the failure to give
22 appropriate consideration of the amount of that -- of those
23 -- of those investments compared to the needs in the trust.
24 And what the Ninth Circuit said was that he had invested too
25 much in inverse floaters.  That was the theory of that case

1 from 2001.

2      These are allegations that are well founded under Ninth

3 Circuit law.  That is what the theory has been.  There was

4 no oral amendment here.  I'm not trying to change the theory

5 of our complaint, but that's -- what was the critical

6 information was not disclosed here.  Plaintiff needed and

7 what he eventually got when he got things upon request and

8 then consulted an expert, it was learned that this is not an

9 appropriate allocation for these type of plans and defined

10 contribution.

11           THE COURT:  Now, Mr. Buckley, I'll go back to you

12 for the final word on the statute of limitations area.

13           MR. BUCKLEY:  Okay.  Good.  Thank you.

14      With respect to the assertions about when Mr. Sulyma

15 got the documents, the contention is he didn't get them

16 until April 2015, but the test is when they were made

17 available to him.  There's no dispute in the case law that's

18 the test, when they were made available.  For the accused to

19 access them or read them is not relevant under all the

20 cases.

21      Mr. Sulyma submitted a declaration in the opposition,

22 and he referred to the documents he received from Intel in

23 April of 2005.  I note two things about it.  First, quoting

24 from paragraph four of Mr. Sulyma's declaration, he said

25 "most of which I had never seen before."  So notice "most of

1  which."  In other words, "I had seen some of those before."

2  So he wasn't denying that he had seen some before.  He was

3  being evasive as to what he had seen before.

4      And then he says "I provided all of the documents I

5  received from the plan administrator (as well as any prior

6  disclosures I had received) to my attorneys."  So he's

7  admitting, again, he got prior disclosures.  So although

8  it's irrelevant whether he got them, he's acknowledging here

9  he had seen some of these documents before, and he's

10 acknowledging that he had prior disclosures at least in some

11 form, which he gave to his attorneys.  But the test is when

12 it was made available to him.

13     Waller, you know, I -- again, I commend Judge -- I

14 guess Judge Morrow's decision in Northrop Grumman to you in

15 which he deals with -- with the Waller case, and it doesn't

16 reflect Ninth Circuit law at all.

17     The complaints now made about, well, yes, there were

18 these disclosures -- well, first of all, whether the fund

19 fact sheets come out quarterly or not, we have them all.  We

20 didn't want to burden the Court and the record, but we're

21 quite happy to supplement the record with all of the

22 quarterly fund -- fund fact sheets to show that they did

23 come out quarterly.  And if you look at the summary plan

24 description, it says they come out periodically.  So it's

25 all -- all there on the record.  But we're happy to give

44

1 them if it makes any difference.

2      The complaint that, well, the disclosures were

3 inadequate, now we're moving beyond the limitations argument

4 I really think to the disclosure claim, and in Counts -- and

5 this is still relevant to the statute of limitations.   In

6 Counts 2 and 4 they complaint that you didn't give hedge

7 fund specific and private equity investments specific

8 information with respect to cost and performance and so

9 forth.

10      We went through the annual disclosures, Exhibits 6 and

11 7.  It's obvious that Intel was not treating those

12 investments -- those -- those categories of investments as

13 designated investment alternatives and was not reading the

14 regulation as requiring disclosure of cost performance

15 information and so forth for each of those investment

16 vehicles.  So the Plaintiff, by virtue of having gotten her

17 -- by virtue of the SPD's having been -- I'm sorry -- by

18 virtue of the annual disclosures having been made available

19 to him in July and August 2012 was, again, aware that the

20 company's position was that those were -- that was not

21 information which the company was required to provide and it

22 didn't provide.  So the limitations clock on the disclosure

23 claims in Counts 2 and 4 begin there as well.

24      Finally, the complaint that, well, how could he have

25 known that these were bad investments when he didn't get all

45

1 this additional information, Plaintiff submitted a

2 declaration from a paralegal in their law firm saying that

3 she accessed the form 5500's to get details on the

4 identifies of the hedge funds and the -- and the private

5 equity, and she couldn't determine any useful information,

6 her words, about them.

