UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER M. SULYMA, et al.,

        Plaintiffs,

       v.

INTEL CORPORATION INVESTMENT POLICY COMMITTEE, et al.,

        Defendants.

Case No. 15-cv-04977 NC

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 122

In this putative class action, former Intel employee Christopher Sulyma sues various fiduciaries of his Intel retirement accounts. While he worked for Intel, Sulyma participated in two retirement plans that invested in conventional investments, such as stocks and bonds, but also invested substantially in alternative investments, such as hedge funds and private equity. Sulyma sues plan fiduciaries for what he alleges were imprudent investments and inadequate disclosures.

Defendants move for summary judgment on all of Sulyma's claims, arguing that the claims are time-barred under the statute of limitations. The key issue is whether Sulyma had actual knowledge of the underlying facts constituting his claim within 3 years of filing his lawsuit. If Sulyma had such knowledge, under federal law his claims are time-barred. Because there is no genuine dispute of material fact that Sulyma had actual knowledge of

Case No. 15-cv-04977 NC

the facts comprising claims I and III, as well as knowledge of the disclosures he alleges were unlawfully inadequate in claims II and IV, the Court GRANTS defendants' motion for summary judgment on those claims, finding them time-barred.

Without live primary claims, the Court also GRANTS summary judgment on Sulyma's derivative duty to monitor and co-fiduciary liability claims (claims V and VI).

# I.   BACKGROUND

## A.   Procedural History

In this putative class action seeking relief under the Employee Retirement Income Security Act (ERISA), Sulyma seeks to represent two classes of plaintiffs: (1) participants in the 401(k) Plan and the Retirement Plan whose accounts were invested in the Target Date Fund 2045 (TDF);[1] and (2) participants in the 401(k) Plan and the Retirement Plan whose accounts were invested in the Global Diversified Fund (GDF).  Dkt. No. 93 at 4. Defendants include the members of the Investment Committee,[2] the Administrative Committee,[3] and the Finance Committee of the Intel Board of Directors,[4] as well as the committee entities.  Sulyma also names the Intel Corporation 401(k) Savings Plan and the Intel Retirement Contribution Plan as nominal defendants.  *Id*. at 15-16.

The gravamen of Sulyma's complaint is that the defendant fiduciaries of the Retirement Plan and 401(k) Plan imprudently over-allocated to hedge funds and private equity investments.  Dkt. No. 93 at 4.  Defendants allegedly breached their fiduciary duties by investing in such funds, which "presented unconventional, significant and undue risk of unduly high fees and costs."  *Id*.  These allocations "departed dramatically" from

---

[1] The complaint states that Sulyma's account in the 401(k) Plan was invested in the Intel Target Date 2045 "Fund," but states that the Intel Target Date accounts were actually "a suite of custom target date portfolios" and therefore uses the term Target Date Portfolios (or TDPs).  Dkt. No. 93 at 4, 5.  Because the Intel Target Date 2045 Fund is entitled Fund, not Portfolio, throughout the financial disclosures, the Court will use the term TDF instead of TDP.
[2] Christopher Geczy, Ravi Jacob, Nanci S. Palmintere, David S. Pottruck, Arvind Sodhani, and Richard Taylor. Dkt. No. 93 at 11-14.
[3] Terra Castaldi, Ronald D. Dickel, Tiffany Doon Silva, Tami Graham, Cary Klafter, and Stuart Odell. Dkt. No. 93 at 14-15.
[4] Charlene Barshefsky, Susan L. Decker, John J. Donahoe, Reed E. Hundt, James D. Plummer, and Frank D. Yeary. Dkt. No. 93 at 9-11.

United States District Court
Northern District of California

prevailing industry standards. *Id.* According to Sulyma, these investment decisions caused "massive losses and enormous excess fees" to the plans and their participants. *Id.*

Sulyma brings six claims: claims I and III allege the Investment Committee Defendants breached their fiduciary duties by over-allocating the assets of the 401(k) Plan and Retirement Plan to hedge fund, private equity, and other alternative investments. *Id.* at 64-66, 68-70. Claims II and IV allege the Administrative Committee Defendants breached their fiduciary duties by failing to disclose required information about the funds. Dkt. No. 93 at 67-68, 70-72. Claim V alleges that the Finance Committee Defendants breached their fiduciary duties by failing to monitor the Investment Committee and Administrative Committee. *Id.* at 72-73. Claim VI alleges that each defendant has derivative liability for the actions of the other defendants. *Id.* at 73-75.

Defendants move for summary judgment on all claims. Dkt. No. 122 at 7. According to defendants, Sulyma had actual knowledge of the facts constituting the alleged violations of ERISA more than three years before he sued, through "annual notices, quarterly Fund Fact Sheets, targeted emails, and two separate websites." *Id.* at 7-8. The Court held a hearing on defendants' motion on December 14, 2016. Dkt. No. 140. All parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). Dkt. Nos. 30, 50.