7       So Plaintiff filed the lawsuit saying it was imprudent

8 to invest in the hedge funds and private equity at the

9 levels which the investments were made without knowing

10 anything about the actual investments, but he says Sulyma

11 had to have the information before the actual knowledge

12 clock began to run, but apparently the Plaintiff didn't have

13 to know anything about the actual investments and says to

14 this day he knows nothing about the risk profile, the

15 performance of any of these alternatives, but now he's

16 arguing that the Plaintiff, oddly, had to have all that

17 information before the limitations clock began.  But the

18 Plaintiff obviously -- the Plaintiff law firm viewed their

19 ignorance as no bar to filing the complaint and alleging

20 imprudence based on what?  On the level of investment in

21 these vehicles, the 30 percent.  And Mr. Sulyma was well

22 aware of that.  So that really was the critical fact.  It's

23 the linchpin of the complaint, and it was a fact known to

24 Mr. Sulyma as well.

25       That's all I have to say.

46

1        THE COURT:  Thank you.

2    Question about the injunctive relief that the

3 Plaintiff's seeking.

4        MR. BARTON:  Sure.

5        THE COURT:  What's the standing for that, and how

6 can I grant injunctive relief after there's -- in this

7 procedural posture?

8        MR. BARTON:  The procedural posture you mean -- I

9 want to make sure I understand the question.  I think that

10 your question is given that Mr. Sulyma is no longer -- he

11 has cashed out of the plan.

12        THE COURT:  He's cashed out of the plan.  He's no

13 longer part of the plan.

14        MR. BARTON:  Sure.

15        THE COURT:  He does not have -- his future rights

16 are not going to be implicated by an order from the Court

17 saying do this in the future.  Why does he have standing to

18 have the Court grant relief in the future?

19        MR. BARTON:  Sure.  So the answer to that question

20 is this, is that he has standing -- he has standing both

21 statutorily and under Article III because of this.  He has

22 -- what standing requires for the statutory part is that you

23 have a colorable claim -- colorable claim for benefits, and

24 that means you have statutory standing.  If he recovers in

25 this case, that means what -- and this is what the Gaidon

47

1 (phonetic) case says and what <u>Evans v. Acker</u> (phonetic) says

2 and <u>Vaughn</u> (phonetic) says is if you are a -- you make a

3 colorable claim and it's -- what you are entitled to in your

4 account is not merely the balance in your account but what

5 should have been in there had there been prudent investment,

6 and so what is the monetary relief that then happens as a

7 result of this case if ultimately the Court finds for us is

8 they will have to put more money into his account.  They'll

9 have to restore his account in the plan and deposit money in

10 there.  And because he has a colorable claim and ultimately

11 hopes to have recovery, he then has standing under Article

12 III because he will be not only a participant for purposes

13 of having a colorable claim for purposes of the statute, but

14 he will have an amount of money that is into his account.

15 Until his money is ultimately withdrawn from the account, he

16 will be a participant just like everybody else, and he has

17 standing under Article III to seek injunction relief, one of

18 which may be to get rid -- you know, to remove the current

19 fiduciaries, to redo the investments, to reduce the 30

20 percent that's in private equity or hedge funds.

21        THE COURT:  All right.  What is your view as to

22 that?

23        MR. BUCKLEY:  Well, whether -- he cashed out of

24 both funds.  So his balance is zero, and he's asking for

25 injunctive relief such as divestiture of all hedge funds.

48

1 Whether the funds continue to invest in hedge funds or don't

2 cannot possibly have any impact on him.  He's not an

3 investor any longer in the Target Date Fund or the TDF.  The

4 same with the private equity, whether they're divested or

5 not, he doesn't have any spin in the game anymore.  So he

6 doesn't have any standing.  And same reason I would notice

7 that he -- he sued the two plans as nominal Defendants, and

8 he's also sued on behalf of the plans, and I think case law

9 is, as it's quite clear, that you can't sue a plan and sue

10 on behalf of a plan.  That's no good.  And then he's suing

11 the plan for injunctive relief, but he's not -- he has no

12 standing to seek injunctive relief.  So I think it's pretty

13 clear that the injunctive relief or prospective relief claim

14 has to be dismissed as well as the nominal Defendants.