## B. Findings of Fact

Sulyma worked for Intel between 2010 and 2012, and participated in two ERISA-governed retirement plans. Dkt. No. 93 at 9. The first was the Intel Retirement Contribution Plan, where Sulyma's retirement assets were invested in the GDF. *Id.* The second was the Intel 401(k) Savings Plan, where Sulyma's retirement assets were invested in the TDF. *Id.*

According to Sulyma, while he worked at Intel, he had little experience with financial issues, and didn't know what "hedge funds," "alternative investments," and "private equity" were. Dkt. No. 134 at 13. While an Intel employee, as Intel's exhibits

demonstrate,[5] Sulyma had access to a number of financial documents pertaining to the GDF and TDF. Many of these documents, such as Fund Facts Sheets, Qualified Default Investment Alternatives Notices, and Summary Plan Descriptions, were made available by Fidelity Workplace Services LLC, "which is the service provider for . . . Intel Retirement Contribution Plan and Intel 401(k) Savings Plan." Dkt. No. 122-1 at 1-2 (Vogel Decl.). Fidelity made these documents available on the NetBenefits website. *Id.* at 2. Sulyma never saw the Fund Facts Sheets or Morningstar reports, and cannot recall receiving or review the Intel plans' Summary Plan Descriptions. Dkt. No. 134 at 13.[6] Sulyma acknowledged it was possible he accessed the NetBenefits website 68 times during his employment at Intel. Dkt. No. 135-3 (Sulyma Dep.) at 27. Sulyma asserts the financial documents Intel uses to attribute actual knowledge on his part were not easily accessible, and often misleading or inconsistent, though he admits he never looked at those documents to begin with. Dkt. No. 134 at 27 ("Mr. Sulyma repeatedly testified that he had not seen

---

[5] Sulyma argues Intel's Clickstream Activity Log, dkt. no. 125-3, is not admissible evidence that may be used on a motion for summary judgment because it is a "sham affidavit," hearsay, and does not comport with Federal Rule of Evidence 1006. Dkt. No. 134 at 43-44. The Court disagrees. Mr. Vogel did not testify at the October 6, 2016, deposition as a designee of Fidelity Workplace Services, so Sulyma's "sham affidavit" argument holds no water. Dkt. No. 133-3 at 4 (Vogel Dep.). Second, as to Sulyma's hearsay objection under Rule 803(6), the Court rejects this argument. Vogel's declaration regarding the Log provides that it "is a true and correct copy of a document generated from Fidelity's systems that shows the activity tracked on Fidelity's NetBenefits portal associated with Mr. Sulyma's account." Dkt. No. 122-1 at 3 (Vogel Decl.). Vogel attested that the exhibits, included the Log "were copies of records that were received or prepared by Fidelity and kept by Fidelity in the ordinary course of regularly conducted business." *Id.* Under *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, "'printouts prepared specifically for litigation from databases that were compiled in the ordinary course of business are admissible as business records to the same extent as if the printouts were, themselves, prepared in the ordinary course of business. The important issue is whether the database, not the printout from the database, was compiled in the ordinary course of business." 576 F.3d 1040, 1043-44 (9th Cir. 2009), (quoting B. Weinstein and M.A. Berger, Weinstein's Federal Evidence § 901.08[1] (2d. ed. 2006), citing *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) and *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994)). The Court finds Rule 1006 inapplicable, because the Log is a business record, and a piece of evidence in itself, not a summary within the meaning of that rule. *See Smith v. Alternative Res. Corp.*, 128 F. App'x. 614, 615 (9th Cir. 2005).

[6] *See* Dkt. Nos. 126 - 127-3 (Defs. Exs. 12-21; Morningstar's TDF Fund Fact Sheets), Dkt. Nos. 127-4 - 128-1 (Defs. Exs. 22-27; Morningstar's GDF Fund Fact Sheet), and Dkt. Nos. 123-3 - 124 (Defs. Exs. 3-5; 2010, 2011, and 2012 Summary Plan Descriptions).

the purported "disclosures" on Intel's website."). The documents Sulyma acknowledges receiving and reviewing are the Intel 401(k) and Intel Retirement Contribution Retirement Savings Statements, which "consistently advised him from 2010 to 2013 that he was invested in 'stock 63 percent, bonds 16%, short-term 21 percent.'" *Id*. at 14; *see* Dkt. Nos. 128-3 (Defs.' Ex. 29), 128-4 (Defs.' Ex. 30). The Savings Statements say nothing about investments in private equity or hedge funds.

## II.  LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Tolan*, 134 S. Ct. at 1863 (citing *Liberty Lobby*, 477 U.S. at 255).

## III.  DISCUSSION

The issues presented are (1) whether claims I-IV (primary breach of fiduciary duty claims) are time-barred; and (2) if so, whether Sulyma's derivative liability claims (V and

1  VI) are also time-barred.

2      **A.**    **Claims I and III Are Time-Barred.**

3        Claims I and III allege the Investment Committee Defendants breached their

4  fiduciary duties by over-allocating the assets of the 401(k) Plan and Retirement Plan to

5  hedge fund, private equity, and other "alternative investments."  Dkt. No. 93 at 64-66, 68-

6  70.

7      **1.  Standard For Fiduciary Duties and Statute of Limitations Under ERISA.**

8        The prudent man standard of care, 29 U.S.C. § 1104(a)(1) (ERISA § 404), provides

9  that the plan fiduciary must discharge his plan duties "solely in the interest of the

10  participants and beneficiaries" and:

           (A) for the exclusive purpose of:

11

12                    (i)      providing benefits to participants and their beneficiaries; and

13

14                    (ii)     defraying reasonable expenses of administering the plan;

15             (B)  with the care, skill, prudence, and diligence under

16                 the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

17                 matters would use in the conduct of an enterprise of a like character and with like aims[.]

18  ERISA's statute of limitations for breaches of fiduciary duties bars actions commenced

19  "after the earlier of" either 6 years after the act or omission constituting the breach, or 3

20  years "after the earliest date on which the plaintiff had actual knowledge of the breach."