15          MR. BARTON:  May I respond, your Honor?

16          THE COURT:  You may on the nominal Defendants

17 issue.

18          MR. BARTON:  On the nominal Defendants, your

19 Honor, I think, first of all, we have not sued the plans.

20 We've sued the fiduciaries of the plans.  As actual

21 Defendants you have the fiduciaries of the plans, not the

22 plans.  So the plans are named as nominal Defendants because

23 these 505(a)(2) cases -- this is the statutory provision

24 under which this is brought -- is generally seen --

25 generally recognized as a derivative like claim.  You name

49

1   the Defendants because the relief has to go actually into

2   the plans.  Clearer statement of this is in a case -- in a

3   concurring opinion from Judge Thomas in <u>Larue</u> (phonetic)

4   from the -- you know, the Supreme Court but a concurring

5   opinion and says of course the relief has to go into the

6   plans.  The Ninth Circuit indicated that having them as

7   proper -- or as nominal Defendants was proper in <u>Acosta</u>

8   which we cite, and it is the Northern District of California

9   <u>Solis v. Webb</u> also recognized that it's appropriate, cited

10  both the Ninth Circuit and the Second Circuit case.

11      The only authority the Defendants have is a District

12  Court case from Massachusetts which then tries to

13  distinguish <u>Acosta</u>.  So this is a common -- common -- it's

14  common to include the plans as nominal Defendants because

15  the relief has to be paid into the plans.  If you look at

16  the statute, 502(a)(2) allow a participant to bring a claim

17  on -- basically on behalf of the plan for the relief that's

18  in 409, and that money is on -- the relief that is sought is

19  on behalf of the plan.  You cannot get individual relief.

20  You can get relief on behalf of various people and

21  participants in the plan, but the ultimate relief has to go

22  into the plans.  That's why we named them as nominals.

23          THE COURT:  I don't think the reply addressed

24  <u>Acosta</u> and <u>Solis</u>, but what's -- why don't they apply?

25          MR. BUCKLEY:

50

1          MR. BUCKLEY:  Were they cited in the --

2          THE COURT:  By the Plaintiffs, yes.

3          MR. BUCKLEY:  We thought they were not controlling

4  in this instance.  We thought this was -- again, to go back

5  to the fact that he has no standing.  Therefore, how can he

6  sue the plan for prospective relief?  And he's suing on

7  behalf of the -- this case is suing on behalf of the plan

8  and against the plan, and that's -- that's the nub of our

9  objection, suing on behalf of and against, even if

10 nominally.  Can't be on both sides of the V.  That's the

11 problem.

12         THE COURT:  All right.  You've given me a lot to

13 think about and additional -- not additional -- materials to

14 review with some highlighting, additional highlighting on

15 what you submitted before.

16     Anything further?  I'll give you each a final -- final

17 word on things you haven't addressed yet.

18         MR. BUCKLEY:  Well, we really haven't discussed

19 the prudence claim.

20         THE COURT:  Well, you've touched on it in the

21 statute of limitations.  But you want to say more about it?