21  29 U.S.C. § 1113 (ERISA § 413).  The three-year limitations period begins on "the date on

22  which the person bringing the suit acquires actual knowledge."  *Landwher v. DuPree*, 72

23  F.3d 726, 733 (9th Cir. 1996).  Constructive knowledge, or "knowledge of facts sufficient

24  to prompt an inquiry which would have uncovered the breach," does not suffice.  *Martin v.*

25  *Pac. Lumber Co*, 1993 WL 832744, at *2 (N.D. Cal. Jan. 15, 1993); *but see Brown v.*

26  *Owens Corning Inv. Review Comm*., 622 F.3d 564, 571 (6th Cir. 2010) (finding that where

27  participants were provided access to Summary Plan Descriptions, but there existed no

28  proof the plaintiffs "actually saw or read the documents that disclosed the allegedly

1    harmful investments," actual knowledge existed) (internal quotations marks omitted).

2          To apply the statute of limitations requiring "actual knowledge," the court "must

3    first isolate and define the underlying violation." *Ziegler v. Conn. Gen. Life Ins. Co.,* 916

4    F.2d 548, 550-51 (9th Cir. 1990).  Second, the Court must inquire when the plaintiff had

5    "actual knowledge" of the alleged breach or violation.  *Id.* at 552.  "This inquiry into

6    plaintiffs' actual knowledge is entirely factual, requiring examination of the record."  *Id.*

7    Therefore, as to claims I and III, the Court must look to the evidence presented to see if the

8    financial disclosures presented notice sufficient to "isolate and define the underlying

9    violation" and provide "actual knowledge" of the violation or breach.  *Id.* at 551-52 (citing

10   *Meagher v. International Ass'n of Machinists and Aerospace Workers Pension Plan*, 856

11   F.2d 1418, 1422 (9th Cir.1988).

12          **2.  Standard for Actual Knowledge of a Substantive Claim.**

13          For a substantive claim alleging imprudent investment under 29 U.S.C. § 1104, the

14   statute of limitations is triggered by the plaintiffs' "knowledge of the transaction that

15   constituted the alleged violation, not by their knowledge of the law."  *Blanton v. Anzalone*,

16   760 F.2d 989, 992 (9th Cir. 1985); *see In re Northrop*, 2015 WL 10433713, at *18 (C.D.

17   Cal. Nov. 24, 2015) (a plaintiff must "have 'knowledge of the facts or transaction that

18   constituted the alleged violation; it is not necessary that the plaintiff also have actual

19   knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger

20   the running of the statute.'") (quoting *Browning v. Tigers Eye Benefits Consulting*, 313

21   Fed. App'x 656, 660 (4th Cir. Feb. 26, 2009)); *see also Meagher*, 856 F.2d at 1423 ("Each

22   time Meagher received a check, he had knowledge of the transaction, though he may not

23   have known at the time that the reduction in benefits was unlawful under ERISA[,]" citing

24   *Blanton* ) *and Lee v. United States*, 809 F.2d 1406, 1410 (9th Cir. 1987) ("A claim accrues

25   as soon as a potential claimant either is aware or should be aware of the existence of and

26   source of his injury, not when he knows or should know that the injury constitutes a legal

27   wrong.  A different rule would require insufficient diligence on the part of potential

28

United States District Court
Northern District of California

claimants," citing *Blanton*).[7]

Sulyma argues for a more permissive rule, piggybacking off of a statement in *Ziegler*: "an ERISA plaintiff's cause of action cannot accrue and the statute of limitations cannot begin to run until the plaintiff has actual knowledge of the breach, regardless of when the breach actually occurred." 916 F.2d at 552. This statement, and the holding in *Waller v. Blue Cross of California*, 32 F.3d 1337, 1341 (9th Cir. 1994) ("The disclosure of a transaction that is not inherently a statutory breach of fiduciary duty . . . cannot communicate the existence of an underlying breach"), gave rise to *Spragg v. Pac. Telesis Grp.* 168 F.3d 501 (9th Cir. 1999). To understand this Court's disagreement with *Spragg*, an unpublished opinion, requires analyzing *Waller*.

In *Waller*, the plaintiffs alleged defendants breached fiduciary duties by "employing an infirm bidding process" aimed at selecting annuity providers enabling the defendants to obtain a maximum reversion. 32 F.3d at 1339. The Ninth Circuit held, *for purposes of a motion to dismiss*, that the three-year limitations period did not run from the date when the plaintiffs purchased the annuities because plaintiffs' theory of breach was that fiduciaries unlawfully employed an infirm bidding process to acquire the annuities. *Id*. at 1341 (accepting plaintiffs lacked "actual knowledge . . . until the publicized account of ELIC's financial difficulties and its ultimate insolvency and the subsequent investigation by counsel for plaintiffs . . . ." (internal citations omitted)) (italics added). Sulyma and *Spragg* cite the court's "*cf.*" citation in *Waller* to *Fink v. National Sav. and Trust Co*., 772 F.2d 951, 957 (D.C. Cir. 1985), that "[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty . . . cannot communicate the existence of an underlying

---

[7] "[T]here is a split of authority regarding the 'actual knowledge' requirement of § 1113." *In re Northrop*, 2015 WL 10433713, at *18. *Browning* discussed the Sixth, Seventh, Ninth, and Eleventh Circuit's standard for actual knowledge, citing *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003), *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992), *Blanton*, 760 F.2d at 992, and *Brock v. Nellis*, 809 F.2d 753, 755 (11th Cir. 1987)), and contrasted it with "[t]he Third and Fifth Circuits' narrow interpretation of actual knowledge in section 413 'requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA.'" [citations omitted]. 313 Fed. App'x at 660.

breach." *Id.*; *Spragg*, 168 F.3d 501.  A "*cf.*" citation means that the cited authority

supports a proposition different from the main proposition, but that is sufficiently

analogous to lend support.  THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION 58 (20th

ed. 2015).  Such reasoning by analogy does not change the rule in *Blanton* that actual

knowledge exists when a plaintiff knows of the transaction constituting the alleged

violation.  760 F.2d at 992.  Thus, the Court joins *In re Northrop* in rejecting this

extension.[8]  2015 WL 10433713, at *20 n.140.