22         MR. BUCKLEY:  I want to say just a few things

23 about it, that, again, the -- so the glaring fact about the

24 complaint is that it makes no allegations about the actual

25 investments held by either the Target Date Fund or the GDF

1    in terms of hedge funds or private equity.  So there's on

2    allegation that they were -- that is, the actual specific

3    investments were too costly or too risky to be prudent

4    investments.  Instead, the claim here rests on general

5    criticisms about the category of these investments that say

6    some hedge funds, some private equity investments may, can

7    result in returns that are subpar relative to the market or

8    involve fees that are out of proportion to what you really

9    get in return, and that sort of -- that sort of theory was

10   the very one that the Second Circuit addressed in the

11   Pension Guarantee case v. St. Vincent's Catholic Medical

12   Center where CitiCorp there had mortgage-backed securities

13   as part of its investments and the Plaintiff was saying,

14   well, lots of information at the time, going back to 2008,

15   that subprime MBS was very risky, and therefore, that should

16   have alerted the fiduciaries of CitiCorp in terms of the

17   plan to divest itself of those -- those investments, and the

18   Court said that the glaring problem was the failure to link

19   the generalized criticism of mortgage-backed securities to

20   the actual characteristics of the securities that were in

21   the portfolio, and you can't have -- I guess I would have

22   used the sort of guilt by association, but here it's

23   imprudence by association.  You're hanging out with the

24   wrong crowd.  That doesn't work in -- in the ERISA word and

25   the Iqbal Twombly world.  You can't just say, you know, a

1 problem could have existed because other hedge funds, other

2 private equity had problems, therefore you should have

3 steered clear.  So you can't have imprudence by -- by

4 association, and there's no support anywhere in the case law

5 for the theory that they're peddling here.

6     The fact that the funds in this unprecedented bull

7 market have not performed as well as the S and P, for

8 example, it's clear under the case law, does not show

9 imprudence.  The -- the Levoy (phonetic) decision in the

10 Second Circuit holds that.

11     The fact that that -- separately or in combination with

12 subpar performance, the fact that the fees were higher, the

13 Levoy case, the Second Circuit holds that that doesn't set

14 forth a claim either.  So you can have both subpar

15 performance relative, say, to whatever comparative fund you

16 want to pick or to the market generally.  You could have

17 higher fees.  Neither of those make out a claim for

18 imprudence under Levoy and the other cases that we've cited,

19 and jurisprudence is also clear that the fact that something

20 costs more in terms of fees doesn't show imprudence because

21 a fiduciary could elect to incur the higher fees for any

22 number of reasons, including under-performance, the fact

23 that they're actively managed strategies.  That really

24 proves nothing.

25     So what you come down to in the end is simply this idea

1 that, well, the funds had 30 percent allocation to

2 alternatives.  Our cherry picked Vanguard and Fidelity

3 target date retail mutual funds had a zero allocation, and

4 they're supposedly peers of your target date fund, but

5 there's no facts to support this allegation that they're

6 peers.  Those are retail mutual funds.  It's all to the

7 general public, and they have their own strategy, and Intel

8 is not selling to the public.  It has employees, employees

9 who participate in the plan.

10      And it could have its own strategy, and I think the

11 Dubrun (phonetic), the one we've cited, says the fact you

12 didn't follow the crowd is of no moment whatsoever.  You're

13 able to have your own style of investment.  We didn't have

14 to be 80 percent in equities the way Fidelity was.  There's

15 no -- it's crazy to say that Intel, given the experience

16 with 2008, 2009, what it knew about the performance of those

17 retail mutual funds, the so-called target date funds sold by

18 Fidelity and Vanguard, what it knew -- what it knew about

19 funds that were heavily invested in equities, you have to

20 incur that risk.  Instead they decide to diversify by

21 getting into these alternative investments, and there's no

22 case that says everyone has to march in lock step and do

23 exactly the same thing as Fidelity or Vanguard, which is

24 totally differently situated than with the pension plan run

25 by a company like Intel.  So that doesn't get them anywhere

54

1 either.

2     I also would note that, as we pointed out in our brief,

3 that the comparison -- they compare -- they compare the

4 allocations in a target date fund in which Mr. Sulyma was

5 not invested, 2035, to the Fidelity funds, and they -- in

6 terms of judging performance, they choose a performance

7 period that is over and under-inclusive.  They exclude 2010

8 in their comparative performance period.  That was a year in

9 which actually Mr. Sulyma's investments in the Intel funds

10 performed rather well.  So they exclude that.  And then they

11 extend the outer bound of the period to 2014, two years

12 after he had left the funds and cashed out.  Yet that's the

13 analysis that's in the complaint.  So it's cherry picking

14 time periods, cherry picking comparative funds, you know,

15 facts to say that these retail mutual funds were -- were

16 peers.