      The Court also rejects Sulyma's argument that it should adopt a "willful blindness"

standard for actual knowledge.  Dkt. No. 134 at 12.  The cases cited by Sulyma are

unpersuasive and do not address ERISA.  *See e.g.*, *Glob.-Tech Appliances, Inc. v. SEB*

*S.A.*, 563 U.S. 754, 768 (2011) (addressing patent infringement).  As Sulyma stated: "the

Ninth Circuit has never adopted willful blindness as a substitute for actual knowledge

under ERISA", dkt. no. 134 at 28; this Court will not be the first to do so.

      Sulyma also argues actual knowledge requires him to know "all material facts

necessary to understand that some claim exists," which could require "opinions of

experts."  Dkt. No. 134 at 30. (citing *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 679 (7th

Cir. 2014)).  But his reliance on that sentence in *Fish* is misplaced because the court was

discussing standards for "actual knowledge" different than that adopted by the Ninth

Circuit.  749 F.3d at 679 (citing, but not adopting the Fifth Circuit's language in *Maher*, 68

F.3d at 954 and *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001)); *see also In re*

*Northrop*, 2015 WL 10433713, at *18-*19 (discussing circuit split).  The Ninth Circuit's

standard is expressed in *Blanton*.  760 F.2d at 992.

### 3.  Standard for Actual Knowledge of a Process-Based Claim.

      The second type of claim under the prudent investor rule is a process-based claim,

---

[8] The Court notes Sulyma argues other circuits interpret *Waller* to be more far-reaching
than its language and procedural posture suggest.  Dkt. No. 134 at 24 n.8; *see Wright v.
Heyne*, 349 F.3d 321, 329 (6th Cir. 2003), *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856,
859 (8th Cir. 1999), *Maher v. Strachan Shipping Co.*, 68 F.3d 951, 955 (5th Cir. 1995) (but
noting *Waller*'s procedural posture as on a motion to dismiss).  The Court declines to also
extend *Waller*.

United States District Court
Northern District of California

in which a plaintiff alleges some infirmity or self-dealing in the defendant's investment decision-making process. "When beneficiaries claim 'the fiduciary made an *imprudent* investment, actual knowledge of the breach [will] usually require some knowledge of how the fiduciary selected the investment.'" *Tibble v. Edison Int'l*, 729 F.3d 1110, 1120-21 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015) (quoting *Brown v. Am. Life Holdings, Inc.,* 190 F.3d 856, 859 (8th Cir. 1999)) (emphasis in original); *see also Fish*, 749 F.3d at 681 ("to trigger the 'actual knowledge' statute of limitations clock under § 1113(2) for a process-based claim, the plaintiffs 'must have been aware of the process utilized by [the fiduciary] in order to have had actual knowledge of the resulting breach of fiduciary duty.'" (quoting *Maher*, 68 F.3d at 956)).

Notably, in *Tibble*, the Ninth Circuit found that financial disclosure documents, including Summary Plan Descriptions and prospectuses notifying participants about the nature of plan investment menu fell "short of providing 'actual knowledge of the breach or violation'" where the claims hinged on "infirmities" in the investment selection process. 729 F.3d at 1121 (internal citation omitted). In addition, upon review of the Ninth Circuit's decision, the Supreme Court found that an ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 135 S. Ct. at 1828.

### 4.  What Is Sulyma's Alleged "Underlying Violation"?

Step one is to "first isolate and define the underlying violation." *Ziegler,* 916 F.2d at 550-51. Claims I and III allege violations of 29 U.S.C. § 1104(a)(1)(A)-(B) by the Investment Committee Defendants managing the TDF and GDF. *See* Dkt. No. 93 at 64-66, 68-70. The imprudence allegations rest on two pieces of information: (1) the decision to invest in alternative investment options; and (2) to do so at a level between 25 and 40% of the assets. Sulyma argues his claims include process-based claims, and he lacked actual knowledge of his claims. Dkt. No. 134 at 11. Sulyma alleges defendants breached their fiduciary duties by investing a significant portion of assets in hedge funds and private

equity, "which presented unconventional, significant and undue risks and unduly high fees and costs," and by "adopting asset allocation models and asset allocations for participant accounts that departed dramatically from" industry standards.  Dkt. No. 93 at 4.

### 5. The Financial Documents Available to Sulyma Gave Actual Knowledge of the Alleged Violations, Whether Substantive or Procedural.

#### a.   Any Substantive Claim for Breach of Fiduciary Duty is Time-Barred.

First, insofar as Sulyma brings a substantive claim, his claims are time-barred. Sulyma disputes he received sufficient notice to provide him with actual knowledge of the alleged fiduciary breaches.  *Blanton* provides that the ERISA "statute of limitations is triggered by [plaintiffs'] knowledge of the transaction that constituted the alleged violation, not by their knowledge of the law."  760 F.2d at 991-92.[9]  Here, the Court finds that Sulyma had actual knowledge of the facts underlying his substantive claims because the financial disclosures provided information about plan asset allocation and an overview of the logic behind investment strategy.  *See* Dkt. No. 122 at 23-25.

The 2011 Qualified Default Investment Alternatives Notice, 2012 Summary Plan Description, 2012 Annual Disclosures, and targeted emails notified Sulyma of the challenged investment allocations.  *Id.* at 25-27.  Taking into consideration the parties' arguments at the December 14, 2016, hearing, and after review of these documents, the Court agrees these documents provided Sulyma notice of how his investments were allocated.