17     And with respect to the Global Diversified Fund, they

18 say we should compare that to a balance fund.  Well, there

19 are no facts pled as to why a balance fund which is like

20 60/40 stocks, bonds, why that's an appropriate comparator to

21 the Global Diversified Fund which was sort of a -- like a

22 one off sort of investment that was not key to anyone's

23 retirement date, just wanted to have stable returns for a

24 long period of time, like an endowment.  It wasn't geared

25 for the same purposes as a -- as a balanced fund would be.

1       So comparing performance cites to the market subpar
2  performance under Levoy doesn't get you anywhere in terms of
3  a prudence claim.  Saying there were higher fees doesn't
4  give you any -- saying both those here doesn't get you
5  anywhere.  Comparing allocations to, you know, peers that
6  are not shown to be peers doesn't get you anywhere either in
7  combination.
8       So at the end of the day, they don't really have a -- a
9  prudence claim at all, and they tried to shift in their
10  opposition and say, "Well, we're really complaining about --
11  about process."  And they cite the Tibble case.  Well,
12  Tibble -- both the problem in Tibble, Tibble v. Edison, the
13  problem there was that the fiduciaries chose retail over
14  less expensive institutional funds, but they did so in the
15  context where Edison was getting money back.  So there was
16  self-dealing involved in that case, and that's what
17  triggered the prudence claim.  In fact, if you look at all
18  their cases, Kruger, the Regents case, Levoy -- I can't
19  rattle them all off, but there are five cases, each of those
20  cases was an example of self-dealing.  If you look at the
21  cases, line them up, every case was a self-dealing case
22  where the fiduciary, the manager of the plan, is picking
23  affiliates, either mutual funds managed by affiliates or
24  picking affiliates.  So they're not acting in the best
25  interests of the participants.  They're kind of selling them

1  out in order to direct revenue to themselves or their

2  subsidiaries.  So the -- I think the law is -- is clear that

3  fiduciaries have discretion in managing these funds.  So

4  they have to show something.  It's not just poor performance

5  and higher fees, not just you didn't do it the way someone

6  else did it.  You've got to show something more, and self-

7  dealing is almost always what's shown, and there's no

8  allegation of self-dealing here at all.

9       That's all I think I want to say about the prudence

10  claim.

11            THE COURT:  Thank you.

12       What is the heart of your prudence claim, and you've

13  already, of course, mentioned the leading case, but do you

14  want to respond to the other case law on that?

15            MR. BARTON:  I will address that.  A self-dealing

16  claim is different than a prudence claim.  Prudence claims

17  stand on their own.  You have self-dealing as in under 406

18  under ERISA.  A breach of loyalty claim is a 404(a)(1)(A)

19  claim -- (a)(1)(A)(i) I believe, and the prudence claim is a

20  separate count under 404.  They're entirely different.

21  Obviously, if you have a breach of loyalty claim, usually

22  can bring a breach of prudence claim as well, but not

23  always.  But frequently you have both.

24       The Lumis case, of course, no breach of loyalty.  The

25  -- there is numerous cases that say the following, because

57

1  breach of loyalty is simply not required.  Yes, it's more
2  common that these cases have come up where they've self-
3  dealt and put them in their own funds, but imprudence does
4  not require that.  The common phrase which you'll find in
5  multiple cases is a pure heart and an empty head is not
6  enough, and what it means is if you have a pure heart but an
7  empty head, you have breached your fiduciary duty.

8       Lumis is probably our best case.  It's a Ninth Circuit
9  case.  I have another case tried in the Second Circuit, and
10 I want to use this as an example.  The investment manager
11 there, and there I represented the fiduciaries, had invested
12 80 percent of the fund's money in publically traded equities
13 concentrated in -- and I'm blanking on it, but it was
14 essentially oil stocks, energy stocks.