Though he does not recall reviewing the Summary Plan Descriptions, each year Sulyma was a plan participant, a Summary Plan Description was made available on the NetBenefits website describing the assets held by the two funds in which he invested, the

---

[9] As discussed above, *In re Northrop* recently addressed tension between *Waller* and *Blanton* in defining the standard for actual knowledge under § 1313, finding "*Blanton* more likely expresses the current rule in the Ninth Circuit."  2015 WL 10433713, at *20 n. 140.  In so finding, the court considered  that "[w]hen other appellate courts have discussed the circuit split that exists regarding the actual knowledge standard, they have consistently cited *Blanton*, not *Waller*, as evidence of the Ninth Circuit's standard."  *Id.* (internal citations and quotations omitted).

United States District Court
Northern District of California

GDF and TDF.  Dkt. Nos. 122-1 at 2 (Vogel Decl.), 123-3 (2010 Summary Plan Description), 123-4 (2011 Summary Plan Description), 124 (2012 Summary Plan Description).  Sulyma does not deny he received the Plan Descriptions.  Dkt. No. 135-3 at 68-70 (Sulyma Dep.).  Regarding Sulyma's holdings in the TDF, for example, the 2012 Summary Plan Description advised Sulyma that "[e]ach fund offers a broadly diversified mix of domestic and international stocks and bonds, and includes investments not typically available to individual investors, such as hedge funds and commodities." Dkt. No. 124 at 12.  As to the GDF, the same Plan Description advised Sulyma that the asset mix of the GDF included "domestic and international equity, global bond and short-term investments, hedge funds, private equity, and real assets (e.g. commodities, real estate & natural resource-focused private equity)." *Id*.  Thus, the Summary Plan Descriptions informed plan participants that the TDF and GDF contained the alternative investments he now alleges were imprudent.

Furthermore, the Summary Plan Descriptions directed Sulyma to review the additional fund information available in the Fund Fact Sheets such as those referenced in the complaint:

> You should review the fund prospectus and/or fund fact sheet available for each of the funds in which you are interested. Those documents provide information about the Fund's investment strategy, expenses, and operation (including any trade limitations)
>
> To view the available funds, most recent fund performance, or the Morningstar quarterly fund fact sheets for the Target Date and Core Funds, visit Fidelity's NetBenefits website or call the Fidelity Service Center.

*Id*. at 11-12.  Fund Facts Sheets available to Sulyma on the NetBenefits website disclosed the amount in which the TDF and GDF were invested in hedge funds or private equity in narrative and graphic formats, and explanations for the inclusion of those alternative investments.  Dkt. No. 122 at 25.  Fund Fact Sheets for the GDF and TDF were available to Sulyma throughout the time he participated in the Plans.  Dkt. Nos. 122-1 at 2 (Vogel Decl.).

For example, the "Investment Overview" section of the GDF Fact Sheet dated June 30, 2012, described the same asset allocation Sulyma asserts was imprudently excessive in the complaint.  Dkt. No. 93 at 35, 65, 69 (allegations of over-allocation); Dkt. No. 128-1 at 4 (Defs. Ex. 4).  It states that the GDF "invests globally to both traditional and alternative asset classes," with a "current target asset allocation" of "35% Global Equity (Long-only), 25% Hedge Funds, 25% Global Fixed Income (Bonds), 10% Real Assets (e.g. Commodities, Real Estate and Natural Resource-focused Private Equity), and 5% Private Equity."  *Id*.  This same allocation was called out through graphs and tables.  *Id.* (graph displaying historical allocation).

The TDF Fact Sheet dated June 30, 2012, provides similar disclosures, that the target asset allocation was 10% global bond funds and short-term investments, 60% domestic and international equity funds, 25% hedge funds, and 5% commodities.  Dkt. No. 127-3 at 3 (Defs. Ex. 21).  Over time, the fund would shift to a more conservative asset mix by incrementally decreasing its equity allocation and increasing its bond allocation, while maintaining a fixed allocation to hedge funds.  *Compare id. with* Dkt. No. 93 at 35, 65, 69 (allegations of over-allocation).

These June 2012 Fund Fact Sheets demonstrate Sulyma had actual knowledge of the elements of his imprudence claims more than three years before he filed suit regarding the allocations.  *Compare* Dkt. No. 128-1 at 2 (Defs. Ex. 27) (showing 35.36% allocation to alternative investments), *with* Dkt. No. 93 at 69 (alleging alternative investment allocation ranging up to 36.71%); *compare also* Dkt. No. 127-3 at 3 (showing 25% allocation to hedge funds and 5% to commodities, and showing international and domestic equities as 60%), *with* Dkt. No. 93 at 65 ("The Investment Committee Defendants breached those duties by adopting an asset allocation model such that the Intel TD[F]s were and are comprised of approximately 20-25% Hedge Funds, 4-5% commodities, and where international equities account for over 50% of equity holdings.").

The Fund Fact Sheets explained both the strategy behind the inclusion of alternative investments and the potential impact of that strategy on performance. They discussed that

costs would increase as a result.  Regarding strategy, the Fund Fact Sheets explained that "[t]he objective of these alternative assets is to provide exposure to investments which have a low (or negative) correlation to the broad equity and fixed income markets, providing further diversification to the Fund."  Dkt. No. 128-1 at 4 (Defs. Ex. 27).  This increased diversification was intended to "dampen the impact any one investment category has on the total performance," so as to reduce volatility:

> The Investment Policy Committee believes that the new asset allocation of the Global Diversified Fund provides an improved balance between risk and reward through enhanced diversification.  Relative to a portfolio of U.S. equities, the Fund's asset allocation is expected to result in lower volatility for participants as well as higher relative performance in certain economic scenarios.  Finally, the portfolio is designed to mitigate the risk of dramatic declines resulting from U.S. equity market volatility, thus providing better protection for participants.