15      We did not allege there that there was anything wrong
16 with any of the particular ones.  It was the over-
17 concentration, the over-allocation.  That's the same theory
18 that the Ninth Circuit upheld in Lumis.

19      The complaints that the Defendants have with respect to
20 our comparisons are what we used, how we used it, whether we
21 should have used retail funds or not.  I can address them,
22 and I'll address them very briefly, but our -- ultimately,
23 these are all arguments for summary judgment or trial.  This
24 is not an argument on the motion to dismiss.  The question
25 on the motion to dismiss is has the complaint set forth

1  enough facts to have a -- to have -- to state a claim, and

2  we have alleged not merely based on hindsight, not merely

3  based on a drop in performance.  We have explained these are

4  the problems with these particular types of investments.

5  This is the problem not with putting any money into them but

6  putting large amounts of money into them.  And what we did

7  is not to say in hindsight.  We allege starting in -- in the

8  early 2000's here are the things that are the problems, and

9  we outline them in detail from various articles that this

10 was well known, and these are things that they should have

11 considered and the comparisons that we use, and I think they

12 confused this.

13      We're not alleging that they should have put all their

14 money or some -- put a majority of their money in equities.

15 We used equities as part of the comparison to give them the

16 benefit of the doubt and say even if in this bull market you

17 have compared it to equities, this is how we get it done.

18 We -- we also allege versus bonds or a split, and that -- we

19 agree you ought to be diversified, but going into hedge

20 funds, going into private equity is not the only way, and

21 the question is are there better ways to have done it.

22      They may have arguments ultimately in terms of why they

23 should prevail here, but the question here is on a motion to

24 dismiss have we sufficiently alleged enough, and we have.

25 We alleged that they -- that these two funds did not perform

59

1  as well as their comparators, that they have lost millions.

2  We have alleged that the reason for the under-performance

3  was over-allocation to hedge funds and private equity, what

4  they call alternatives.  And that's not really -- they don't

5  really dispute that they've under-performed.  I think O'Dell

6  admits as much in the 2004 -- 2014 interview that they

7  submitted that we cite in the complaint.

8       We allege why and we explain why their rationale for

9  the investment, the asset diversification and simultaneously

10  performance, why that is flawed, particularly with respect

11  to private equity, that -- and why hedge funds as a class,

12  you have to look at the underlying strategies, and we go

13  through in terms of their strategies and the problems with

14  why they -- they -- of their rationale for this.  And we

15  explain that it's versus the light -- in light of the risk,

16  transparency and lack of liquidity and how this could have

17  performed and could he have done this -- obtained the same

18  objectives for less cost.  That's what we have alleged in

19  the complaint.

20       They like to cite the Second Circuit case.  I do not

21  think that that is -- I think there's two things to point

22  out about that.  First of all, one of the things that was

23  the basis of this is a certain amount of information that

24  the Second Circuit either assumed was available or was, in

25  fact, available because the Plaintiffs in that case were the

60

1  fiduciaries to the plan.  They would have had access to that

2  information.

3       And the second thing is I don't believe the standard

4  that the Second Circuit applies is consistent with the Ninth

5  Circuit standard.  If you look at the dissenting opinion

6  from the Second Circuit, Judge Straub, that is more

7  consistent with the Ninth Circuit decision than _Gilliad_ in

8  terms of -- and _Braden_, which is the Eighth Circuit

9  decision, and Straub cites _Braden_ up and down, and _Braden_

10 and _Gilliad_ are consistent in terms of value adding and

11 complaint on a motion to dismiss, reminding the Court in

12 both cases this is not the time for trial.  This is not the

13 time for the Court to make decisions about whether or not he

14 believes the claim.  It's merely to evaluate the claims

15 given the inference and letting the influences flow to the

16 Plaintiff, have there been enough facts established or set

17 forth in the complaint to establish the complaint.  That's

18 the test.

19       MR. BUCKLEY:  Since counsel has decided to make

20 his bed in _Lumis_, I just would like to read two sentences

21 from the _Lumis_ --

22       MR. BARTON:  Your Honor --

23       MR. BUCKLEY:  -- Ninth Circuit decision.

24       MR. BARTON:  If I could have one more moment, I'm

25 done.