*Id.* (regarding the GDF); *see also* Dkt. No. 127-3 at 2 (Defs. Ex. 21) (regarding the TDF). The Fund Fact Sheet stated, "[t]he fund's steadier performance does come with a price":

> For starters, the fund's reduced market exposure is bound to serve as a drag when markets are experiencing rapid run-ups. Additionally, the fund's cost is higher than it used to be due to the fact that it invests less in passively run index funds and now devotes more to higher-cost actively run strategies. On balance, however, the improved diversification and opportunity set that these strategies offer are apt to outweigh their potential cost drag, awarding investors a more efficiently designed portfolio and help[ing] them experience a smoother ride.

Dkt. No. 128-1 at 2; *see also* Dkt. No. 127-3 at 3 (same).  Statements such of these explain the higher costs and fees associated with the funds.

Sulyma points to inconsistencies between the documents made available to him, specifically the Retirement Savings Statements, as compared to the Fund Facts Sheets. Dkt. Nos. 135-10 - 135-19 (Pls. Exs. J-S).  For example, the pie chart in the April 1, 2012 - June 30, 2012, statement entitled "Your Asset Allocation" specified Sulyma was invested in 58% stocks, 20% bonds, and 22% short-term. Dkt. No. 135-18 at 3 (Pls. Ex. R).  Yet the Fund Fact Sheet for the GDF as of June 30, 2012, stated that the fund was "comprised of 35% Global Equity (Long-only), 25% Hedge Funds; 25% Global Fixed Income

(Bonds), 10% Real Assets (e.g., Commodities, Real Estate and Naural Resource-focused Private Equity), and 5% Private Equity." Dkt. No. 128-1 at 4 (Defs. Ex. 27). The TDF Fund Fact Sheet for the same period similarly did not match up with the Retirement Savings Statement. Dkt. No. 127-3 (Defs. Ex. 21) (providing an allocation of 23% domestic stock, 36% international stock, 26% hedge funds, 10% global bond, and 5% commodities). In addition, as discussed above, the Qualified Default Investment Alternatives Notice and 2012 Summary Plan Description likewise would have clarified to Sulyma what exactly his funds were invested in. Sulyma extensively argued this issue at the December 14, 2016, hearing, and the Court notes the inconsistency in the statements.

Defendants recognized the statements did not disclose the allocation of Sulyma's investments "well," but that the Court should still find Sulyma had "actual knowledge" of the asset allocation under a "totality of the information" theory, taking into account the disclosures on the 12 Fund Facts Sheets. Dkt. No. 143 at 27 (Hearing Transcript). The Savings Statements repeatedly made reference to the NetBenefits website where the Fund Facts Sheets were located, and repeatedly referred the reader to access the website. *See e.g.*, Dkt. No. 135-18 at 2, 4, 6. The Court does find persuasive the argument that most of the information made available regarding the TDF and GDF did disclose the investment in alternative investments, as well as the point that it was the Fund Facts Sheet, not the statements that provided information regarding the investment strategy. Lastly, Sulyma admitted he never looked at the documents made available to him on the NetBenefits website. Though inconsistencies existed in the documents made available to Sulyma, most of those documents reflected the high percentage of investments in hedge funds, private equity, and commodities.

The central issue here is not whether Sulyma knew he might have a legal claim against defendants regarding how his investments were allocated; rather, the issue is whether disclosures were made available to him in such a way that he knew the underlying facts constituting the transaction that formed the basis of his complaint. *Blanton*, 760 F.2d at 992. The latter is "actual knowledge," and there is no genuine dispute of fact as to

1    whether he had such knowledge.  Even making all inferences in Sulyma's favor that he

2    only ever reviewed the statements, those statements repeatedly directed him to the

3    NetBenefits website.  It would be improper to allow Sulyma's claims to survive merely

4    because he did not look further into the disclosures made to him.  Thus, Sulyma has not

5    raised a genuine dispute as to any material fact regarding his "actual knowledge" of the

6    alleged violations, when considering the disclosures that defendants have now shown were

7    made to him. Fed. R. Civ. P. 56(a).

8             **b.     Any Process Claim for Breach of Fiduciary Duty is Time-Barred.**

9             Second, Sulyma provided no facts to support a process claim.  Sulyma offers *Tibble*

10   as support for his assertion that the statute of limitations was not started in 2012 because

11   "the occurrence of a breach does not necessarily coincide with actual knowledge of the

12   breach."  Dkt. No. 134 at 24 (citing 729 F.3d at 1121).  As noted above, to find actual

13   knowledge that a fiduciary imprudently invested funds, such a finding will "usually require

14   some knowledge of how the fiduciary selected the investment."  729 F.3d at 1121.

15            *Tibble* is distinguishable.  In *Tibble*, the "crux of beneficiaries' successful theory of

16   liability at trial was that alternatives to retail shares had not been investigated—not simply

17   that their inclusion had been imprudent."  *Id*. at 1120.  The plaintiffs sued for prohibited

18   transactions and an imprudent investment claim based on the defendant's over-reliance on

19   an outside consultant, which violated its fiduciary obligation to only reasonably rely upon

20   consultant advice. *Id.* at 1138.  *Tibble*'s allegations that the defendant imprudently relied

21   on an outside consultant showed an infirmity in the process.  Further, the *Tibble* plaintiffs

22   objected to an inclusion of certain mutual funds, claiming their "inclusion had been

23   imprudent, and that the practice of revenue sharing had violated both the Plan document

24   and a conflict-of-interest provision."  *Id*. at 1118.