61

1          MR. BUCKLEY:  Oh, sure.

2          MR. BARTON:  But go ahead.

3          MR. BUCKLEY:  Okay.

4          THE COURT:  Give me two sentences.  I've got to

5  get to a criminal matter.  So --

6          MR. BUCKLEY:  Okay.

7          THE COURT:  -- my time is running short.

8          MR. BUCKLEY:  All right.  So at 259 F.3d, at 1045,

9  the Appellate Court writes:

10              "Specifically, the District Court

11              found that the investment of 30 percent

12              of Welfare Trust Assets in the interest

13              rate sensitive inverse floaters of

14              lengthy duration violated the overall

15              conservatism of the Welfare Trust

16              guidelines."

17      So a violation of -- and the next page, my second

18  sentence:

19              "We find no fault in the District

20              Court analysis given that inverse

21              floaters could be highly risky

22              investments and that the Welfare Trust

23              had very conservative investment

24              guidelines."

25      So here we know from the documents we presented to you

62

1 that the Intel plans expressly allowed investment

2 alternatives.  And, secondly, inverse floaters there were

3 found to be highly risky.  There's no allegation about the

4 level of risk at all about the actual hedge funds private

5 equity held in either GDF or with respect to hedge funds

6 alone in the Target Date Funds.  So they're not -- those

7 actual held investments are not alleged to be highly risky,

8 unlike the <u>Lumis</u> case on two critical points.

9          THE COURT:  All right.  Mr. Barton, I'll give you

10 the final word.

11          MR. BARTON:  Thank you.  Your Honor, the Ninth

12 Circuit expressly found that there was no violation of the

13 investment guidelines.  Investment guidelines are different

14 than the plan document.  They have not turned over the

15 investment guidelines.  We don't know whether they did or

16 didn't violate the investment guidelines because we haven't

17 gotten them.

18      The second thing -- so let me make that point.  And the

19 second thing, your Honor, with respect to the statute of

20 limitations, I would also urge you to read <u>Chow v. Cortier</u>

21 (phonetic), which we cite in our brief in terms of the

22 difference between actual knowledge and constructive --

23          MR. BUCKLEY:  I represent 20 individuals that have

24 been sued here.  They would be very upset with me as counsel

25 if I didn't point out that we have moved to dismiss the

1  members of the finance committee of the board for breaching

2  -- allegedly breaching a duty to monitor and all the members

3  of the committee on a co-fiduciary liability theory where

4  there are no specific facts alleged as to the conduct of

5  either or any of the members or either -- any of those three

6  committees, the administrative committee, the investment

7  policy committee, or the finance committee, and counsel in

8  their opposition didn't even bother to try to distinguish

9  the cases that we cited where conclusory allegations against

10  these types of fiduciaries for failure to monitor co-

11  fiduciary liability have been dismissed.

12      Thank you.

13          THE COURT:  All right.  Thank you very much for

14  your presentations.

15          MR. BARTON:  Thank you, your Honor.

16          THE COURT:  They're much appreciated, and for your

17  patience.  I will issue a written order detailing all the

18  different aspects of the motion to dismiss.  Thank you very

19  much.

20          MR. BUCKLEY:  Thank you.

21          MR. BARTON:  Your Honor, just one thing.  We also

22  had on schedule today a case management conference.

23          THE COURT:  I'm going to defer that conversation

24  until you have a ruling, and I promise if the case goes

25  forward that we'll have a further discussion about that.

64

1          MR. BARTON:  Thank you, your Honor.

2          THE COURT:  Thank you very much.

3          MR. BUCKLEY:  Thank you.

4      (Proceedings adjourned at 3:44 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65

CERTIFICATE OF TRANSCRIBER

1

2

3       I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9       I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16          Echo Reporting, Inc., Transcriber

17             Friday, August 12, 2016

18

19

20

21

22

23

24

25