25            Here, the complaint contains only conclusory statements about process that do not

26   allege problems with *how* Defendants made the decision to invest in alternative

27   investments.  *See e.g.*, Dkt. No. 93 at 66 ("On information and belief, including based on

28   the statements of Stuart Odell, the Investment Committee Defendants did not understand

Case No. 15-cv-04977 NC                    16

United States District Court
Northern District of California

United States District Court
Northern District of California

1   and failed to give appropriate consideration to [the well-known risks associated with

2   investment in alternative investments like hedge funds, private equity, and commodities],

3   or disregarded such risks, when they selected and maintained the asset allocation for the

4   Intel TD[F]s.").  Sulyma completed discovery on the statute of limitations issue, *see* dkt.

5   no. 117, and at summary judgment has not presented *any* evidence suggesting *any*

6   infirmity in the process used to select the investments, and the extent to which the plans'

7   funds were invested in such investments.  *Galen*, 477 F.3d at 658; *see also Pension Ben.*

8   *Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv.*

9   *Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (allowing a claim lacking proof of well-pled

10  factual allegations survive for purposes of a motion to dismiss).

11          As to Sulyma's discussion of the high fees participants paid for their investments,

12  the Court notes that Sulyma made no allegations as to these fees violating any duty in the

13  complaint's discussion of claims I and III.  There is no explanation as to how these data

14  points contribute to Sulyma's allegations that defendants breached their fiduciary duties by

15  selecting hedge funds and other alternative investments, and by selecting those investments

16  as such a high percentage of the TDF and GDF.  Sulyma's authorities that purport to

17  support the inclusion of such allegations in this case are from the Second Circuit, which

18  uses a different standard of "actual knowledge," and arise from a different procedural

19  posture.  *See e.g.*, *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 420

20  (S.D.N.Y. 2008), *aff'd*, 325 F. App'x. 31 (2d Cir. 2009) (motion to dismiss), *Moreno v.*

21  *Deutsche Bank Americas Holding Corp.*, No. 15-cv-9936 LGS, 2016 WL 5957307, at *4

22  (S.D.N.Y. Oct. 13, 2016) (same).

23          The complaint does not contain the process-based allegations the *Tibble* court found

24  sufficient to prevent the claims being time-barred.[10]  *Tibble* also pointed to *Waller*.  32

25  F.3d 1337.  As discussed above, in *Waller*, the Ninth Circuit, in a motion to dismiss held

26

27  [10] Insofar as Sulyma attempts to graft the Supreme Court's reasoning regarding ERISA §
    413(1)'s statute of limitations onto § 413(2), dkt. no. 134 at 22, the Court rejects such an

28  invitation.  *Tibble*, 729 F.3d at 1119 (refusing to "equitably engraft" the continuing
    violation theory onto § 413(2)).

the three-year limitations period did not run from the date when the plaintiffs purchased annuities because their theory of breach was that the fiduciaries unlawfully employed an infirm bidding process to acquire them. *Id.* at 1341. In *Tibble* and *Waller*, there were more elements to the plaintiffs' underlying claims because the plaintiffs alleged either a specifically flawed or fraudulent process. Here, claims I and III allege the Investment Committee "did not understand and failed to give appropriate consideration to [the risks of hedge funds and private equity]." Dkt. No. 93 at 66, 69. Unlike in *Waller*, Sulyma does not allege an infirm bidding process or self-dealing. 32 F.3d at 1341. Unlike in *Tibble*, he does not allege specific infirmities such as overreliance on outside consultants. 711 F.3d at 1070. The financial disclosures available to Sulyma in 2012 provided the information he needed to allege his current claims.

Thus, the elements of claims I and III—the inclusion of alternative investments, their percentage allocations, the potential resulting "drag" on performance during "rapid run-ups," and the expected increase in costs—were disclosed to Sulyma more than three years before he sued. *See* Dkt. No. 122-1 at 2 (Vogel Decl.) (stating Fund Fact Sheets and other financial disclosures were available to plan participants on NetBenefits). The financial disclosures provided Sulyma notice of the elements of the "underlying violation" he alleges: (1) investing in hedge funds and private equity in (2) too high an allocation of the assets. *Ziegler*, 916 F.2d 550-51. Claims I and III are time-barred.

### B.    Claims II and IV Are Time-Barred.

Claims II and IV allege the Administrative Committee Defendants breached their fiduciary duties by failing to disclose detailed information about the hedge funds and private equity investments held by the GDF and TDF. Dkt. No. 93 at 67-68, 71-72.

The court "must first isolate and define the underlying violation." *Ziegler,* 916 F.2d at 550-51. Claims II and IV allege violations of 29 U.S.C. § 1104(a)(1)(A)-(B) and 29 C.F.R. § 2550.404a-5 for failure to ensure plan participants were informed of their "rights and responsibilities" regarding the investment of their assets, and were "provided sufficient information regarding the plan, including fees and expenses, and regarding designated

investment alternatives, including fees and expenses thereto, to make informed decisions" regarding account management.  Dkt. No. 93 at 67-68 (citing 29 C.F.R. § 2550-404a-5(a)).

In his opposition brief, Sulyma failed to defend his 29 C.F.R. § 2550.404a-5 argument after defendants' motion,[11] *see* Dkt. No. 134 at 38-41, and instead concentrated on asserting these claims under 29 U.S.C. § 1104(a)(1)(A)-(B).  Defendants argue that under § 1104, Sulyma had actual knowledge of the facts constituting the claimed violations more than three years before he filed suit.  Dkt. No. 122 at 30.

Sulyma received Annual Disclosures in July 2012, for his 401(k) and Retirement Plan.  Dkt. Nos. 124-1 through 125-1 (Defs. Exs. 6-8); *see* Dkt. Nos. 129-9, 129-10 (Defs. Exs. 44-45) (July 14, 2012, and August 30, 2012 emails to Sulyma providing links to these disclosures).  These disclosures provided information on the performance, fees, and expenses associated with the various investment options available for each of the Plans, including the TDF and GDF, *see* dkt. nos. 125 at 7; 125-1 at 7, but no disclosures regarding the individual investments held.  Defendants argue that even if these disclosures were inadequate, under *Blanton*, Sulyma should be charged with actual knowledge of their inadequacy starting in the summer of 2012, because he need not have known the disclosures' legal import.  Dkt. No. 122 at 30.

The Court finds these claims time-barred because the disclosures gave Sulyma "actual knowledge" of the transactions constituting the alleged violations, and the disclosures were made more than three years before Sulyma sued.  *Blanton*, 760 F.3d at 992; *see also In re Northrop*, 2015 WL 10433713, at *23 (finding claims for excessive fees time-barred because the plaintiffs knew the fees via financial disclosures three years prior to filing suit).  Sulyma's ignorance of the law is immaterial.  *Blanton*, 760 F.3d at 992.  Furthermore, though a "fiduciary has an obligation to convey complete and accurate

---

[11] In defendants' motion papers, they cite to arguments made in the motion to dismiss, dkt. no. 103, regarding the inapplicability of 20 C.F.R. § 2550.404a-5 to this case.  Dkt. No. 122 at 30.  Based on its review of that regulation, the Court finds that because the TDF and GDF are not "designated investment alternatives," that regulation does not apply to this case.  *See* 20 C.F.R. § 2550.404a-5(h)(4).

United States District Court
Northern District of California

1    information material to the beneficiary's circumstance, even when a beneficiary has not

2    specifically asked for the information[,]" a plaintiff must still complain of incomplete or

3    inaccurate information within the limitations period." *See Barker v. Am. Mobil Power*

4    *Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995), *as amended* (Nov. 15, 1995).

5            Claims II and IV allege inadequate disclosure, similar to Sulyma's untimely

6    imprudent allocation claims. Dkt. No. 93 at 67. Because the Court has found that Sulyma

7    had actual knowledge of the elements of his imprudent allocation claims in 2012,

8    inadequate disclosure claims tied to when he had sufficient information to bring the

9    imprudent allocation claims are similarly time-barred.

10           Sulyma argues that even if defendants' disclosures were sufficient, defendants

11   violated their duties by not complying in their fiduciary obligations when Sulyma

12   requested disclosures in January, 2015. Dkt. No. 134 at 40. This is the first time Sulyma

13   has raised this issue in this case. The Court will not consider it for the first time on

14   summary judgment. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir.

15   2008) (refusing to hear a new claim on a summary judgment motion where the complaint

16   lacked the necessary factual allegations). The elements of claims II and IV were known to

17   Sulyma in 2012 when the financial disclosures he alleges were inadequate were already

18   available to him.

19       **C.    Claims V and VI Are Time-Barred.**

20           Claim V alleges the Finance Committee Defendants failed to monitor the

21   Investment Committee Defendants and the Administrative Committee Defendants. Dkt.

22   No. 93 at 72. Claim VI alleges co-fiduciary liability for all defendants for the breaches of

23   all other defendants. *Id*. at 73-75. Defendants seek summary judgment on both of these

24   claims because the claims "fail" due to the "primary breach" claims (I-IV) being time-

25   barred. Dkt. No. 122 at 31. Sulyma argues that even if the primary claims are time-barred,

26   that does not mean the fiduciaries did not breach their duties. Dkt. No. 134 at 41.

27           Co-fiduciary liability can only attach to live primary liability. *In re McKesson*

28   *HBOC, Inc. ERISA Litig.*, No. 00-cv-20030 RMW, 2002 WL 31431588, at *17 (N.D. Cal.

Sept. 30, 2002) (dismissing claim for co-fiduciary liability under ERISA § 405 because the court has dismissed with leave to amend the other two other claims for relief, upon which the co-fiduciary claim depends").  Sulyma alleges "no supporting factual allegations of any kind" as to claims V and VI, dkt. no. 137 at 26, and rests on bald assertions and a recitation of legal elements.  Furthermore, Sulyma failed to uncover any facts in discovery suggesting a failure to monitor by the Finance Committee Defendants, or grounds for imposing co-fiduciary liability.

As to Sulyma's argument that claims V and VI did not accrue until 2015, the Court finds this argument unpersuasive, first, because none of the cases cited for this proposition are from within this circuit, and second, because those cases are factually distinguishable from the allegations presented in this case.[12]

## IV.  CONCLUSION

Because Sulyma had actual knowledge of the elements of claims I and III more than three years before filing this case, as well as knowledge of the disclosures he alleges were unlawfully inadequate in claims II and IV, his primary claims are time barred.  Thus, the Court GRANTS summary judgment as to claims I-IV.  Without live primary claims, the Court also GRANTS summary judgment on Sulyma's derivative claims (claims V-VI).

The Court will enter judgment for defendants and terminate this case.


**IT IS SO ORDERED.**


Dated:  March 31, 2017                          _____
                                                NATHANAEL M. COUSINS
                                                United States Magistrate Judge

---

[12] *See Brown v. Owens Corning Inv. Review Comm*., 622 F.3d 564, 576 (6th Cir. 2010) (alleging a breach of fiduciary duty where a fiduciary failed to sue another fiduciary on a motion to dismiss), *Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 971 (E.D. Mo. 2010) (same), *Martin v. Consultants & Administrators, Inc*., 966 F.2d 1078, 1089 (7th Cir. 1992) (alleging a breach of fiduciary duty where fiduciaries failed to sue former fiduciaries).

United States District Court
Northern District of California